**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

<table>
<tr>
<td>

**L'Association des Américains Accidentels**
Rue Alexandre Dumas 34
Le Vésinet, France

**Fabien Lehagre**
Rue Alexandre Dumas 34
Le Vésinet, France

**Miriam Therese Kupper**
Rue du Puits 201
Tournai, Belgium

**Aline Coscarat**
1 Avenue d'Ilbaritz
RESIDENCE ILBARITZ DIANE 51
Bayonne, France

**Paula Calvo Suarez**
Nefelejcs Utca 47
Budapest, Hungary

**Epifanio Antonio Migliozzi**
Via Barattino 19
Molinella, Italy

**Robyn Smoor**
Douwes Dekkerstraat 135
Voorburg, Netherlands

**Stephen Serra**
c/o Rue Alexandre Dumas 34
Le Vésinet, France

**Kevin Purnelle**
Paskomliget utca 58, 9 – 54
Budapest, Hungary

**Stephanie Moses**
Bermuda Avenue 35
Deception Bay, Australia

</td>
<td>

Case No. _____

</td>
</tr>
</table>

**Tim O'Donnell**
Siward Road 8
London, United Kingdom

**Steven Van Laeken**
Torenstraat 11/2
Zandhoven, Belgium

**Ali Khanchoul**
Avenue des Champs 20
Ris Orangis, France

**Sara Chouchane**
2 place des bains péré,
Tarbes, France

**Ronald Walther**
Schaerenhof 40
Dortmund, Germany

**Justin Sim**
James Road 8
Kardinya, Australia

**Roberto Costantino Ettore Silvis**
Via Malipiero 16
Latina, Italy

**Arangagu Staack Delgado**
Calle Teniente Coronel Noreňa 4
Madrid, Spain

**Kim Margaret Hall**
Old Forge Pound Lane
Ringwood, United Kingdom

**Deborah Jane Marner**
Meadow View, Kirkham Road
Essex, United Kingdom

**Julie Hocquet**
Rue des Romains 3b
Helmsange, Luxembourg
                              *Plaintiffs*,

v.

**U.S. Department of State**
The Executive Office,
Office of the Legal Adviser
Suite 5.600, 600
19th Street NW.
Washington DC 20522


**Mike Pompeo**
In his official capacity as Secretary of State
c/o Civil Process Clerk,
United States Attorney's Office
555 4th Street NW
Washington, D.C. 20530

**Carl C. Risch**
In his official capacity as Assistant Secretary of State
for Consular Affairs
c/o Civil Process Clerk,
United States Attorney's Office
555 4th Street NW
Washington, D.C. 20530


*Defendants.*


**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## PRELIMINARY STATEMENT

1.          Voluntary expatriation, the ability to renounce one's nationality[1], is a fundamental right, upon which, arguably, all other civil rights ultimately depend.  In the words of Thomas Jefferson, expatriation is a "natural right which all men have." A Bill Declaring Who Shall Be Deemed Citizens of This Commonwealth, June 18, 1779.

*See* https://founders.archives.gov/documents/Jefferson/01-02-02-0132-0004-0055.

2.          Unlike Jefferson, however, Defendants have failed to understand or comprehend the significance or scope of this fundamental right. This is apparent from Defendants' decision to place severe limitations on the right to voluntarily expatriate, essentially forcing U.S. citizens to remain U.S. citizens against their will. These limitations lie at the center of this lawsuit.

3.          This Complaint challenges Defendants' decision to create and then subsequently increase the fee for voluntary expatriation of United States citizens. Prior to 2010, exercising the right of expatriation was free of charge. In March 2010, Defendants, for the first time in American history, placed a $450 price tag as a precondition to exercise this fundamental right.

4.          Approximately five years later, in 2015, Defendants increased the $450 fee fivefold to $2,350, making it the most expensive charge for voluntary expatriation anywhere in the world (we will refer to the fee in the Complaint as the "Renunciation Fee")[2].

5.          As a result, many "Accidental American"[3] citizens, like Plaintiffs here, are being effectively denied their fundamental right to expatriate and are being forced to associate with the Republic against their will. As such, Defendants' actions are reminiscent of the feudal system in

---

[1] This Complaint uses the term "nationality" and "citizenship" interchangeably.
[2] This Complaint challenges both the $450 and $2,350 fee as being unconstitutional.
[3] For a discussion about this term, see below, ¶¶124-130.

1

which perpetual allegiance was born out of and for which this Country fought to change and revolutionize.

6.      As one authority correctly points out, "[t]o date, no prospective renunciant has yet challenged the U.S. Department of State in its attempt to impose this fee as a condition to expatriation. Such a challenge would be appropriate." Allison Christians, *A Global Perspective on Citizenship-Based Taxation*, 38 MICH. J. INT'L L. 193, 241 (2017). Plaintiffs here are doing just that.

7.      Renunciation refers to the voluntary act of taking an oath of renunciation pursuant to 8 U.S.C. §1481(a)(5).[4] It is this form of expatriation that forms the basis of the challenged governmental action.

8.      In 2010 Defendants issued a Notice of Proposed Rulemaking, recommending imposing a $450 fee for renunciation under 8 U.S.C. §1481(a)(5). 75 Fed. Reg. 6321 (Feb. 9, 2010). This rule became final on February 2, 2012. 77 Fed. Reg. 5177 (Feb. 2, 2012). Prior to this time, renunciation was free of charge. This fee was created just when the Foreign Account Tax

---

[4] 8 U.S.C. §1481(a) provides, in pertinent part, as follows:

A person who is a **national of the United States** whether by birth or **naturalization,** shall lose his nationality by voluntarily performing any of the following acts with the intention of relinquishing **United States** nationality [...]

(1) [...]
(2) [...]
(3) [...]
(4) [...]
(5) making a formal renunciation of nationality before a diplomatic or **consular officer** of the **United States** in a **foreign state,** in such form as may be prescribed by the Secretary of **State**
(6) [...]
(7) [...]

Compliance Act ("FATCA") — a bulk data collection program requiring foreign financial institutions to report to the IRS detailed information about the accounts of U.S. citizens living abroad– went into effect. *See* below, ¶¶131-144.

9.      On August 28, 2014 Defendants increased the fee for voluntary expatriation to $2,350 through an interim final rule. 79 Fed. Reg. 51247 (Aug. 28, 2014) (the "2014 IFR"). The 2014 IFR became final on August 25, 2015. 80 Fed. Reg. 51464 (Aug. 25, 2015) (the "2015 Final Rule").

10.     By levying the $450 fee in the first place and then by unjustifiably increasing it more than 500%, Defendants have violated Plaintiffs' fundamental rights, both under the Fifth Amendment's Due Process clause, the First Amendment, and the Excessive Fines Clause of the Eighth Amendment.

11.     As for the Fifth Amendment claim, the right to expatriate is a fundamental right and any burden imposed on its exercise by the government is subject to strict scrutiny analysis. Namely, if the burden is not necessary to further a compelling governmental interest it must be stricken. As asserted below, the fivefold increase of the Renunciation Fee is not necessary to further even an important, let alone a compelling governmental interest. *See* below, ¶¶161-171.

12.     As for the claim under the First Amendment, voluntary expatriation is both speech and expressive conduct, and a manifestation of political and societal association. This is certainly the case here where Plaintiffs also wish to renounce their United States citizenship as an act of protest and for ideological reasons. Accordingly, any restriction on this speech is subject to strict scrutiny analysis and will be deemed an unconstitutional burden upon the freedom of expression unless it is necessary to further a compelling governmental interest. That is not the case here. *See* below, ¶¶172-188.

13.    As for Plaintiffs' Eighth Amendment claim, the Renunciation Fee constitutes a "fine" for the purposes of the Excessive Fines Clause because its purpose is to deter and punish U.S. citizens who wish to sever their ties with America, whether because of FATCA and its resulting burdens, or because of their political ideologies. This "fine" is grossly disproportionate and excessive. *See* below, ¶¶189-197.

14.    In addition to the constitutional issues raised, Defendants' actions also run afoul of the Administrative Procedure Act, Pub. L. 79–404, 60 Stat. 237, *codified at* 5 U.S.C. §500 *et seq.* The decision to increase the fee by more than 500% is: (a) arbitrary and capricious, (b) not supported by any substantial evidence, (c) not in accordance with the law, (d) contrary to a constitutional right and (e) in excess of statutory jurisdiction, authority, or limitations. Defendants' stated reasons for increasing the fee – the increase in costs to the Defendant in providing renunciation-related services – not only ignores the nature and gravity of the right at issue, but also lacks an intelligible reason that would justify such a drastic fee hike. After all, renunciation is a simple, straightforward process.  *See* below, ¶¶199-207.

15.    Lastly, the right to expatriate is a customary international norm enshrined and reflected in international and state practice and treaties. By conditioning this right on the payment of a fee (other than a nominal modest fee), the government has run afoul of its international duties and obligations. *See* below, ¶¶208-218.

## <u>SUBJECT MATTER JURISDICTION AND VENUE</u>

16.    This Court has federal question jurisdiction under 28 U.S.C. §1331 because this lawsuit arises under the Constitution and laws of the United States, including customary international law and federal common law. Specifically, this lawsuit challenges the Renunciation Fee under (a) the Fifth Amendment's Due Process Clause, (b) Plaintiffs' right of free expression

and association guaranteed under the First Amendment, (c) the Eighth Amendment's Excessive Fines Clause, and (d) the right to voluntarily expatriate under federal common law and customary international law.

17.     In addition, this lawsuit challenges the 2015 Final Rule under 5 U.S.C. §702. The same statute serves as a waiver of Defendants' sovereign immunity.

18.     Defendants' promulgation of the Final Rule in the Federal Register on August 25, 2015 constitutes final agency action and is therefore subject to administrative judicial review. 5 U.S.C. §§704, 706.

19.     Venue is proper in this Court under 28 U.S.C. §1391(e)(1) because Defendant DOS is an agency of the United States and is based in the District of Columbia and Defendants Secretary of State and Assistant Secretary of State for Consular Affairs are being sued in their official capacities.

## PARTIES

### Plaintiffs

20.     Plaintiff L'Association des Américains Accidentels ("AAA") is a Paris-based non-profit organization that was established in 2017 under French law. AAA's members include individuals described as "Accidental Americans."  The goal of the AAA is to represent and defend Accidental Americans who live outside the United States from the adverse effects of certain American extraterritorial laws. *See* https://www.americains-accidentels.fr/page/234149-nos-objectifs. Some of the Plaintiffs are members of AAA.

21.     Plaintiff Fabien Lehagre is a dual-national, holding U.S. and French citizenship, who resides in Le Vésinet, France. Mr. Lehagre founded the AAA. Mr. Lehagre was born in 1984 in Mountain View, California to a French father and mother of Singaporean origin who had

obtained U.S. citizenship based upon a prior marriage to a U.S. citizen. Following the divorce of his parents, Mr. Lehagre left the U.S. in 1986 at the age of one and a half and has returned only once for one month. Mr. Lehagre wishes to renounce his United States citizenship because of the hardships and obstacles entailed in maintaining such citizenship. Moreover, Mr. Lehagre, through an act of expatriation, wishes to express his frustration, disappointment and protest regarding the United States government's unfair, arbitrary and discriminatory policies towards himself and similarly situated individuals. In addition, Mr. Lehagre wishes to renounce his U.S. citizenship for ideological reasons, as discussed more fully below. *See* ¶151.   The Renunciation Fee effectively prevents Mr. Lehagre from expatriating.

22.      Plaintiff Miriam Therese Kupper is a dual-national, holding U.S. and Belgian citizenship, residing at Rue du Puits 201, Tournai, Belgium. Ms. Kupper was born in Chicago in 1950 to Belgian parents and left the country when she was 13 months old. Ms. Kupper has returned to the United States three times since her birth for tourist- related activities for an average length of two weeks. Since 2013, Ms. Kupper's foreign bank required her to renounce her U.S. citizenship as a condition for maintaining her account. Other foreign banks have refused to open an account for Ms. Kupper due to her U.S. citizenship. In addition, Ms. Kupper's U.S. citizenship has proven to be an obstacle in securing credit. Ms. Kupper wishes to renounce her United States citizenship because of the hardships and obstacles entailed in maintaining such citizenship. Moreover, Ms. Kupper, through an act of expatriation, wishes to express her frustration, disappointment and protest regarding the United States government's unfair, arbitrary and discriminatory policies towards herself and similarly situated individuals. In addition, Ms. Kupper wishes to renounce her U.S. citizenship for ideological reasons, as discussed more fully below. *See* ¶152. The Renunciation Fee effectively prevents Ms. Kupper from expatriating.

23.     Plaintiff Aline Coscarat, is a dual-national, holding U.S. and French citizenship, residing at 1 Avenue d'Ilbaritz Résidence ILBARITZ DIANE 51, Bayonne, France. Ms. Coscarat was born in the United States in 1961 to her French parents and left when she was nine months old. Ms. Coscarat has returned to America 6-7 times since her birth for tourist-related activities, with an average stay of two-three weeks. Due to her U.S. citizenship, Ms. Coscarat has encountered numerous problems in maintaining her foreign bank account, including the refusal of foreign banks to provide loans to her or make available other investment opportunities. In addition, Ms. Coscarat is unable to switch banks because French banks are refusing to accept customers with American citizenship. Ms. Coscarat wishes to renounce her United States citizenship because of the hardships and obstacles entailed in maintaining the citizenship. Moreover, Ms. Coscarat, through an act of expatriation, wishes to express her frustration, disappointment and protest regarding the United States government's unfair, arbitrary and discriminatory policies towards herself and similarly situated individuals. In addition, Ms. Coscarat wishes to renounce her U.S. citizenship for ideological reasons, as discussed more fully below. *See* ¶153. The Renunciation Fee effectively prevents Ms. Coscarat from expatriating. Ms. Coscarat is a member of Plaintiff AAA.

24.     Plaintiff Paula Calvo Suarez is a dual-national, holding U.S. and Costa Rican citizenship, residing at Nefelejcs Utca 47, Budapest, Hungary. Ms. Suarez was born in America in 1980 to Costa Rican parents and left when she was approximately two years old. Ms. Suarez has returned once to the United States when she was six for a 14-day visit. Due to her U.S. citizenship, Ms. Suarez has encountered numerous problems in maintaining her foreign bank account. Ms. Suarez wishes to renounce her United States citizenship because of the hardships and obstacles entailed in maintaining the citizenship. Moreover, Ms. Suarez, through an act of

expatriation, wishes to express her frustration, disappointment and protest regarding the United States government's unfair, arbitrary and discriminatory policies towards herself and similarly situated individuals. In addition, Ms. Suarez wishes to renounce her U.S. citizenship for ideological reasons, as discussed more fully below. *See* ¶154.  The Renunciation Fee effectively prevents Ms. Suarez from expatriating.

25.     Plaintiff Epifanio Antonio Migliozzi is a dual-national, holding U.S. and Italian citizenship, residing at Via Barattino 19, Molinella, Italy. Mr. Migliozzi was born in New Jersey in 1970 to Italian parents and returned to Italy when he was four. He has never returned to America. Due to his U.S. citizenship, Mr. Migliozzi has encountered numerous problems in maintaining his foreign bank account: his bank required him to provide his social security number and threatened to close his account for failure to do so. Mr. Migliozzi had no choice but to travel to the U.S. embassy in Rome to receive a social security number.  Mr. Migliozzi wishes to renounce his United States citizenship because of the hardships and obstacles entailed in maintaining the citizenship. Moreover, Mr. Migliozzi, through an act of expatriation, wishes to express his frustration, disappointment and protest regarding the United States government's unfair, arbitrary and discriminatory policies towards himself and similarly situated individuals. In addition, Mr. Migliozzi wishes to renounce his U.S. citizenship for ideological reasons, as discussed more fully below. *See* ¶155. The Renunciation Fee effectively prevents Mr. Migliozzi from expatriating.

26.     Plaintiff Robyn Smoor is a dual-national, holding U.S. and Dutch citizenship, residing at Douwes Dekkerstraat 135, Voorburg, Netherlands. Ms. Smoor was born in Michigan, U.S.A. to Dutch parents in 1969. Due to her U.S. citizenship, Ms. Smoor has encountered numerous problems in maintaining her foreign bank account. Ms. Smoor wishes to renounce her

United States citizenship because of the hardships and obstacles entailed in maintaining the citizenship, including the U.S. policy and law of citizenship-based taxation. Moreover, Ms. Smoor, through an act of expatriation, wishes to express her frustration, disappointment and protest regarding the United States government's unfair, arbitrary and discriminatory policies towards herself and similarly situated individuals. In addition, Ms. Smoor wishes to renounce her U.S. citizenship for ideological reasons, as discussed more fully below. *See* ¶156. The Renunciation Fee effectively prevents Ms. Smoor from expatriating.

27.     Plaintiff Stephen Serra is a dual-national, holding U.S. and Italian citizenship, residing in Italy.  Mr. Serra was born in the United States in 1965 to non-U.S. nationals. Mr. Serra left America when he was young and has returned only once for a duration of a week.  Mr. Serra wishes to renounce his United States citizenship because of the hardships and obstacles entailed in maintaining the citizenship. Moreover, Mr. Serra, through an act of expatriation, wishes to express his frustration, disappointment and protest regarding the United States government's unfair, arbitrary and discriminatory policies towards himself and similarly situated individuals. In addition, Mr. Serra wishes to renounce his U.S. citizenship for ideological reasons, as discussed more fully below. *See* ¶157. The Renunciation Fee effectively prevents Mr. Serra from expatriating.

28.     Plaintiff Kevin Purnelle is a dual-national, holding U.S. and Belgian citizenship, residing at Paskomliget utca 58, 9 – 54, Budapest, Hungary. Mr. Purnelle was born in Texas in 1982 to Belgian parents and left the country when he was approximately three-years old. Since then, Mr. Purnelle has returned to America twice for tourist related activities. As a result of his U.S. citizenship, Mr. Purnelle cannot open foreign bank accounts and has trouble securing credit and bank loans. He cannot invest his money like other U.S. nationals that reside in the U.S. and

is not free to prepare for retirement like others. Mr. Purnelle wishes to renounce his United States citizenship because of the hardships and obstacles entailed in maintaining the citizenship. Moreover, Mr. Purnelle, through an act of expatriation, wishes to express his frustration, disappointment and protest regarding the United States government's unfair, arbitrary and discriminatory policies towards himself and similarly situated individuals. The Renunciation Fee effectively prevents Mr. Purnelle from expatriating.

29.     Plaintiff Stephanie Moses is a dual-national, holding U.S. and Australian citizenship, residing at 35 Bermuda Avenue, Deception Bay, Australia. Ms. Moses was born in the United States in 1984 and left when she was two. She has never returned. Due to her U.S. citizenship, Ms. Moses has encountered numerous problems in maintaining her foreign bank account: in order for her to maintain her bank account, she must provide the bank with a social security number, which she does not presently have. Ms. Moses wishes to renounce her United States citizenship because of the hardships and obstacles entailed in maintaining the citizenship. Moreover, Ms. Moses, through an act of expatriation, wishes to express her frustration, disappointment and protest regarding the United States government's unfair, arbitrary and discriminatory policies towards herself and similarly situated individuals. The Renunciation Fee effectively prevents Ms. Moses from expatriating.

30.     Plaintiff Tim O'Donnell is a U.S., U.K. and Irish citizen, residing at 8 Siward Road, London, United Kingdom. Mr. O'Donnell was born in the United States in 1969 to British parents and left when he was six-months old.  Mr. O'Donnell has returned to America twice, once for three months and once for five days. Due to his U.S. citizenship, Mr. O'Donnell has encountered numerous problems in maintaining foreign bank accounts and investing in various instruments. Mr. O'Donnell wishes to renounce his United States citizenship because of the hardships and

obstacles entailed in maintaining the citizenship. Moreover, Mr. O'Donnell, through an act of expatriation, wishes to express his frustration, disappointment and protest regarding the United States government's unfair, arbitrary and discriminatory policies towards himself and similarly situated individuals. The Renunciation Fee effectively prevents Mr. O'Donnell from expatriating.

31.     Plaintiff Steven Van Laeken is a dual-national, holding U.S. and Belgian citizenship, residing at Torenstraat 11/2, Zandhoven, Belgium. Mr. Van Laeken was born in the United States in 1994 to Belgian parents. Due to his U.S. citizenship, Mr. Van Laeken has encountered numerous problems in maintaining his bank account. Mr. Van Laeken wishes to renounce his United States citizenship because of the hardships and obstacles entailed in maintaining the citizenship. Mr. Van Laeken has faced obstacles in securing loans and financing, opening foreign trading accounts and expanding his business.  Moreover, Mr. Van Laeken, through an act of expatriation, wishes to express his frustration, disappointment and protest regarding the United States government's unfair, arbitrary and discriminatory policies towards himself and similarly situated individuals. The Renunciation Fee effectively prevents Mr. Van Laeken from expatriating.

32.     Plaintiff Ali Khanchoul holds U.S., German and French citizenship, and resides at 20 Avenue des Champs, Ris Orangis, France. Mr. Khanchoul was born in America in 1986 to a German father and an Algerian mother. Mr. Khanchoul left America when he was one-year old and returned once for approximately three weeks. Due to his U.S. citizenship, Mr. Khanchoul has encountered numerous problems in opening or maintaining a foreign bank account. Mr. Khanchoul wishes to renounce his United States citizenship because of the hardships and obstacles entailed in maintaining the citizenship. Moreover, Mr. Khanchoul, through an act of expatriation, wishes to express his frustration, disappointment and protest regarding the United

11

States government's unfair, arbitrary and discriminatory policies towards himself and similarly situated individuals. The Renunciation Fee effectively prevents Mr. Khanchoul from expatriating. Mr. Khanchoul is a member of Plaintiff AAA.

33.      Plaintiff Sara Chouchane is a dual-national, holding U.S. and Tunisian citizenship, residing at 2 place des bains péré, Tarbes, France. Ms. Chouchane was born in the United States in 1989 to Tunisian parents. Ms. Chouchane left America when she was six months old and since then has returned once for one week.  Due to her U.S. citizenship, Ms. Chouchane has been unable to open a bank account in France because she does not have a TIN or Social Security number. Ms. Chouchane wishes to renounce her United States citizenship because of the hardships and obstacles entailed in maintaining the citizenship. Moreover, Ms. Chouchane, through an act of expatriation, wishes to express her frustration, disappointment and protest regarding the United States government's unfair, arbitrary and discriminatory policies towards herself and similarly situated individuals. The Renunciation Fee effectively prevents Ms. Chouchane from expatriating. Ms. Chouchane is a member of Plaintiff AAA.

34.      Plaintiff Ronald Walther is a dual-national, holding U.S. and German citizenship, residing at Schaerenhof 40, Dortmund, Germany. Mr. Walther was born in the United States in 1965 to German parents. Mr. Walther left America in 1966, returned briefly from 1972-1975 at the age of 10. Mr. Walther has not returned since then.  Mr. Walther wishes to renounce his United States citizenship because of the hardships and obstacles entailed in maintaining the citizenship. Moreover, Mr. Walther, through an act of expatriation, wishes to express his frustration, disappointment and protest regarding the United States government's unfair, arbitrary and discriminatory policies towards himself and similarly situated individuals. The Renunciation Fee effectively prevents Mr. Walther from expatriating.

35.     Plaintiff Justin Sim is a dual-national, holding U.S. and Australian citizenship, who resides at James Road 8, Kardinya, Australia. Mr. Sim was born in the United States in 1994 to non-U.S. nationals. Mr. Sim left America when he was 1-2 years old and since then has returned once for a period of six months. Mr. Sim wishes to renounce his United States citizenship because of the hardships and obstacles entailed in maintaining the citizenship. Moreover, Mr. Sim, through an act of expatriation, wishes to express his frustration, disappointment and protest regarding the United States government's unfair, arbitrary and discriminatory policies towards himself and similarly situated individuals. The Renunciation Fee effectively prevents Mr. Sim from expatriating.

36.     Plaintiff Roberto Costantino Ettore Silvis is a dual-national, holding U.S. and Italian citizenship, who resides at Via Malipiero 16, Latina, Italy. Mr. Silvis was born in the United States in 1969 to non-U.S. nationals. Mr. Silvis left America when he was nine months old and since then has returned once for a period of three years (1978-1980). Mr. Silvis wishes to renounce his United States citizenship because of the hardships and obstacles entailed in maintaining the citizenship. Moreover, Mr. Silvis, through an act of expatriation, wishes to express his frustration, disappointment and protest regarding the United States government's unfair, arbitrary and discriminatory policies towards himself and similarly situated individuals. The Renunciation Fee effectively prevents Mr. Silvis from expatriating.

37.     Plaintiff Arangagu Staack Delgado is a dual-national, holding U.S. and Spanish citizenship, residing at Calle Teniente Coronel Noreňa 4, Madrid, Spain.  Mr. Delgado was born in the United States in 1973 to non-U.S. nationals. Mr. Delgado left America between the ages of one and two and since then has never returned. Mr. Delgado wishes to renounce his United States citizenship because of the hardships and obstacles entailed in maintaining the citizenship.

Moreover, Mr. Delgado, through an act of expatriation, wishes to express his frustration, disappointment and protest regarding the United States government's unfair, arbitrary and discriminatory policies towards himself and similarly situated individuals. The Renunciation Fee effectively prevents Mr. Delgado from expatriating.

38.     Plaintiff Kim Margaret Hall is a dual-national, holding U.S. and U.K. citizenship, residing at the Old Forge Pound Lane, Ringwood, United Kingdom.  Ms. Hall was born in New York in 1965 to non-U.S. nationals. Ms. Hall left America when she was eight months old and has returned six times for tourist related activities.  Ms. Hall wishes to renounce her United States citizenship because of the hardships and obstacles entailed in maintaining the citizenship. Moreover, Ms. Hall, through an act of expatriation, wishes to express her frustration, disappointment and protest regarding the United States government's unfair, arbitrary and discriminatory policies towards herself and similarly situated individuals. The Renunciation Fee effectively prevents Ms. Hall from expatriating.

39.     Plaintiff Deborah Jane Marner is a dual-national, holding U.S. and U.K. citizenship, residing at Meadow View, Kirkham Road, Essex, United Kingdom.  Ms. Marner was born in America in 1965 to British parents. Ms. Marner left America when she was thirteen months old and has returned sporadically for tourist related activities (average of two weeks per visit). Ms. Marner wishes to renounce her United States citizenship because of the hardships and obstacles entailed in maintaining the citizenship. Moreover, Ms. Marner, through an act of expatriation, wishes to express her frustration, disappointment and protest regarding the United States government's unfair, arbitrary and discriminatory policies towards herself and similarly situated individuals. The Renunciation Fee effectively prevents Ms. Marner from expatriating.

40.     Plaintiff Julie Hocquet is a dual-national, holding U.S. and Belgian citizenship, residing at Rue des Romains 3b Helmsange, Luxembourg. Ms. Hocquet was born in America in 1985 to Belgian parents, left when she was four months old and has never returned. Ms. Hocquet wishes to renounce her United States citizenship because of the hardships and obstacles entailed in maintaining the citizenship. Moreover, Ms. Hocquet, through an act of expatriation, wishes to express her frustration, disappointment and protest regarding the United States government's unfair, arbitrary and discriminatory policies towards herself and similarly situated individuals. The Renunciation Fee effectively prevents Ms. Hocquet from expatriating.

**Defendants**

41.     Defendant Department of State ("DOS") is a department of the Executive Branch of the United States Government (22 U.S.C. §2651) and is an agency within the meaning of 5 U.S.C. §552(f)(1).

42.     The Bureau of Consular Affairs is an office under the auspices and supervision of the DOS, headed by the Assistant Secretary of State for Consular Affairs. The Bureau of Consular Affairs is "responsible for the welfare and protection of U.S. citizens abroad, for the issuance of passports and other documentation to citizens and nationals, and for the protection of U.S. border security and the facilitation of legitimate travel to the United States." https://www.state.gov/about-us-bureau-of-consular-affairs/.

43.     The Office for Overseas Citizen Services is one of the eight offices managed by the Bureau of Consular Affairs in the DOS. The Office for Overseas Citizen Services is responsible for adjudicating voluntary renunciation cases and issuing Certificates of Loss of Nationality under 22 C.F.R. §50.50.

44.     The DOS created the Renunciation Fee in 2010 and increased it to $2,350 in 2015.

15

45.     Defendant Mike Pompeo is the Secretary of State and is being sued in his official capacity as Secretary of State.

46.     Defendant Carl C. Risch is the Assistant Secretary of State for Consular Affairs and is being sued in his official capacity as the Assistant Secretary of State for Consular Affairs.


**STANDING**

47.     Plaintiff AAA has organizational standing:

(a) AAA's members would otherwise have standing to sue in their own right. AAA's members include United States citizens who wish to renounce their U.S. citizenship, but are unable to do so because of the increase in the fee. These individual members, including some of the Plaintiffs in this lawsuit, have standing.

(b) The interests AAA seeks to protect are germane to AAA's purpose. AAA's purpose is to further the interests of "Accidental Americans" – *i.e.* those individuals who are deemed United States citizens due to place of birth but have no or inconsequential connections with the United States. In furthering the interests of Accidental Americans, AAA also campaigns against the Renunciation Fee that is the subject of this lawsuit.

(c) Neither the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit.  The relief sought by AAA is to invalidate the Renunciation Fee.  The question undergirding this lawsuit is, for the most part, legal and does not require the participation of individual members of AAA (although some of the individual plaintiffs are, in fact, members of AAA).

48.     The individual Plaintiffs in this action have standing. Plaintiffs are all holders of United States citizenship which was acquired as a result of their birth on American soil. Other than place of birth, Plaintiffs have minimal or nonexistent contacts with the United States.

49.     Plaintiffs suffered injury from Defendants' actions: The Renunciation Fee imposes a charge as a precondition to renunciate citizenship. The requirement to pay the fee as a precondition to renunciate constitutes a direct injury-in-fact.

50.     Moreover, the very fact that Plaintiffs are being forced to be U.S. citizens against their will is sufficient for the injury-in-fact requirement. _Schnitzler v. United States_, 761 F.3d 33, 40 (D.C. Cir. 2014) (being required to continue association with the United States against wishes is sufficient for injury-in-fact requirement).

51.     In addition to the direct injury, the Renunciation Fee has also generated indirect injuries: the expenses, burdens and other obstacles associated with being a United States citizen in foreign countries: Plaintiffs have all suffered injuries in connection with the maintenance of their bank accounts and other financial dealings as a result of holding United States citizenship. These burdens and obstacles are a result of their United States citizenship which they wish to renounce.

52.     As to redressability, the relief Plaintiffs seek is within the power of the Court to grant and, if granted, would eliminate the unconstitutional and illegal burdens imposed upon their fundamental right to expatriate.

53.     Plaintiffs also have prudential standing to challenge the 2015 Final Rule under 5 U.S.C. §702 because they have been and will be injured by the application of these rules. Plaintiffs are also within the zones of interest of 8 U.S.C. §1481(a)(5) and 22 C.F.R. §§22.1 and 50.50.

## STATUTORY AND LEGAL FRAMEWORK

### A.  The Historical Right to Expatriate under United States Law

54.     The right to expatriate is perhaps the most fundamental of all rights guaranteed to an American citizen. The right to expatriate embodies the right of an individual to associate him/herself with the American Republic. *See*, for example, Glenda Burke Slaymaker, *The Right of the American Citizen to Expatriate*, 37 AM. L. REV. 191, 192 (1903) (hereinafter: "SLAYMAKER"), at 192 ("The function of society is to overcome defects in individual existence, and when social, political or other environment ceases to conduce to the good of the individual, then it is that the individual may seek the society which can afford him what the conditions of his welfare and his happiness demand. It is a natural right, included within the larger right of the - pursuit of happiness which the fathers of this nation have declared to be inalienable.") (internal quotations omitted). The right to expatriate serves as a continuous reaffirmation of this political association.

55.     Under British law at the time of the Declaration of Independence, the bond of allegiance between a sovereign and its subject was an immutable, permanent bond established by the law of nature. *See* SLAYMAKER, at 192 (discussing the British concept of perpetual allegiance and the American Revolution's departure from such a concept).

56.     In rejecting this doctrine of perpetual allegiance, the authors of the Declaration of Independence announced that they were "absolved from all Allegiance to the British Crown and that all political connection between them and the state of Great Britain is and ought to be totally dissolved." THE DECLARATION OF INDEPENDENCE (U.S. 1776).

57.     While the right to expatriate covertly permeates the Constitution, it overtly appears as a fundamental and natural right throughout American history and jurisprudence. We already mentioned Thomas Jefferson (*see* above, ¶1). But Jefferson was not alone.

58.     After the formation of the of the United States, the ideas of expatriation began to manifest themselves in state constitutions and laws.  In Virginia, for example, echoing Jefferson's natural rights view, the right to expatriate was "inherent in every man by the laws of nature, and incapable of being rightfully taken from him even by the united will of every other person in the nation." Douglas Bradburn, THE CITIZENSHIP REVOLUTION: POLITICS AND THE CREATION OF THE AMERICAN UNION, University of Virginia Press (2009), at 106.

59.     The exact nature and scope of the right to expatriate was at the forefront of political and judicial debate throughout the early years of the Republic. These debates were usually in the context of questions regarding American citizens who were accused of aiding an enemy at a time of war or disobeying a declaration of neutrality.

60.     For example, in *Henfield's Case*, Gideon Henfield was accused of aiding the French Revolution, in direct disobedience to then President Washington's declaration of neutrality. *Henfield's Case*, 11 F. Cas. 1099, 1110-11 (C.C.D. Pa. 1793) (No. 6360). For his defense, Henfield asserted that he exercised his natural right to expatriate and relinquished his American citizenship. Ultimately, the jury adopted the Jeffersonian rule and acquitted him.

61.     *See also*, *Williams' Case*, 29 F. Cas. 1330 (C.C.D. Conn. 1799) (No. 17,708); *Talbot's Case*, 3 U.S. (3 Dall.) 133 (1795); *Murray v. McCarty*, 16 Va. 393, 396–97 (1811) ("Nature has given to all men the right of relinquishing the society in which birth or accident may have thrown them; and of seeking subsistence and happiness elsewhere; and it is believed that this right of emigration, or expatriation, is one of those inherent rights, of which, when they enter

19

into a state of society, they cannot, by any compact, deprive, or devest their posterity."). In *Murray v. McCarty*, Judge Roane, in a separate opinion, called the right to expatriate "one of paramount authority, bestowed on us by the God of Nature […]". *Id*., at 405.

62.     These and similar cases set down the stage for the American notion that expatriation is a natural, fundamental and inherent right, subject only to reasonable regulation for the "safety and security of the society." SLAYMAKER, at 200. *See* also below, ¶163.

63.     This viewpoint was ultimately codified in 1868 when Congress enacted the Act Concerning the Rights of American Citizens in Foreign States, ch. 249, 15 Stat. 223 (1868) (the "Expatriation Act").[5]

64.     The Expatriation Act unequivocally stated that "the right of expatriation is a natural and inherent right of all people, indispensable to the enjoyment of the rights of life, liberty, and the pursuit of happiness." [6]

65.     The Expatriation Act did not contain specific provisions as to how an individual could exercise his/her right of expatriation. The rules and procedures governing how an individual can expatriate were set forth in the Expatriation Act of 1907 (the "1907 Act"), which largely codified the existing law of expatriation as implemented since 1868 by the State Department. Notably, the 1907 Act did not alter the doctrine of voluntary expatriation as understood at that time. The 1907 Act merely codified "how" an American citizen could expatriate.

---

[5] The immediate catalyst for this law was two Irish-born, naturalized American citizens, veterans of the Civil War, who were accused of treason in Great Britain and found guilty, notwithstanding their claim that they had exercised their right of expatriation.

[6] The U.S. Attorney General at the time the Expatriation Act was enacted, George Williams, opined that the "affirmation by Congress, that the right of expatriation is a 'natural and inherent right of all people' includes citizens of the United States as well as others and the executive should give to it that comprehensive effect." 14 OPINIONS ATTY.-GEN. U.S., 295, 296.

66.     The 1907 Act enumerated specific actions that, when coupled with voluntary intent to relinquish citizenship, would constitute expatriating acts: (a) naturalization in a foreign country; (b) taking an oath of allegiance to a foreign state; and (c) residence abroad by naturalized citizens.

67.     Although voluntary renunciation was not mentioned in the 1907 Act, it was available to U.S. citizens who wished to exercise their right to voluntary expatriate.

68.     The enumerated acts in the 1907 Act were viewed as confirmatory actions evincing an individual's intent to voluntarily relinquish his/her citizenship. For the purposes of this Complaint, these enumerating acts, as well as those described below, will be collectively referred to as "Confirmatory Acts."

69.     The list of Confirmatory Acts expanded in 1940 with the enactment of the Nationality Act, Pub. L. 76-853; 54 Stat. 1137 (the "Nationality Act"), the forerunner of the current statute that governs expatriation, and the first all-embracing compilation of statutory and common law provisions on nationality and expatriation.

70.     Section 401 of the Nationality Act provided that a U.S. citizen "shall lose his nationality" by performing any of the Confirmatory Acts, which included the two primary expatriation acts in the 1907 Act: (a) obtaining naturalization in a foreign state; and (b) taking an oath or making an affirmation or other formal declaration of allegiance to a foreign state.[7]

71.     The Nationality Act included the following additional Confirmatory Acts: (a) service in the armed forces of a foreign state; (b) employment by the government of a foreign state; (c) voting in a foreign election; (d) conviction of desertion; or (e) conviction for treason.

---

[7] Residence abroad was also included as a Confirmatory Act in the Nationality Act, but was invalidated in _Schneider v. Rusk_, 377 U.S. 163 (1964).

72.     In addition, for the first time in American history, the Nationality Act codified the preexisting and recognized fundamental right to voluntarily expatriate (Section 401(f) of the Nationality Act).

73.     The current process by which an individual can exercise his/her right to voluntarily expatriate is governed by Section 349 of the Immigration and Nationality Act ("INA"), Pub. L. 89–236, 79 Stat. 911, *codified at* 8 U.S.C. §1481(a), enacted in 1952.

### B.  The Modern Law of Expatriation

74.     8 U.S.C. §1481(a) lists seven Confirmatory Acts by which a U.S. citizen – whether by birth or naturalization – "shall lose his nationality." The statute requires that the individual voluntarily perform one of the Confirmatory Acts "with the intention of relinquishing United States nationality."[8]

---

[8] Since its legislation, 8 U.S.C. §1481 has undergone several substantive changes. Among these changes are the following:

(1) The Expatriation Act of 1954, 68 Stat. 1146, Pub. L. No. 772, 83d Cong., 2d Sess. (Sept. 3, 1954 amended §349(a)(9) of the Immigration and Nationality Act to read:

(a) a person who is a national of the United States whether by birth or naturalization, shall lose his nationality by

[…]

(9) committing any act of treason against, or attempting by force to overthrow, or bearing arms against the United States, *violating or conspiring to violate any of the provisions of section 2383 of title 18, United States Code, or willfully performing any act in violation of section 2385 of title 18, United States Code, or violating section 2384 of said title by engaging in a conspiracy to overthrow, put down, or to destroy by force the Government of the United States, or to levy war against them*, if and when he is convicted thereof by a court martial or by a court of competent jurisdiction [...]

(Portions added by the Expatriation Act are italicized.)

(2) In 1961, the INA was amended by inserting subsection (c) which read as follows:

22

75.     Six of the seven Confirmatory Acts [8 U.S.C. §1481(a)(1)-(4) and (6)-(7)] all require that the applicant have voluntarily performed an act, coupled with the requisite intent to relinquish citizenship:

------

Whenever the loss of United States nationality is put in issue in any action or proceeding commenced on or after the enactment of this subsection under, or by virtue of, the provisions of this or any other Act, the burden shall be upon the person or party claiming that such loss occurred, to establish such claim by a preponderance of the evidence. Except as otherwise provided in subsection (b), any person who commits of performs, or who has committed or performed, any act of expatriation under the provisions of this or any other Act shall be presumed to have done so voluntarily, but such presumption may be rebutted upon a showing, by a preponderance of the evidence, that the act or the acts committed or performed were not done voluntarily.

(3) In 1976, the INA was amended yet again by striking out subsection (10) which dealt with the expatriation of persons who remained outside of the jurisdiction of the United States in time of war or national emergency to avoid service in the military. Pub. L. 94–412 (HR 3884), September 14, 1976, 90 Stat. 1255.

(4) In 1978, former subsection (a)(5) which dealt with expatriation of persons who voted in a political election in a foreign state or participated in an election or plebiscite to determine sovereignty over foreign territory was struck out. Pub. L. 95–432 (HR 13349), October 10, 1978, 92 Stat. 1046. The same amendment also struck out subsection (a)(8) which dealt with expatriation of persons who were dismissed or dishonorably discharged as result of deserting the military, air, or naval forces of the United States in time of war. *Id*.

(5) The last substantive amendment occurred in 1986. Prior to 1986, the phrase "voluntarily performing any of the following acts with the intention of relinquishing United States nationality" was not in the INA. The INA was amended to include that phrase, reflecting and codifying the Supreme Court decisions in *Afroyim v. Rusk*, 387 U.S. 253 (1967) and *Vance v. Terrazas*, 444 U.S. 252 (1980) (*see* below). The same amendment also made minor amendments to subsection (2), (3) and (4).  Moreover, the amendment struck out former subsection (b), which related to conclusive presumption of voluntariness and lack of duress for any person performing any act specified in subsection (a), if, at time of such act, such person was national of state in which act was performed and had been physically present in such state for period totaling ten years or more immediately prior to such act. PL 99–653 (HR 4444), PL 99–653, November 14, 1986, 100 Stat 3655.

(a) obtaining naturalization in a foreign state upon his own application or upon an application filed by a duly authorized agent, after having attained the age of eighteen years, 8 U.S.C. §1481(a)(1);

(b) taking an oath or making an affirmation or other formal declaration of allegiance to a foreign state or a political subdivision thereof, after having attained the age of eighteen years, 8 U.S.C. §1481(a)(2);

(c) entering, or serving in, the armed forces of a foreign state if (A) such armed forces are engaged in hostilities against the United States, or (B) such persons serve as a commissioned or non-commissioned officer, 8 U.S.C. §1481(a)(3);

(d) accepting, serving in, or performing the duties of any office, post, or employment under the government of a foreign state or a political subdivision thereof, after attaining the age of eighteen years if he has or acquires the nationality of such foreign state; or (B) accepting, serving in, or performing the duties of any office, post, or employment under the government of a foreign state or a political subdivision thereof, after attaining the age of eighteen years for which office, post, or employment an oath, affirmation, or declaration of allegiance is required, 8 U.S.C. §1481(a)(4);

(e) making in the United States a formal written renunciation of nationality in such form as may be prescribed by, and before such officer as may be designated by, the Attorney General, whenever the United States shall be in a state of war and the Attorney General shall approve such renunciation as not contrary to the interests of national defense, 8 U.S.C. §1481(a)(6);

24

(f) committing any act of treason against, or attempting by force to overthrow, or bearing arms against, the United States, violating or conspiring to violate any of the provisions of section 2383 of title 18, or willfully performing any act in violation of section 2385 of title 18, or violating section 2384 of title 18 by engaging in a conspiracy to overthrow, put down, or to destroy by force the Government of the United States, or to levy war against them, if and when he is convicted thereof by a court martial or by a court of competent jurisdiction, 8 U.S.C. §1481(a)(7).

76. Relinquishment by way of renunciation – the Confirmatory Act at issue in this lawsuit – is listed in in 8 U.S.C. §1481(a)(5), which provides as follows:

A person who is a **national of the United States** whether by birth or **naturalization,** shall lose his nationality by voluntarily performing any of the following acts with the intention of relinquishing **United States** nationality […] making a formal renunciation of nationality before a diplomatic or **consular officer** of the **United States** in a **foreign state,** in such form as may be prescribed by the Secretary of **State.**

Hereinafter: the "Renunciation Statute." Relinquishment by means of 8 U.S.C. §1481(a)(1)-(4) and (6)-(7) will be referred to as "non-renunciation relinquishment."

77. Renunciation differs from the other non-renunciation relinquishment provisions. Renunciation is a Confirmatory Act that is based exclusively and solely on the will of the applicant, with no additional act required (other than physically appearing before a diplomatic officer to take an oath). The other non-renunciation relinquishment provisions refer to circumstances where the individual performs an expatriating act with intent to relinquish and, by virtue of that act, *loses* his or her citizenship.

25

78.    Non-renunciation-relinquishment can be initiated by an individual. However, relinquishment under the non-renunciation provisions can also be commenced unilaterally by the DOS. Such DOS-initiated proceedings can potentially lead to the individual being stripped of his/her U.S. citizenship even when the individual unequivocally declares that he/she had no intention of relinquishing citizenship at the time the Confirmatory Act was committed.[9] This use of 8 U.S.C. §1481(a)(1)-(4) and (6)-(7) by the DOS is sometimes referred to as "denationalization." *See* T. Alexander Aleinikoff, *Theories of Loss of Citizenship*, 84 MICH. L. REV. 1471, 1473 (1986).

79.    As discussed below, these differences, as well as other discussed later, highlight some of the inconsistencies in the Defendants' decisions to create and subsequently increase the Renunciation Fee.

---

[9] *See*, for example, 7 FAM 1280(b):

"[…] However, the Terrazas Court also recognized that intent may be "expressed in words or found as a fair inference from proved conduct," and the Department has taken the view that actions inherently inconsistent with allegiance to the United States may be more probative than words.  See 7 FAM 1285 for a fuller discussion of the subject."

FAM refers to the DOS's Foreign Affairs Manual. *See* below, ¶81.

On October 2, 1985, the DOS stripped Rabbi Meir Kahane of his American citizenship under 8 U.S.C. §1481(a)(4), notwithstanding that Kahane informed the DOS that he had no intention to relinquish his citizenship. Kahane appealed the decision to the Board of Appellate Review. In its brief, the DOS argued that Kahane's "actions speak louder than his words in determining his true intent." The Board of Appellate Review accepted the DOS's reasoning. The Board's decision was overruled in <u>Kahane v. Shultz</u>, 653 F. Supp. 1486 (E.D.N.Y. 1987) which found that the administrative record did not support a finding that Kahane had intention to relinquish his citizenship.

## C.  The Process and Procedure for Renunciation

80.      The DOS has issued a regulation implementing the Renunciation Statute. 22 C.F.R. §50.50. That regulation states as follows:

> A person desiring to renounce U.S. nationality under section 349(a)(5) of the Immigration and Nationality Act shall appear before a diplomatic or consular officer of the United States in the manner and form prescribed by the Department. The renunciant must include on the form he signs a statement that he absolutely and entirely renounces his U.S. nationality together with all rights and privileges and all duties of allegiance and fidelity thereunto pertaining.

81.      The detailed procedures for renunciation are set for in the DOS Foreign Affairs Manual ("FAM"), the "comprehensive, and authoritative source for the Department's organization structures, policies, and procedures that govern the operations of the State Department, the Foreign Service and, when applicable, other federal agencies." https://fam.state.gov/.

82.      While the DOS claims it spends substantial amounts of time to accept, process, and adjudicate loss of nationality cases, in reality, the process for *renunciation* is quite simple, does not involve long or complex forms, and can be completed in a single face-to-face interview.

83.      The process for renunciation begins with an "Initial Information Session." 7 FAM 1262.2.  The purpose of the Initial Information Session is to (a) explain the serious consequences of renunciation as summarized in the one-page Form DS-4081, entitled "Statement of Understanding Concerning the Consequences and Ramifications of Relinquishment or Renunciation of U.S. Citizenship;" and (b) inform the individual to think over whether he or she truly wishes to renounce U.S. nationality. *Id*. The DS-4081 is available online.

84.      The Initial Information Session may be conducted by telephone by a consular mission member. *Id*. In practice, these sessions are usually done via telephone.

27

85.     After the Initial Information Session, an appointment for the renunciation oath is scheduled. *Id*.

86.     On the day of the renunciation oath, the renunciant must appear before a consulate officer.

87.     During the meeting with the consulate officer, the renunciant reads Form DS-4081, and indicates that he or she comprehends it.  Form DS-4081 contains twelve statements that must ultimately be declared by the renunciant and attested to by the consular officer. The statements in Form DS-4081 include the following:

(1) I have the right to renounce/relinquish my United States nationality.
(2) I have the intention of relinquishing my United States nationality.
(3) I am exercising my right of renunciation/relinquishment freely and voluntarily without force, compulsion or undue influence placed upon me by any person.
(4) Upon renouncing/relinquishing my U.S. nationality, I will become an alien with respect to the United States, subject to all laws and procedures of the United States regarding entry and control of aliens.
(5) If I do not possess the nationality/citizenship of any country other than the United States, upon my renunciation/relinquishment I will become a stateless person and may face extreme difficulties traveling internationally and entering most countries and maintaining a place to reside.
(6) If I am found to be deportable by a foreign country, my renunciation/relinquishment may not prevent my involuntary return to the United States.
(7) My renunciation/relinquishment may not affect my military or selective service status, if any. I understand that any problems in this area must be resolved with the appropriate agencies.
(8) My renunciation/relinquishment may not affect my liability, if any, to prosecution for any crimes which I may have committed or may commit in the future which violate United States law.
(9) My renunciation/relinquishment may not affect my liability for extradition to the United States.
(10)    My renunciation/relinquishment may not exempt me from United States income taxation. With regard to United States taxation consequences, I understand that I must contact the United States Internal Revenue Service. Further, I understand that if my renunciation of United States nationality is determined by the United States Attorney General to be motivated by tax avoidance purposes, I will be found excludable from the United States under Immigration and Nationality Act, as amended.
(11)    Upon renouncing/relinquishing my U.S. nationality, I will no longer be able to transmit U.S. nationality to my children born subsequent to this act.

88.     After reading Form DS-4081, the renunciant signs the form. 7 FAM 1262.4(b).

89.     Next, the renunciant must read the one-page Form DS-4080, entitled "Oath/Affirmation of Renunciation of the Nationality of the United States," and then sign it. 7 FAM 1262.4(c). Form DS-4080 is publicly available online.

90.     The Oath of Renunciation contains the following language, pursuant to 22 C.F.R. §50.50:

> I desire and hereby make a formal renunciation of my U.S. nationality, as provided by section 349(a)(5) of the Immigration and Nationality Act of 1952, as amended, and pursuant thereto, I hereby absolutely and entirely renounce my United States nationality together with all rights and privileges and all duties and allegiance and fidelity thereunto pertaining. I make this renunciation intentionally, voluntarily, and of my own free will, free of any duress or undue influence.

91.     Prior to taking the oath of renunciation, the renunciant must pay the Renunciation Fee. 7 FAM 1262.4.[10]

92.     Under 7 FAM 1262.4(i), the officer must keep a record of his/her assessment of the renunciant's state of mind: whether the renunciant appeared to be acting out of his or her own free will and to have fully understood the consequences of renunciation. Such opinions might note if there appeared to be family pressure to renounce, if the individual was likely renouncing for tax avoidance purposes, etc.  The opinion should also note if the renunciant displays animosity or has spoken threateningly towards the United States.

---

[10] 7 FAM 1262.4:

> Under Federal regulations at 22 CFR 22.1, an administrative processing fee applies to documenting renunciation of U.S. nationality.  The fee should be collected after the individual has decided to proceed with the renunciation and has arrived at post to take the oath of renunciation.  The fee should be collected before conducting the ceremony and administering the oath.

93.     Notably, 7 FAM 1262(e) instructs that the "execution of the Oath of Renunciation usually is sufficient evidence of intent to lose U.S. nationality." This contrasts with non-renunciation relinquishment cases where there is an "administrative presumption of intent to retain citizenship." 7 FAM 1281(d).

94.     Tellingly, the renunciation process does ***not*** require the renunciant to complete the eight-page Form DS-4079, entitled "Request for Determination of Possible Loss of United States Nationality." The purpose of DS-4079 is to determine the Confirmatory Act that serves as the grounds for relinquishment under 8 U.S.C. §1481(a)(1)-(4) and (6)(7) (non-renunciation-relinquishment cases). *See* 7 FAM 1264.[11]  Therefore, an applicant under 8 U.S.C. §1481(a)(5) (renunciation) is not required to complete or submit the DS-4079.[12]

---

[11] 7 FAM 1264(b)(Note):

> While Form DS-4079, Request for Determination of Possible Loss of United States Citizenship, is not standard or typically necessary for renunciation cases, where there is a question about intent it may prove useful. Further, the DS-4079 may serve as a helpful tool for information gathering in appropriate cases regarding, for example, ties to the United States and the host country, or possible earlier commission of an expatriating act.   In short, consular officers should not seek completion and signature of the DS-4079 in renunciation cases as a matter of routine but only if pertinent as described above.

[12] *See* the website for the United States Embassy in the U.K. https://uk.usembassy.gov/u-s-citizen-services/citizenship/loss-of-u-s-citizenship-i-e-expatriation/. There, the website has two sets of instructions: one for applicants who wish to *relinquish* and another set for applicants who wish to renounce. For applicants wishing to relinquish citizenship, they are required to complete and submit the DS-4079; for applicants wishing to renounce citizenship, no such requirement is listed.

> *See* also the website for the United States Embassy in Israel, distinguishing between the requirements of renunciation and relinquishments. https://il.usembassy.gov/u-s-citizen-services/renouncing-u-s-citizenship/appointment-and-processing/: "On the day of your appointment, you will meet with a Consular Officer and be given another opportunity to review the Statement of Understanding prior to taking the Oath of Renunciation *or* signing the DS-4079 questionnaire." (emphasis not in original).

> *See* also the website of the United States Embassy in France, https://fr.usembassy.gov/u-s-citizen-services/citizenship-services/renounce-u-s-citizenship/: "The information below provides

95.     After the renunciation ceremony, the consular officer must forward the forms and documents, including his/her recommendations to the Bureau of Consular Affairs, Office of Overseas Citizens Services in Washington, D.C. for final approval.

96.     If approved, the consular officer overseas provides the applicant with a Certificate of Loss of Nationality ("CLN"). If approved, the date of expatriation is the date that the oath was taken in front of the consular officer.[13] If the oath is not approved and no CLN is issued, the renunciant remains a citizen of the United States.

97.     If a renunciation is undertaken but not approved by the DOS, the Renunciation Fee is not refundable. 7 FAM 1262.4.

## D. The Renunciation Fee

98.     The INA and the regulations do not specifically authorize the DOS to set and collect fees from potential renunciants. The DOS's authority is derived from the Independent Offices Appropriations Act, 31 U.S.C. §9701, which provides as follows:

> The head of each agency […] may prescribe regulations establishing the charge for a service or thing of value provided by the agency. Regulations prescribed by the heads of executive agencies are subject to policies prescribed by the President and shall be as uniform as practicable. Each charge shall be—
> (1) Fair; and
>
> (2) based on- (A) the costs to the Government; (B) the value of the service or thing to the recipient; (C) public policy or interest served; and (D) other relevant facts.

---

instructions for relinquishing U.S. citizenship by taking an oath of renunciation under INA 349(a)(5). For information on relinquishment by voluntary commission of different potentially expatriating acts under INA 349(a)(1)-(4) with intent to lose U.S. nationality, please read […]".

[13] For non-renunciation relinquishment cases, the effective date of loss of nationality is the date of the expatriating act. *See* 7 FAM 1228.3(e).

99.     Prior to February 2010, the DOS did not charge any fee for a "loss of citizenship," whether the loss was pursuant to 8 U.S.C. §1481(a)(1)-(4) and (6)(7) or whether it was pursuant to the Renunciation Statute.

100.     In 2010 – the same year FATCA was enacted– the DOS issued a Notice of Proposed Rulemaking ("NPRM"), recommending levying a $450 fee as a precondition for *renunciation* under 8 U.S.C. §1481(a)(5). 75 Fed. Reg. 6321 (Feb. 9, 2010).

101.     This charge to exercise the right of expatriation was unprecedented. For over two-hundred years, U.S. citizens were entitled to exercise their fundamental right to expatriate without having to pay any fee.

102.     As noted in the NPRM, the DOS adjusts fees accordingly so that the actual cost of services provided is covered by the fees actually paid. The proposed changes were based on a cost-of-services study ("CoSS") that the DOS authorized to study the fee structure to determine whether the DOS was fully recovering the costs of services.[14]

103.     According to the NPRM:

> The CoSS demonstrated that documenting a U.S. citizen's renunciation of citizenship is extremely costly, requiring American consular officers overseas to spend substantial amounts of time to accept, process, and adjudicate cases. A new fee of $450 will be established to help defray a small portion of the total cost to the U.S. Government of documenting the renunciation of citizenship.[15]

104.     Subsequently, the DOS issued a supplemental notice of proposed rulemaking which provided more information about the CoSS and extended the comment period until April 7, 2010.

---

[14] Plaintiffs do not concede the content of DOS's analysis and conclusion.
[15] Plaintiffs do not concede the content of DOS's analysis and conclusion.

105.     The DOS received 1,800 comments on the proposed changes. Some of those comments challenged this first-time fee for documenting renunciation of citizenship. The DOS determined that "it must recoup at least a portion of its costs of providing this very costly service." The DOS went on to explain that in "order to lessen the impact on those who need this service and not discourage the utilization of the service, the Department decided to set the fee at $450, less than 25 percent of the cost to the U.S. Government."  75 Fed. Reg. 36522 (June 28, 2010). The interim rule went into effect on July 13, 2010.[16]

106.     The DOS issued a final rule adopting the interim rule on February 2, 2012, amending the fee schedule in 22 C.F.R. §22.1. 77 Fed. Reg. 5177 (Feb. 2, 2012).

107.     Non-renunciation relinquishment applications under 8 U.S.C. §1481(a)(1)-(4) and (6)(7) remained free of charge.

108.     On August 28, 2014, the DOS issued the 2014 IFR[17] adjusting the fee for the renunciation of citizenship from $450 to $2,350. 79 Fed. Reg. 51247 (Aug. 28, 2014).

109.     According to the DOS, it completed a "fee review using its activity-based Cost of Service Model." The review was conducted from April 2012 through July 2013 and provides the basis for updating various fees, including the Renunciation Fee. In conducting the review, the

---

[16] Plaintiffs do not concede the content of DOS's analysis and conclusion.

[17] Generally, an agency is required to issue a proposed rule prior to issuing an interim or final rule. 5 U.S.C. §553(b). However, 5 U.S.C. §553(b)(3)(B) authorizes an agency to bypass the proposed rule stage "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest."  The DOS relied on this provision when issuing the interim final rule (without first issuing a proposed rule), "publishing this rule as an interim final rule, with a 60-day provision for post-promulgation comments and with an effective date less than 30 days from the date of publication." 79 Fed. Reg. 51247, 51251. According to the DOS, "Delaying implementation of this rule would be contrary to the public interest because the fees in this rule fund consular services that are critical to national security, including screening visa applicants." *Id.*

DOS "chose to develop and use an activity-based costing (ABC) model to determine the full cost of the services listed in its Schedule of Fees."[18]

110.    ABC models require an organization to: [19]

- Identify all of the activities that are required to produce a particular product or service;

- Identify all of the resources allocated to the production of (costs) that product or service;

- Measure the quantity of resources consumed; and

- Measure the frequency and intensity of demand placed on activities to produce services.

111.    The DOS stated that "documenting a U.S. citizen's renunciation of citizenship is extremely costly, requiring American consular officers overseas to spend substantial amounts of time to accept, process, and adjudicate cases." *Id*.

112.    According to the DOS: [20]

> consular officers must confirm that the potential renunciant fully understands the consequences of renunciation, including losing the right to reside in the United States without documentation as an alien. Other steps include verifying that the renunciant is a U.S. citizen, conducting a minimum of two intensive interviews with the potential renunciant, and reviewing at least three consular systems before administering the oath of renunciation. The final approval of the loss of nationality must be done by law within the Directorate of Overseas Citizens Services in Washington, DC, after which the case is returned to the consular officer overseas for final delivery of the Certificate of Loss of Nationality to the renunciant. These steps further add to the time and labor that must be involved in the process. *Id*.

113.    According to the 2014 IFR, since 2010, the demand for renunciation services "increased dramatically, consuming far more consular official time and resources." The 2014 IFR

---

[18] Plaintiffs do not concede the content of DOS's analysis and conclusion.
[19] Plaintiffs do not concede the content of DOS's analysis and conclusion.
[20] Plaintiffs do not concede the content of DOS's analysis and conclusion.

goes on to state – in stark contrast to its June 28, 2010 publication (*see* above, ¶105) – that the DOS "believes there is no public benefit or other reason for setting this fee below cost." In its June 28, 2010 publication, the DOS at least appeared to realize that renunciation is a public benefit, and it is important "not to discourage the utilization of the service." This realization is completely missing in the 2014 IFR.  The 2014 IFR went into effect on September 6, 2014.[21]

114.    After the publication of the 2014 IFR, more than seventy comments were received. *See* 80 Fed. Reg. 51464 (Aug. 25, 2015). "More than one-third of the comments suggested that the increased fee to process renunciations is a burden." *Id*. Some of the comments asserted that citizen renunciation is a "constitutional or human right." *Id*., at 51465. These comments stated that the increased renunciation fee acts as a deterrent to renouncing one's nationality, thereby violating the right to expatriate. *Id*.

115.    These comments were cavalierly rejected by the DOS, which issued the 2015 Final Rule. In its 2015 Final Rule, DOS claimed without supporting evidence that the fee increase did not restrict or burden the right of expatriation.

116.    According to the DOS, the Renunciation Fee is unrelated to any U.S. tax regime, "except to the extent that the legislation caused an increase in consular workload that must be paid for by user fees." *Id*.  The DOS went on to describe the type of expenses and work incurred by the renunciation process and its duty to ensure that it recoups these expenses by way of charging an appropriate fee for renunciation. "Conforming to guidance from the Office of Management and Budget (OMB), federal agencies make every effort to ensure that each service provided to specific recipients is self-sustaining, charging fees that are sufficient to recover the full cost to the government." *Id*. The increase in the fee, according to the DOS, is connected with

---

[21] Plaintiffs do not concede the content of DOS's analysis and conclusion.

the increase of applicants for a Certificate of Loss of Nationality. In the past, the total number of renunciations was small and constituted a minor demand on the DOS. As a result, "it was difficult to assess accurately the cost of the service." *Id*. In contrast, "in recent years, the number of people requesting the renunciation service has risen dramatically, driven in part by tax legislation affecting U.S. taxpayers abroad, including the Foreign Account Tax Compliance Act (FATCA), materially increasing the resources devoted to providing the service." *Id*. [22]

117.    According to the DOS, as a result of the Supreme Court's decisions in *Afroyim v. Rusk*, 387 U.S. 253 (1967)[23] and *Vance v. Terrazas*, 444 U.S.C. 252 (1980)[24], it is required to implement "thorough," "serious," and "time-consuming" procedures that ensure that the renunciation is done voluntarily.[25]

118.    The 2014 IFR and the 2015 Final Rule did not make any changes to non-renunciation relinquishment applications under 8 U.S.C. §1481(a)(1)-(4) and (6)(7). Those types of procedures remained free of charge.

---

[22] Plaintiffs do not concede the content of DOS's analysis and conclusion.

[23] In *Afroyim v. Rusk*, the Supreme Court ruled that citizens of the United States may not be deprived of their citizenship involuntarily. There, the government attempted to strip the citizenship of Beys Afroyim, because he had cast a vote in an Israeli election after becoming a naturalized U.S. citizen. The Supreme Court decided that Afroyim's right to retain his citizenship was guaranteed by the Citizenship Clause of the Fourteenth Amendment to the Constitution. The Court's majority held that "Congress has no power under the Constitution to divest a person of his United States citizenship absent his voluntary renunciation thereof." *Id*., at 253.

[24] In *Vance v. Terrazas*, the Supreme Court *overturned* portions of the INA which had listed various expatriating that could be taken as conclusive, irrebuttable proof of intent to give up U.S. citizenship. The Court held that as a prerequisite for losing citizenship it is not enough that the individual voluntarily performs an expatriating act, but he/she must also intend to relinquish citizenship by performing that act.

[25] Plaintiffs do not concede the content of DOS's analysis and conclusion. Plaintiffs merely concede that this is what DOS has stated.

### E.  **Extending the Renunciation Fee to Non-Renunciation Relinquishments**

119.     Less than a month after the publication of the 2015 Final Rule, on September 8, 2015, the DOS issued an interim final rule[26], extending the increased fee to any request for expatriation, whether the individual is attempting to relinquish nationality by way of renunciation under 8 U.S.C. §1481(a)(5) or by way of non-renunciation relinquishment under 8 U.S.C. §1481(a)(1)-(4).  80 Fed. Reg. 53704 (Sep. 8, 2015):

120.     According to the DOS, the "Fiscal Year 2012 Cost of Service Model update demonstrated that documenting a U.S. national's relinquishment of nationality is extremely costly whether the service is for a relinquishment under 8 U.S.C. 1481(a)(1) to 1481(a)(4) or a relinquishment by renunciation under 8 U.S.C. 1481(a)(5)." *Id.*[27]

121.     According to the DOS, "the services performed in both situations are similar, requiring close and detailed case-by-case review of the factors involved in a request for a Certificate of Loss of Nationality, and both result in similar costs to the Department." *Id.*[28]

122.     The DOS summarized the grounds for extending the fee to non-renunciation relinquishment cases as follows:

> In the past, individuals seldom requested Certificates of Loss of Nationality from the Department to document relinquishment. Although the Department was aware that an individual relinquishment service was among the most time consuming of consular services, it was rarely performed so the overall cost to the Department was low and the Department did not establish a fee. Requests for a Certificate of Loss of Nationality on the basis of a non-renunciatory relinquishment have increased significantly in recent years, and the Department expects the number to grow in the future, causing the total cost of this service to increase. At the same time, the Department funds consular services completely

---

[26] *See* fn. 16, above. Here too, the DOS found "good cause" under 5 U.S.C. §553(b)(3)(B) because "the delay involved in publishing this rule for notice and comment would cause immediate harm to the ability of the Department to provide" services. 80 Fed. Reg. 53704 (Sep. 8, 2015).

[27] Plaintiffs do not concede the content of DOS's analysis and conclusion.

[28] Plaintiffs do not concede the content of DOS's analysis and conclusion.

from user fees. The Cost of Service Model continues to demonstrate that such costs are incurred by the Department when accepting, processing, and adjudicating relinquishment of nationality cases; therefore, the Department will collect a fee from all individuals seeking a Certificate of Loss of Nationality. Taking into account the costs of both renunciation and non-renunciation relinquishment processes, the fee will be $2,350.[29]

123.     As set forth above and below, Defendants' position that the Renunciation Fee is necessary to cover the costs of the services provided is wrong.

## FACTUAL BACKGROUND

### A.  Accidental Americans and the Burdens in Carrying United States Citizenship

124.     Plaintiffs have a fundamental right to exercise their right to expatriate. Their motivations and reasons for exercising that right are largely irrelevant for this lawsuit: being a fundamental right, the government cannot curtail or otherwise limit this right unless it is necessary for a compelling government interest.

125.     That said, the fact that motivation is not a factor does not mean that it cannot highlight the problems associated with Defendants' actions.  Plaintiffs' status as United States citizens – all the while having little or no connection to America – has injured them and continues to injure them.

126.     Maintaining such a status may have had its benefits in the past, but the current legal and regulatory regimes promulgated by the U.S. government have created a reality where it simply is not worth it anymore to be what we call here an "Accidental American."

127.     The term "Accidental American" describes individuals whom the U.S. deems to be American citizens as a result of being born in the U.S., but who have lived abroad most if not all of their lives as citizens of another country. *See* Peter J. Spiro, *Citizenship Overreach*, 38 MICH.

---

[29] Plaintiffs do not concede the content of DOS's analysis and conclusion.

J. Int'l L. 167, 167 (2017) (hereinafter: "Spiro") (defining "accidental Americans" as "those born with U.S. citizenship but lacking meaningful social connections to the United States in adulthood […]").

128.     Under the Citizenship Clause of the Fourteenth Amendment of the Constitution, "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside." U.S. Const. amend. XIV, §1. Under 8 U.S.C. §1401(a), "a person born in the United States" becomes a national and citizen of the United States at birth.

129.     United States law and practice, as described above, have resulted in a global phenomenon whereby millions of individuals with utterly no connection with the United States – save their place of birth – are deemed U.S. citizens.

130.     Accidental Americans – such as Plaintiffs – generally do not regard themselves as U.S. citizens and never chose to be U.S. citizens. Yet, Accidental Americans carry the heavy burdens attached to U.S. citizenship.

**B.  FATCA, Accidental Americans and the Increase in the Renunciation Fee**

131.     Enacted in 2010, the Foreign Account Tax Compliance Act[30], better known as "FATCA," was and remains the primary cause of the discriminatory and unfair practices that have been instituted in the foreign finance and banking industry against Accidental Americans in their foreign places of residence.

---

[30] Hiring Incentives to Restore Employment Act (HIRE), Pub. L. No. 111-147, §§ 501-531, 124 Stat. 71 (2010) (codified in scattered sections of the Internal Revenue Code).

132.     It is no surprise that FATCA has been the number one catalyst for the sharp rise in

applications for renunciations, the DOS's justification for raising the fee for renunciation.[31]

133.     According to all estimates, renunciations have been on the rise since 2010, the year

FATCA was enacted[32]:



---

[31] Catherine Bosley and Richard Rubin, *A Record Number of Americans Are Renouncing Their Citizenship*, Bloomberg Business, Feb. 10, 2015, http://www.bloomberg.com/news/articles/2015-02-10/americans-overseas-top-annual-record-for-turning-over-passports;

Ali Weinberg, *Record Number of Americans Renouncing Citizenship Because of Overseas Tax Burdens*, ABC News, Oct. 28, 2014, http://abcnews.go.com/International/recordnumberamericans-renouncing-citizenship-overseas-tax-burdens/story?id=26496154;

Laura Saunders, *More Americans Renounce Citizenship, With 2014 on Pace for a Record*, The Wall Street Journal, Oct. 24, 2014, http://blogs.wsj.com/totalreturn/2014/10/24/more-americans-renouncecitizenship-with-2014-on-pace-for-a-record/;

Robert W. Wood, *Americans Renouncing Citizenship Up 221%, All Aboard The FATCA Express*, Forbes, Feb. 6, 2014, http://www.forbes.com/sites/robertwood/2014/02/06/americans-renouncing-citizenship-up-221-all-aboard-the-fatca-express/

[32] Under 26 U.S.C. §6039G, the U.S. Government publishes the names of all Americans who give up their citizenship.

134.    There can be no question as to the connection between FATCA and the DOS's creation of the Renunciation Fee and its subsequent increase. The DOS first established the $450 Renunciation Fee in March 2010, which became effective in the summer of that same year. FATCA was also enacted in March 2010.

135.    On information and belief, levying the $450 Renunciation Fee in 2010 (and subsequently increasing it to $2,350 in 2015) was intended to discourage U.S. citizens abroad from exercising their fundamental right to expatriate.  The government's primary purpose was not, as it claimed, to recoup administrative costs ostensibly associated with the renunciation process.  Rather the timing and juxtaposition of the FATCA legislation and the unprecedented imposition of a renunciation fee were part and parcel of an overarching scheme the effect of which was to stigmatize overseas Americans as tax cheats, while at the same time preventing them from escaping the U.S. citizenship-based tax regime through renunciation of citizenship.   In this context, the Renunciation Fee operated from its inception as a punitive exit tax.

C.  **FATCA's Negative Effect on Accidental Americans**

136.    FATCA is a bulk data collection program requiring foreign governments and financial institutions to report to the IRS detailed information about the accounts of U.S. citizens living abroad, including their account balances and account transactions.

137.    FATCA's sweeping and overarching scope has brought within its draconian regime Americans who have nothing to hide.

138.    FATCA has caused many foreign financial institutions to curtail their business dealings with U.S. citizens living abroad because the costs associated with compliance are simply not worth the trouble.

139.     According to a 2014 study conducted by the group "Democrats Abroad", almost one-quarter (22.5%) of Americans living abroad who attempted to open a savings or retirement account and 10% of those who attempted to open a checking account were unable to do so.[33] In 2014, it was estimated that one million Americans living abroad have had bank accounts closed because of FATCA.

140.     In addition to causing Americans overseas to lose access to basic financial services abroad, FATCA has also had a detrimental impact on U.S. citizens living abroad at work and at home. Many have reported that they are being denied consideration for promotions at their jobs, particularly with respect to high level positions, because of the concomitant compliance burdens foisted on employers by FATCA. Indeed, in the study by "Americans Abroad" (www.americansabroad.org), 5.6% of respondents reported that they had been denied a position because of FATCA. Others reported difficulty opening a business or partnering with others in joint ventures because of obstacles created by FATCA.

141.     These statistical numbers may have changed since 2014. However, Plaintiffs in this lawsuit demonstrate that the burdens of FATCA persist. All in all, holders of American citizenship are still considered financial pariahs. *See* also: "More Dutch banks turning away 'unintentional Americans', latest NRC Handelsblad report reveals" (Dec. 7, 2020), available at https://americanexpatfinance.com/tax/item/593-more-dutch-banks-turning-away-unintentional-americans.

---

[33]  Democrats Abroad, FATCA: Affecting Everyday Americans Every Day 6 (2014), https://www.democratsabroad.org/fatca_research_affecting_everyday_americans_every_day.

142.     FATCA is premised on the United States' policy of "citizen-based taxation." *See* I.R.C. §7701 (a)(30)(A) (2014).  Prior to FATCA, many Accidental Americans were not aware that they had any tax-related obligations due to their "accidental" citizenship status. In fact, many Accidental Americans were not even conscious of the fact that they held United States citizenship.[34] FATCA served as a wake-up call for individuals who up to that point did not see themselves as Americans at all.

143.     Facing the obstacles FATCA has imposed on them, Americans abroad have not sat on their hands.  Many advocacy groups as well as individuals have challenged FATCA with the hope that this discriminatory and invasive statute would be declared unconstitutional or repealed. Challenges have been raised both in the legislative framework and through courts of law in the United States and elsewhere. *See Crawford v. United States Dep't of Treasury*, 868 F.3d 438 (6th Cir. 2017), *rehearing en banc denied*, 2017 WL 9516374 (6th Cir. Sept. 26, 2017), *cert. denied*, 138 S. Ct. 1441 (2018); *Republicans Overseas Israel, et al. v. The Government of the State of Israel, et al.*, HCJ 8886/15 (Jan. 2, 2018) (FATCA legal challenge in Israel); *Gwendolyn Louise Deegan v. The Attorney General of Canada,* 2019 FC 960 (FATCA legal challenge in Canada); *See* also,  Tax Fairness for Americans Abroad Act of 2018, 115th Congress (2017-2018); *See* also the Republican Party Platform 2016 which included language calling for the repeal of FATCA and      moving      to      Residence      Based      Taxation,      available      at

---

[34] *See, e.g.*, Amber Hildebrandt, U.S. FATCA Tax Law Catches Unsuspecting Canadians in Its Crosshairs, CBC NEWS (lase visited Dec. 1, 2020), http://www.cbc.ca/news/canada/u-s-fatca-tax-law-catches-unsuspecting-canadians-in-its-crosshairs-1.2493864 (discussing the unanticipated reach of U.S. tax law to Canadian citizens born in Canada to dual citizen parents).  *See also*, Liberty and Justice for All United States Persons Abroad, THE ISAAC BROCK SOCIETY, http://isaacbrocksociety.ca/ (last visited Dec. 1, 2020); A Gathering Place for People Fighting FATCA, FBAR, and U.S. Citizenship-Based Taxation, MAPLE SANDBOX, http://maplesandbox.ca/ (last visited Dec. 1, 2020).

https://republicansoverseas.com/timeline/gop-includes-anti-fatca-language-2016-platform; *See also*, *Reviewing the Unintended Consequences of the Foreign Account Tax Compliance Act: Hearing Before the Subcommittee on Government Operations of the Committee on Oversight and Government Reform*, 115 Cong. 1 (2017); *See also* https://americanexpatfinance.com/news/item/478-accidental-americans-in-france-take-banks-to-court (French-based efforts against FATCA and FATCA-related policies); https://international-adviser.com/france-sued-by-accidental-americans-over-fatca/ (same).[35]

144.    Despite these efforts, FATCA remains in full force and effect, negatively affecting the lives of Accidental Americans, including Plaintiffs.[36]

### D.  Plaintiffs' Renunciation as Freedom of Expression

145.    Several of the Plaintiffs wish to renounce their U.S. citizenship as an expression of their disenchantment of United States policies and political ideology. This should come as no surprise. Renunciation of citizenship is and always has been the quintessential means to express ideological sentiments. Essentially, these plaintiffs – and those similarly situated – wish to irrevocably sever their ties with the United States for ideological reasons by invoking their right to expatriate.

---

[35] See also:

https://www.voanews.com/usa/accidental-americans-file-eu-suit-against-france-over-us-tax-risk;

https://www.reuters.com/article/us-france-us-idUSKCN1R825K;

https://www.europarl.europa.eu/doceo/document/TA-8-2018-0316_EN.html.

[36] FATCA has many indirect negative consequences not addressed in this Complaint. In addition, although FATCA is the primary cause for overseas discrimination against American citizens, it is by no means the only cause. For example, U.S. sanctions on Iran negatively affect U.S. citizens abroad who have dealings or interests in corporations that work directly with Iran.

146.    Historically, expatriation has been used as an expressive act, reflecting the renunciant's position regarding his or her association with a body politic. For example, many Japanese Americans who were placed in internment camps throughout the West during World War II elected to renounce their U.S. citizenship as an "expression of momentary emotional defiance in reaction to years of persecution." Minoru Kiyota, BEYOND LOYALTY: THE STORY OF A KIBEI, University of Hawaii Press (1997), at 129. *See Korematsu v. United States,* 323 U.S. 214 (1944).

147.    Similarly, Juan Mari Brás'[37] renunciation of U.S. citizenship in 1994 also comes to mind. By renouncing United States citizenship, "Mari Brás sought to spread his very own view of his pro-independence ideal for Puerto Rico, to express his objection to a citizenship he believes was unlawfully imposed, and to affirm his belief that Puerto Rico is a nation and his sole homeland." Ramirez de Ferrer v. Mari Bras, 144 D.P.R. 141, 1997 WL 870836 (S. Ct. P.R., Nov. 18, 1997) (translated from the Spanish).

148.    Plaintiffs in this action are composed of two groups. One group includes individuals who feel that the United States has discriminated against them for almost a decade.  This discrimination has manifested itself, first and foremost, with the enactment of FATCA. All the Plaintiffs are included in this category.

149.    This  group  of  Plaintiffs are utterly disenchanted,  upset, and frustrated by their treatment by banking and financial institutions in their countries of residence as a result of FATCA and the U.S. Government's stubborn refusal to ameliorate their plight. Plaintiffs wish to protest their       predicament by       severing       their       ties       with the       United

---

[37] Juan Mari Brás (December 2, 1927 – September 10, 2010) was an advocate for Puerto Rican independence from the United States who founded the Puerto Rican Socialist Party (PSP).

States, *i.e.* through renunciation.  For these Plaintiffs, renunciation is the ultimate form of this protest, the culmination of a decade's worth of mostly failed attempts to bring about a change in U.S. policy.

150.     The second group of Plaintiffs include those who embrace a fundamentally different political philosophy than that which underlies the American form of government and American society. These Plaintiffs disagree on the most basic tenets of the American way of life, wholly apart from FATCA (although FATCA may exacerbate these individuals' disdain for American values and mores).

151.     This latter group of Plaintiffs include Plaintiff Fabien Lehagre who disagrees with the "ultra-capitalist vision and globalist ideology of the United States."[38]

152.     Plaintiff Miriam Kupper similarly shares a distinct political ideology than that espoused by the United States and does not want to be "a citizen of a country which believes itself superior, exploits the wealth of others, interferes with the conflicts of others when it doesn't create them, hasn't signed the climate agreements or ratified the convention on children's rights." [39]

153.     Plaintiff Aline Coscarat also fundamentally disagrees with American foreign and domestic policies. She has become completely disenchanted with the United States as a result of its fifty-year embargo of Cuba; she believes that the embargo and sanctions on Iran constitutes genocide and blackmail against non-U.S. companies. In addition, Ms. Coscarat vehemently disagrees with U.S.-based legislation that limits the freedom of women to "dispose of their bodies" and disagrees with a country that bans abortion in some states" and the "bigotry of American people who always refer to some God." [40]

---

[38] Statement on-file with undersigned counsel.
[39] Statement on-file with undersigned counsel.
[40] Statement on-file with undersigned counsel.

154.     Plaintiff Paula Calvo Suarez is "highly critical of the United States foreign policy, the way it has kept intervening and spurring inner conflicts in many countries for its own economic interests, the way it demands sanctions to be applied to those it finds to be 'non-compliant' with the law whenever it suits them; but refuses to be held accountable for its own dishonest actions... The US has become a bully and I'm not interested in pledging alliance to it, nor do I have any real emotional/blood ties to it." [41]

155.     Plaintiff Epifanio Antonio Migliozzi is "a communist" and does "not support at all the capitalist ideology promoted by the United States."[42]

156.     Plaintiff Robyn Smoor is a "socialistic democrat" and does not "support the monopolistic and divisive rule of capitalism and suppression" in the United States. [43]

157.     Plaintiff Stephen Serra has become disenchanted "the way the United States people and politics has changed in the last years."

158.      One need not agree with these beliefs or ideologies; they may indeed be repugnant to many. But Plaintiffs' beliefs have no bearing on this lawsuit. The simple fact is that Plaintiffs wish to renounce their U.S. citizenship as an expression of their political and ideological disenchantment with America.

159.     By creating the Renunciation Fee and subsequently increasing it to $2,350, Defendants have placed an expensive price tag on these most fundamental freedoms and rights and have implicated Plaintiffs' freedoms and rights under the First Amendment of the Constitution.  The Renunciation Fee is for all intents and purposes an "exit tax," not dissimilar from that levied by the former Soviet Union on those of its citizens who sought freedom in the

---

[41] Statement on-file with undersigned counsel.
[42] Statement on-file with undersigned counsel.
[43] Statement on-file with undersigned counsel.

West.  *See* Korey, *Jackson-Vanik and Soviet Jewry*, [1984] The WASH. Q., at 119 ("diploma tax" to emigrate with family reached 40,000 rubles).

160.     By imposing such a heavy burden, Defendants are also forcing these Plaintiffs – Americans by happenstance – to continue to associate themselves with a political body that they feel no connection with and with which they vehemently disagree.

## CAUSES OF ACTION

## COUNT I

## VIOLATION OF DUE PROCESS UNDER THE FIFTH AMENDMENT

161.     Plaintiffs incorporate by reference all the allegations above.

162.     Under the Due Process Clause of the Fifth Amendment, when government action imposes a burden upon the exercise a fundamental right, courts must review the action under strict scrutiny: the burden must be necessary to further a compelling government interest.

163.     Plaintiffs have a fundamental and natural right to renounce their United States citizenship.  Allison Christians, *A Global Perspective on Citizenship-Based Taxation*, 38 MICH. J. INT'L L. 193, 241 (2017) ("The imposition of a fee to renounce expressly appears to violate the fundamental right that everyone has to leave their nationality."); Preamble to the Act of July 27, 1868, 15 Stat. 223 (1868) ("[T]he right of expatriation is a natural and inherent right of all people, indispensable to the enjoyment of the rights of life, liberty and the pursuit of happiness."); *Savorgnan v. United States*, 338 U.S. 491, 497–98 (1950) ("Traditionally the United States has supported the right of expatriation as a natural and inherent right of all people. Denial, restriction, impairment or questioning of that right was declared by Congress, in 1868, to be inconsistent with the fundamental principles of this Government."); *Afroyim v. Rusk*, 387 U.S. 253, 258 (1967) (stating that by 1818, "no one doubted the existence of the right of voluntary expatriation"); *Cf.*

*Richards v. Sec'y of State, Dep't of State*, 752 F.2d 1413, 1422 (9th Cir. 1985); *Juando v. Taylor*, 13 F. Cas. 1179, 1181 (S.D.N.Y. 1818) ("In this country, expatriation is conceived to be a fundamental right. As far as the principles maintained, and the practice adopted by the government of the United States is evidence of its existence, it is fully recognized. It is constantly exercised, and has never in any way been restrained. The general evidence of expatriation is actual emigration, with other concurrent acts showing a determination and intention to transfer his allegiance").

164.     It follows that any legislation or regulation that imposes restrictions on the right to renounce United States citizenship is subject to strict scrutiny. *Scahill v. D.C.*, 271 F. Supp. 3d 216, 238 (D.D.C. 2017), *aff'd*, 909 F.3d 1177 (D.C. Cir. 2018) (Government infringement of a substantive fundamental right is analyzed under strict scrutiny).

165.     In order for a government action to survive under strict scrutiny, it must be narrowly tailored to promote a compelling government interest. *United States v. Playboy Entm't Grp., Inc*., 529 U.S. 803, 813 (2000)

166.     Accordingly, Defendants' decision to levy the $450 Renunciation Fee and then subsequently increase it to $2,350 must be *necessary* to achieve a *compelling* government interest.

167.     The imposition of the Renunciation Fee fails to meet the strict scrutiny standard because it is not necessary to achieve a compelling government interest. Here, the government has sought to legitimize the imposition and increase in the Renunciation Fee based on a cost-of-service analysis, a general government policy that requires agencies to be self-sustaining. This pecuniary interest is not a "compelling interest" and cannot be used to justify the infringement or limitation of the fundamental, natural, inherent and constitutional right to expatriate. Tellingly, there is no statute or other source that mandates the DOS to impose any fee on renunciation. The

statute that the DOS derived its authority to impose and subsequently increase the Renunciation Fee, 31 U.S.C. §9701, states that an agency *may* prescribe regulations establishing the charge for a service […]". Moreover, the Congressional intent underlying 31 U.S.C. §9701 is that "each service or thing of value provided by an agency […] is to be self-sustaining *to the extent possible*." Therefore, the very statutory authorization relied upon by the DOS belies any attempt to construe the Renunciation Fee as a compelling or necessary governmental interest.

168.    The payment of the Renunciation Fee is a precondition to exercise the fundamental right to voluntary expatriate. Tellingly, renunciation can only be performed before a consular official and **only after** the payment of the Renunciation Fee. Thus, the exercise of the right to expatriate via renunciation is dependent on and subject to the payment of the Renunciation Fee. Therefore, the Renunciation Fee directly burdens and prevents Plaintiffs from exercising their fundamental right to voluntarily expatriate.

169.    Moreover, Defendants have not demonstrated, nor will they be able to demonstrate, that the Renunciation Fee was "necessary" to achieve the government interest at issue, whatever that interest may be. As described below in the APA cause of action, the DOS's "cost of service" analysis is fundamentally and logically flawed: The claim that the DOS spends substantial amounts of time to accept, process, and adjudicate 8 U.S.C. §1481(a)(5) cases is belied by the fact that procedures under this statute are, in fact, simple, short, and straightforward. Any increase in workload – as asserted by the DOS due to a rise in 8 U.S.C. §1481(a)(5) applications – does not support the factual finding of the DOS, justifying the necessity of fee or its increase. This is especially so when the increase in the workload is a result of government action, *i.e.,* FATCA, and when there are obvious alternative ways to cover the costs of the services (whatever those costs may be).

170.     Even if the restrictions imposed by the Renunciation Fee were subject to intermediate scrutiny, they would still fail to pass muster under the Fifth Amendment.

171.     Accordingly, the Renunciation Fee should be declared unconstitutional under the Due Process Clause of the Fifth Amendment, and Defendants should be enjoined from enforcing it.

## COUNT II

## VIOLATION OF THE FIRST AMENDMENT OF THE UNITED STATES CONSTITUTION

172.     Plaintiffs incorporate by reference all the allegations above.

173.     The First Amendment to the United States Constitution provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

174.     Restrictions that implicate First Amendment rights are categorized as either content-based or content-neutral.   Content-based restrictions — "regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content"—are subject to strict scrutiny. _Reed v. Town of Gilbert, Ariz._, 576 U.S. 155, 163 (2015) (burdening "speech because of the topic discussed or the idea or message expressed" is subject to "strict scrutiny.") Such content-based regulations are presumptively invalid and may only be sustained if "necessary to serve a compelling state interest and [...] narrowly drawn to achieve that end."

175.     Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed. _Id_.

176.     If a law, by its terms, discriminates based on content, strict scrutiny is applied "regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Id.,* at 168.

177.     Regulations that are facially content neutral, will be considered content-based regulations of speech if they cannot be "justified without reference to the content of the regulated speech." *Id.,* citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

178.     The First Amendment also prohibits the government from telling people what they must say.  *Wooley v. Maynard*, 430 U.S. 705, 717 (1977).

179.     Protected speech is not limited to oral or written modes of expression. Rather, the First Amendment's protections extend to various expressions of speech, including expressive conduct.

180.     Renunciation of one's citizenship involves both conventional speech and expressive conduct. It is speech because it involves the taking of a renunciation oath by virtue of which an individual's United States' citizenship is terminated, subject to the approval of the DOS. Renunciation is also expressive conduct because it purports to strip oneself of citizenship, the quintessential "speech act."[44] Through an act of renunciation, Plaintiffs wish to express their disillusionment with the U.S. government's unfair, arbitrary and discriminatory policies and laws against them. Some of the Plaintiffs wish to express their political ideology through an act of renunciation. The common denominator of both groups of Plaintiffs is that they wish to protest their frustration by way of the highest form of expression available to them- renunciation. In this

---

[44] *See* Lawrence B. Solum, *Freedom of Communicative Action: A Theory of the First Amendment Freedom of Speech*, 83 Nw. U. L. Rev. 54, 55 (1989).

regard, renunciation is no less than other forms of expressive conduct that have been recognized as "speech" for purposes of First Amendment jurisprudence.

181.    Accordingly, renunciation is "speech", enjoying the protections of the First Amendment.

182.    Moreover, the Renunciation Fee is a *content*-based restriction. The Renunciation Fee applies when and only when an individual wishes to have his oath of renunciation effective. In other words, Defendants impose the Renunciation Fee when an individual wishes to sever his or her ties with the United States. That is content-based regulation, pure and simple, or, at the very least, a regulation that cannot be justified without reference to the content of the speech.

183.    Moreover, by deterring and preventing Plaintiffs and those similarly situated to disassociate with the United States, Defendants are essentially forcing Plaintiffs to associate themselves with and embrace a political ideology they find repugnant.

184.    The Renunciation Fee does not regulate the time, place or manner of the act of expatriation. It merely places a price tag as a precondition on a highly expressive action. This is yet another reason why the Renunciation Fee is content-based.

185.    The highly expressive nature, historical pedigree, and uniqueness of voluntary renunciation also warrants the conclusion that any direct burden on it should be classified as content-based.

186.    Because the Renunciation Fee burdens speech and because the burden is content-based, the Renunciation Fee is subject to strict scrutiny and must be stricken as an unconstitutional burden on freedom of expression if it is not necessary to further a compelling government interest. As alleged above in Count I, the restrictions are not are necessary to achieve a compelling government interest and therefore must be stricken.

187.     As asserted above in Count I, even if the restrictions imposed by the Renunciation Fee were subject to a lesser form of scrutiny, they would still fail to pass muster under the First Amendment.

188.     Accordingly, the Renunciation Fee should be declared unconstitutional under the First Amendment of the Constitution, and Defendants should be enjoined from enforcing it.

## COUNT III

## THE RENUNCIATION FEE IS UNCONSTITUTIONAL UNDER THE EXCESSIVE FINES CLAUSE

189.     Plaintiffs incorporate by reference all the allegations above.

190.     The Eighth Amendment provides: "Excessive bail shall not be required, *nor excessive fines imposed*, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

191.     The Excessive Fines Clause is not limited only to fines that are criminal in nature but extends to civil fines as well. *Austin v. United States*, 509 U.S. 602, 610 (1993). A fine is subject to the Excessive Fines Clause if one of the purposes of the fine is punishment. Fines calibrated for retributive or deterrent purposes are considered to be for the purpose of punishment. *Austin*, 509 U.S. at 610.

192.     In *Austin*, the Supreme Court held that because the "purpose of the Eighth Amendment [...] was to limit the government's power to punish," the Excessive Fine Clause may apply to civil forfeiture if that sanction "can only be explained as serving *in part* to punish." *Id*., at 609–10 (emphasis added); *See also United States v. Halper*, 490 U.S. 435, 447 (1989) ("[A] civil sanction that cannot fairly be said *solely* to serve a remedial purpose, but rather can only be explained as *also* serving either retributive or deterrent purposes, is punishment, as we have come to understand the term.") (emphasis added).

54

193. The Renunciation Fee is a punishment for the purposes of the Excessive Fines Clause. As alleged above, the purpose of the Renunciation Fee is to deter and disincentivize U.S. citizens from exercising their fundamental right to expatriate. As discussed below in the APA claim, the government's contention that the Renunciation Fee was created and increased to cover the costs associated with services rendered is false and baseless. Rather, the real purpose behind the increase in the Renunciation Fee was to punish U.S. citizens who merely wish to escape the burdens placed upon them by FATCA or share a different political ideology. The enactment of FATCA and the Renunciation Fee within the same time frame in 2010 is no coincidence. The government knew FATCA would cause mass expatriation and, in its attempt to keep its overseas citizenry within its tax reach, the government was determined to deter individuals from expatriating. The deterrent nature of the Renunciation Fee brings it into the ambit of the Eighth Amendment.

194. Because the Renunciation Fee is a "fine," it is subject to the protections of the Eighth Amendment. Accordingly, the Renunciation Fee cannot be "excessive."

195. The Supreme Court has identified three general criteria to guide the determination of whether a fine is grossly disproportionate and, hence, excessive: (1) the degree of the defendant's reprehensibility or culpability; (2) the relationship between the penalty and the harm to the victim caused by the defendant's actions; and (3) the sanctions imposed in other cases for comparable misconduct. *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 434–35 (2001).

196. Applying these criteria, the Renunciation Fee is "excessive" for the following reasons. First, a U.S. citizen's exercise of his/her right to expatriate does not constitute reprehensible nor culpable conduct. Second, there is no relationship whatsoever between the fine

and any harm because the renunciant's act of expatriation harms no one. Lastly, the DOS imposes fees for other consular/visa services that are significantly lower than the Renunciation Fee, even when those services obviously require more effort (*see* below, ¶203 and fn. 46).

197.    Accordingly, the Renunciation Fee should be declared unconstitutional under the Excessive Fines Clause, and Defendants should be enjoined from enforcing it.

## COUNT IV

## VIOLATION OF ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. §706

198.    Plaintiffs incorporate by reference all the allegations above.

199.    The APA states that a court must "hold unlawful and set aside" agency action that is "arbitrary, capricious, [or] an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

200.    Under the APA, a court must "hold unlawful and set aside" agency action that is "not in accordance with law" 5 U.S.C. §706(2)(A) or "contrary to a constitutional right," 5 U.S.C. §706(2)(B), or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. §706(2)(C).

201.    The APA also states that a court must "hold unlawful and set aside" agency action that is "unsupported by substantial evidence." 5 U.S.C. § 706(2)(E).

202.    Courts will invalidate agency determinations that fail to examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.

203.    For a number of independent reasons, the 2015 Final Rule is unlawful under the APA because it is arbitrary and capricious, and unsupported by substantial evidence:[45]

---

[45] The following list is not meant to be exhaustive and Plaintiffs reserve their right to further demonstrate how the 2015 Final Rule is arbitrary, capricious and not supported by substantial evidence.

(A) The services under 8 U.S.C. §1481(a)(5) are straightforward and simple, requiring the DOS to do one thing, and one thing only: Verify that the renunciant is taking the oath voluntarily. There is nothing complex about such a process, certainly nothing that justifies the imposition of the highest fee known in the immigration context. Passport and visa applications, for example, – which are far more complex, requiring far more paperwork and consular discretion – do not cost nearly as much.[46]

(B) The DOS also fails to differentiate and consider the different types of services under its own activity-based costing (ABC) model.  For example, the DOS has asserted that a determination under 8 U.S.C. §1481(a)(5) can be "especially demanding in the case of

---

[46] By way of example only, consider E-1/E-2 Treaty Trader/Investor visa applications. Such applications require the payment of a $205 fee. Even a cursory glance at the rules, regulations and instructions regarding this type of visa demonstrates that E-1 visa applications are far more complicated and time consuming than a voluntary renunciation of citizenship.  *See*, in general, https://www.uscis.gov/working-in-the-united-states/temporary-workers/e-1-treaty-traders.

Tellingly, the DOS issued 63,178 E-1/E-2 visas in 2019; 60,438 in 2018; 62,974 in 2017; 64,329 in 2016; and 59,221 in 2015. *See* https://travel.state.gov/content/travel/en/legal/visa-law0/visa-statistics/annual-reports/report-of-the-visa-office-2019.html.

These numbers relate only to the number of visas that were issued, not the number of applications that were filed. These statistics lead to the inevitable conclusion that the Renunciation Fee's purpose cannot merely be to cover the costs of services. If that was the sole purpose behind the policy of the DOS, how is it possible that for much more complex visa services which involve the processing of tens of thousands of applications, the fee is nominal, whereas for the simple processing of a renunciation case, which are relatively rare (in 2019, the DOS issue 2,017 CLNs; in the same year the DOS issued 63,178 E-visas), the fee is more than one-hundred times the amount of the E-visa fee.

Notably, the estimated processing time of an E visa is six months. However, applicants may apply for "premium processing" to expedite the E visa processing time from six months to 15 calendar days for a fee of $1,225, which is still approximately half of the current Renunciation Fee.

minors or individuals with a developmental disability or mental illness."[47]   However, there is no indication that the ABC model accounted for time spent on 8 U.S.C. §1481(a)(5) applications from minors and 8 U.S.C. §1481(a)(5) applications from adults. Had the ABC model considered these differences it would have found that there is nothing complex or difficult in discerning an *adult's* desire and intent to renounce.

(C) The DOS also fails to distinguish between services for renunciation cases and services for non-renunciation relinquishment cases. Non-renunciation cases are inherently more complex and difficult to adjudicate because they require not only to discern *intent* and *voluntariness*, but also to identify the exact Confirmatory Act that serves as the predicate of the expatriating act. The inherent complexity in non-renunciation relinquishment cases is manifest also in the additional Form DS-4079 that is required to be completed and signed by both the applicant and consular officer.

Moreover, even a cursory review of 7 FAM 1220, the section that deals with non-renunciation relinquishment cases, demonstrates that the work required by the DOS in these types of cases is of a completely different nature. These types of cases may require significant resources and time. That is not the case with renunciation.

In addition, as we have noted, in renunciation cases, the DOS generally does not need to ascertain the intent of the renunciant because the oath is sufficient to demonstrate intent. This contrasts with non-renunciation relinquishment cases where there is an administrative presumption of intent to retain citizenship. (*see* above, ¶93).

---

[47] It is unclear how many renunciation cases involve minors and individuals with developmental disabilities.

Yet, despite these obvious differences, the DOS has increased the fee for both renunciation and non-renunciation cases.

(D) Finally, the DOS also failed to take into account that the Supreme Court cases it relied upon are irrelevant in the context of *renunciation*. The DOS supported the 2015 Final Rule with the Supreme Court rulings in *Afroyim v. Rusk* and *Vance v. Terrazas*. This assertion makes no sense. *Afroyim v. Rusk* and *Vance v. Terrazas* concerned ***non-renunciation relinquishment cases***. In those cases, the United States government initiated the relinquishment proceeding and attempted to strip the citizenship of U.S. citizens against their will (*i.e., denationalization*).  Under those circumstances, the Supreme Court set down the rules that the DOS cannot strip someone of their citizenship absent an affirmative and independent finding of intent and voluntariness to relinquish.

In *renunciation* cases, however, the intent and voluntariness are apparent on the face of it: the individual is asking the DOS to strip him from his/her citizenship. While the DOS may need to confirm the voluntariness of the renunciant, the amount of work and resources to make such a determination is, at most, nominal. *Afroyim v. Rusk* and *Vance v. Terrazas* cannot serve as a justification for imposing or increasing the Renunciation Fee. If anything, *Afroyim v. Rusk* and *Vance v. Terrazas* support the contention that when an individual renounces under his own free will, no fee at all should be imposed.

204.    The 2015 Final Rule is also unlawful under the APA because it is contrary to a constitutional right, as discussed above.

205.    The 2015 Final Rule is also unlawful under the APA because it is not in accordance with law, *i.e.,* 31 U.S.C. §9701. The DOS also failed to properly consider and apply 31 U.S.C.

§9701 because (1) the Renunciation Fee does not truly reflect the costs to the Government, as asserted above; (2) the DOS utterly ignored the value of the service to the recipient and the public policy or interest served. In this regard, we are unaware of any source that demonstrates that the DOS considered the gravity of the right at issue when it established the Renunciation Fee and subsequently increased it.

206.    Finally, because the Renunciation Fee does not comport with 31 U.S.C. §9701 and is clearly not intended to cover the costs of the services rendered, the imposition and increase in the fee exceed the Congressional authorization set out in 31 U.S.C. §9701 and amount to an improper tax. Therefore, Defendants' actions also fail to comport with 5 U.S.C. §706(2)(C) because they are in excess of statutory jurisdiction.

207.    Accordingly, the 2015 Final Rile should be declared unlawful under the APA, and Defendants should be enjoined from enforcing it.


### COUNT V

### VIOLATION OF CUSTOMARY INTERNATIONAL LAW

208.    Plaintiffs incorporate by reference all the allegations above.

209.    Voluntary expatriation is recognized as a right under customary international law. Note, *The Right of Nonrepatriation of Prisoners of War*, 83 YALE L. J. 358, 373 ("Beyond national law, however, the individual has the right under international law to expatriate himself. For over a hundred years the United States has viewed expatriation as an international right of all people which cannot be abridged by any acts of the American government. It has likewise declared that all states are bound by this right and has refused to recognize any contention that a native state can make the option conditional.").

210.    The international community explicitly recognized the right of expatriation as an international norm in the Universal Declaration of Human Rights of 1948, which included in Article 15 that "no one shall be [...] denied the right to change his nationality." Universal Declaration of Human Rights, art. 15, G.A. Res. 2I7A, 3 U.N. GAOR Supp. 535, 538, U.N. Doc. A/777 (1948). *See* also SLAYMAKER, at 191-192 ("Expatriation is a right tantamount, at least, and indeed has been said to be antecedent and superior, to the right of society; the law of nations recognizes it, and the modern nations of the world have sanctioned it, either by their codes or by their course of action, to varying, extents.").[48]

211.    The government's authority to regulate expatriation rests, at least in part, on international law. Indeed, the genesis of expatriation law developed from this Country's dealings and relations with foreign nations. *See* SLAYMAKER, at 191 ("It is evident, therefore, from the very nature of the acts involved in the exercise of the right, that friendly relations between the nations are promoted by the recognition of common rules of international law, or by treaty relations between the respective nations concerning the rights and the status of those of either nation who would exercise this privilege").

212.    The rules governing expatriation should conform with international law and norms wherever possible.

213.    Customary international law is legally enforceable as part of the law of the United States, either directly or through federal common law, unless superseded by a clear statement from Congress. Such statement must be unequivocal and mere silence is insufficient to meet this standard.

---

[48] *See also* SLAYMAKER, at 193, discussing the origins of the right to expatriate and demonstrating its universal acceptance among the nations.

214.    Congress has made no statement that can serve to override the customary international right to expatriate.

215.    The limitations and regulations governing the right to voluntarily expatriate should be interpreted and applied so as to conform to the international norm.

216.    Accordingly, the Renunciation Fee must be compatible with international law.

217.    As discussed above, the Renunciation Fee preconditions Plaintiffs' right to expatriate on the payment of an exorbitant fee and, therefore, fails to comport with customary international law.

218.    Accordingly, the Renunciation Fee should be declared illegal under customary international law and Defendants should be enjoined from enforcing it.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court enter judgment in favor of Plaintiffs against Defendant, as follows:

(a) Issue a declaratory judgment that the Renunciation Fee violates Plaintiffs' rights under the Fifth Amendment's Due Process Clause because it is not necessary to further a compelling government interest;

(b) Issue a declaratory judgment that the Renunciation Fee violates Plaintiffs' rights under the First Amendment's right to freedom of expression because it is not necessary to further a compelling government interest;

(c) Issue a declaratory judgment that the Renunciation Fee violates Plaintiffs' rights under the Excessive Fines Clause of the Eighth Amendment because it is an excessive punishment imposed on Plaintiffs who wish to exercise their right to expatriate;

(d) Issue a declaratory judgment that the 2015 Final Rule (concerning the Renunciation Fee) is arbitrary, capricious, contrary to a constitutional right, not in accordance with law, not supported by substantial evidence, and in excess of statutory jurisdiction;

(e) Issue a declaratory judgment that the Renunciation Fee is contrary to customary international law;

(f) Enjoin Defendants from enforcing the Renunciation Fee;

(g) Award Plaintiffs the costs of this action, including attorney's fees and all reasonable expenses pursuant to 8 U.S.C. § 2412; and

(h) Grant such other and further relief as shall be deemed just and proper by the Court.

Date: December 9, 2020.

Respectfully submitted,


/s/ *Lawrence Marc Zell*

_____
Lawrence Marc Zell
(DC Bar # 959437)
Noam Schreiber,
*pro hac vice to be filed*
**ZELL & ASSOCIATES**
**INTERNATIONAL ADVOCATES LLC**
1345 Ave. of the Americas,
2nd floor,
New York, NY 10105

34 Ben Yehuda St.
15th Floor
Jerusalem, Israel 9423001
E-mail: mzell@fandz.com
E-mail: Schreiber.noam@gmail.com

*Counsel for Plaintiffs*