**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| L'ASSOCIATION DES AMÉRICAINS ACCIDENTALS, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03573-TSC |
| v. | |
| UNITED STATES DEPARTMENT OF STATE, *et al.*, | |
| Defendants. | |

## DEFENDANTS' ERRATA

Subsequent to filing Defendants' Motion for Partial Dismissal of Plaintiffs' Complaint and for Summary Judgment on April 23, 2021, counsel for Defendants discovered that the footer in the Memorandum in Support of the Motion included the words "Sensitive But Unclassified." This phrase is an internal marker used during the drafting process, and it was inadvertently included in the final public filing. Along with this errata, Defendants have attached a corrected brief which excludes that language but is otherwise identical to the previously filed brief.

Dated:  April 26, 2021

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

*/s/ Laurel H. Lum*
LAUREL H. LUM
Trial Attorney (NY Bar No. 5729728)
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005

Tel:  (202) 305-8177
Fax:  (202) 616-8470
E-mail:  laurel.h.lum@usdoj.gov
*Counsel for Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| L'ASSOCIATION DES AMÉRICAINS ACCIDENTELS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF STATE, *et al.*, <br><br> Defendants. | Civil Action No. 1:20-cv-03573-TSC |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL
DISMISSAL AND SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

BACKGROUND ......................................................................................................... 2

I.      Expatriation is a Right Granted and Administered by Statute ............................................. 2

II.     The Authority for Issuing a Certificate of Loss of Nationality ............................................ 5

III.    Department of State Authority to Set and Collect Fees .................................................... 6

IV.     Renunciation Processing Fee Rulemakings ................................................................. 8

        A.      2010:  First Renunciation Processing Fee ......................................................... 8

        B.      2014:  Fee Increase ............................................................................. 9

STANDARD OF REVIEW ............................................................................................. 13

ARGUMENT ........................................................................................................ 14

I.      THE COURT SHOULD DISMISS PLAINTIFFS' CLAIMS FOR FAILURE TO
        STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED OR, IN THE
        ALTERNATIVE, GRANT SUMMARY JUDGMENT FOR DEFENDANTS. ............... 14

        A.      The 2015 Final Rule is Neither Arbitrary Nor Capricious. ................................. 14

        B.      The Substantial Evidence Standard is Inapplicable Here. .................................. 21

        C.      The 2015 Final Rule is In Accordance with Law and Not In Excess of
                Statutory Jurisdiction. ......................................................................... 21

                1.      The 2015 Final Rule Complies With 31 U.S.C. § 9701. ......................... 21

                2.      The 2015 Final Rule Does Not Violate Customary International
                        Law. ..................................................................................... 23

D.   The Renunciation Processing Fee is Not Contrary to a Constitutional Right...................................................................................................... 25

1.   The Renunciation Processing Fee Does Not Violate the Fifth Amendment Right to Substantive Due Process. ...................................... 25

2.   The Renunciation Processing Fee Does Not Violate the First Amendment Right to Freedom of Speech................................................ 30

3.   The Renunciation Processing Fee Does Not Violate the Eighth Amendment's Prohibition of Excessive Fines. ........................................ 34

CONCLUSION.................................................................................................................... 37

## TABLE OF AUTHORITIES

**Cases**

*Afroyim v. Rusk*,
  387 U.S. 253 (1967) ................................................................................ 5, 19, 20

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................................ 13

*AT&T Corp. v. F.C.C.*,
  220 F.3d 607 (D.C. Cir. 2000) ...................................................................... 14

*\*Austin v. United States*,
  509 U.S. 602 (1993) .................................................................................. 35, 36

*Bellion Spirits, LLC v. United States*,
  335 F. Supp. 3d 32 (D.D.C. 2018) ............................................................ 13, 14

*Bowman Transp., Inc. v. Ark. Best Freight Sys.*,
  419 U.S. 281 (1974) ........................................................................................ 14

*Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc.*,
  492 U.S. 257 (1989) ........................................................................................ 35

*Chiayu Chang v. United States Citizenship & Immigr. Servs.*,
  254 F. Supp. 3d 160 (D.D.C. 2017) ................................................................ 13

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) ........................................................................................ 14

*\*City of Erie v. Pap's A.M.*,
  529 U.S. 277 (2000) ........................................................................................ 32

*\*Collins v. City of Harker Heights, Tex.*,
  503 U.S. 115 (1992) .................................................................................. 26, 28

*Collins v. S.E.C.*,
  736 F.3d 521 (D.C. Cir. 2013) ...................................................................... 35

*Cottage Health Sys. v. Sebelius*,
  631 F. Supp. 2d 80 (D.D.C. 2009) ................................................................ 13

*\*Cox v. New Hampshire*,
  312 U.S. 569 (1941) .................................................................................. 29, 34

*Doe v. District of Columbia*,
  206 F. Supp. 3d 583 (D.D.C. 2016) ............................................................ 25, 26

*Expatriation – Effect of Afroyim v. Rusk*,
  42 Op. Atty. Gen. 397 (1969) ................................................................... 2

*F.C.C. v. Prometheus Radio Project*,
  No. 19-1231, 2021 WL 1215716 (U.S. Apr. 1, 2021) ............................. 14

*\*Farrell v. Pompeo*,
  424 F. Supp. 3d 1 (D.D.C. Nov. 27, 2019) ......................................... 5, 27

*Hutchins v. District of Columbia*,
  188 F.3d 531 (D.C. Cir. 1999) ................................................................ 26

*\*Kwok Sze v. Johnson*,
  172 F. Supp. 3d 112 (D.D.C. 2016), *aff'd sub nom. Kwok Sze v. Kelly*,
  No. 16-5090, 2017 WL 2332592 (D.C. Cir. Feb. 21, 2017) .................... 27

*\*Kwong v. Bloomberg*,
  723 F.3d 160 (2d Cir. 2013) ............................................................ 29, 34

*Leong Kwai Yin v. United States*,
  31 F.2d 738 (9th Cir. 1929) ................................................................. 4, 5

*Lozada Colon v. U.S. Dep't of State*,
  2 F. Supp. 2d 43 (D.D.C. 1998), *aff'd*, 170 F.3d 191 (D.C. Cir. 1999) .................. 27

*McKesson Corp. v. Islamic Republic of Iran*,
  539 F.3d 485 (D.C. Cir. 2008) ................................................................ 23

*Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. Ruckelshaus*,
  719 F.2d 1159 (D.C. Cir. 1983) .............................................................. 14

*Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) .................................................................................. 21

*Murray v. Schooner Charming Betsy, The*,
  6 U.S. 64 (1804) ...................................................................................... 24

*Nat'l Awareness Found. v. Abrams*,
  50 F.3d 1159 (2d Cir. 1995) .................................................................... 34

*Nat'l Lifeline Ass'n v. Fed. Commc'ns Comm'n*,
  No. 20-1006, 2020 WL 7511124 (D.C. Cir. Dec. 22, 2020) .................... 15

*Nishikawa v. Dulles*,
  356 U.S. 129 (1958) ................................................................................. 5

iv

*Packingham v. North Carolina*,
    137 S. Ct. 1730 (2017) ................................................................................................... 32

*Perkins v. Elg*,
    307 U.S. 325 (1939) ...................................................................................................... 2

*\*Reed v. Town of Gilbert, Ariz.*,
    576 U.S. 155 (2015) ...................................................................................................... 31

*San Antonio Indep. Sch. Dist. v. Rodriguez*,
    411 U.S. 1 (1973) ......................................................................................................... 28

*Scott v. United States*,
    No. 1:13-CV-2030 LJO-BAM, 2014 WL 2807652 (E.D. Cal. June 20, 2014) ....................... 27

*Shanks v. Dupont*,
    28 U.S. 242 (1830) ....................................................................................................... 3

*Turner Broad. Sys., Inc. v. F.C.C.*,
    512 U.S. 622 (1994) ................................................................................................. 32, 33

*Tutora v. U.S. Attorney Gen. for E. Dist. of Pennsylvania*,
    No. CV 16-MC-195, 2017 WL 2126321 n.6 (E.D. Pa. May 16, 2017) ............................ 27, 28

*\*United States v. O'Brien*,
    391 U.S. 367 (1968) ................................................................................................. 32, 33

*Vance v. Terrazas*,
    444 U.S. 252 (1980) ............................................................................................. 2, 19, 20

*Washington v. Glucksberg*,
    521 U.S. 702 (1997) ..................................................................................................... 26

**Statutes**

5 U.S.C. § 706 ................................................................................................................ 13, 14

5 U.S.C. § 706(2)(A) ....................................................................................................... 14, 15

5 U.S.C. § 706(2)(E) .............................................................................................................. 21

8 U.S.C. § 1104(a) ................................................................................................................. 5

8 U.S.C. § 1481(a) ................................................................................................................ 3, 4

8 U.S.C. § 1481(a)(1)-(4) ................................................................................................... 2, 19

8 U.S.C. § 1481(a)(1)-(5) ....................................................................................................... 1

8 U.S.C. § 1481(a)(5)..................................................................................................... *passim*

8 U.S.C. § 1481(a)(6)........................................................................................................... 3

8 U.S.C. § 1481(b)......................................................................................................... 12, 20

8 U.S.C. § 1501............................................................................................................... 5, 12

22 U.S.C. § 4219........................................................................................................ 2, 6, 33

31 U.S.C. § 9701............................................................................................................ *passim*

31 U.S.C. § 9701(a).............................................................................................................. 21

31 U.S.C. § 9701(b)................................................................................................... 7, 21, 22

*An Act Concerning the Rights of American Citizens in Foreign States,*
 40 Cong. Ch. 249, 15 Stat. 223, (sec. 1999, R.S., 1878) ............................................. 3

Expatriation Act of March 2, 1907, 34 Stat. 1228 (1907) ................................................ 3

**Rules**

Fed. R. Civ. P. 25(d) .......................................................................................................... 1

Fed. R. Civ. P. 56(a) ........................................................................................................ 13

Fed. R. Civ. P. 12(b)(6)....................................................................................... 13, 25, 36

**Regulations**

22 C.F.R. § 50.40-50.51 ..................................................................................................... 6

22 C.F.R. § 22.1 .................................................................................................................. 7

75 Fed. Reg. 6321-01 (Feb. 9, 2010) ................................................................................ 8

75 Fed. Reg. 14111-01 (Mar. 24, 2010) ........................................................................ 7, 8

75 Fed. Reg. 36522-01 (June 28, 2010)........................................................................... 8, 9

77 Fed. Reg. 5177-01 (Feb. 2, 2012) ............................................................................ 7, 8, 9

79 Fed. Reg. 51247-01 (Aug. 28, 2014) .................................................................... *passim*

80 Fed. Reg. 51464-01 (Aug. 25, 2015) .................................................................... *passim*

80 Fed. Reg. 53704-01 (Sept. 8, 2015)....................................................................... 12, 18, 30

83 Fed. Reg. 4423-02 (Jan. 31, 2018) ............................................................................ 13

**Constitution**

U.S. CONST. amend. V ................................................................................................... 26

**Other Authorities**

Exec. Order No. 10718, 22 Fed. Reg. 4632 (1957) ........................................................ 6

7 Foreign Affairs Manual Chapter 1200 (7 FAM 1200)............................. 6, 12, 20, 21

OMB Circular No. A-25, § 6(a)(2)(a)............................................................... 7, 22, 23

Restatement (Third) of Foreign Relations Law § 102(2) (1987) .................................. 23

Justin Hughes, *The Charming Betsy Canon, American Legal Doctrine, and the Global Rule of Law*, 53 Vand. J. Transnat'l L. 1147 (2020) ............................................................ 25

*North Sea Continental Shelf (Federal Republic of Germany v. Denmark / Federal Republic of Germany v. Netherlands)*,
I.C.J. Reports 1969................................................................................................... 23

*Right of Nonrepatriation of Prisoners of War*,
83 YALE L. J. 358 (1973) ....................................................................................... 24

**INTRODUCTION**

Plaintiff L'Association des Américains Accidentels and 20 individually-named plaintiffs (collectively, "Plaintiffs") brought this action against the U.S. Department of State, Michael Pompeo, in his official capacity as Secretary of State, and Carl C. Risch, in his official capacity as Assistant Secretary of State for Consular Affairs,[1] (collectively, "Department" or "Defendants") seeking declaratory and injunctive relief.  Plaintiffs assert that the $2,350 fee that the Department charges for administrative processing of a request for a Certificate of Loss of Nationality ("CLN") in renunciation cases under Immigration and Nationality Act (INA) § 349(a)(5), 8 U.S.C. § 1481(a)(5), ("the renunciation processing fee")[2] was adopted in violation of the Administrative Procedure Act ("APA") and violates the Constitution and customary international law.  Plaintiffs claim that the rule adopting the fee is arbitrary and capricious, that the rule fails the substantial evidence test, that the rule is in excess of statutory jurisdiction, that the renunciation processing fee violates customary international law, and that the existence of any fee as well as its current amount are contrary to constitutional rights under the First, Fifth, and Eighth Amendments.

Congress has the authority to prescribe the conditions for expatriation, and it has charged the Department of State with administering expatriations and making loss of nationality determinations under INA § 349(a)(1)-(5), 8 U.S.C. § 1481(a)(1)-(5).  This includes the authority

---

[1]  Pursuant to Fed. R. Civ. P. 25(d), Antony J. Blinken, in his official capacity as Secretary of State, has been substituted as a defendant in place of former Secretary of State, Michael Pompeo, and Ian G. Brownlee, in his official capacity as Acting Assistant Secretary for Consular Affairs, has been substituted as a defendant in place of former Assistant Secretary for Consular Affairs, Carl C. Risch.

[2]  Except where otherwise noted, the term "renunciation" as used by Defendants in this brief refers to taking the oath of renunciation abroad before a U.S. diplomatic or consular officer under INA § 349(a)(5), 8 U.S.C. § 1481(a)(5).  Case law sometimes uses the term "renunciation" or the phrase "renouncing U.S. citizenship" to refer to the broader act of relinquishing U.S. citizenship regardless of the section of the INA under which the individual requests a CLN.

to set fees for processing requests for a CLN, including those requests involving taking an oath of renunciation of U.S. citizenship abroad under INA § 349(a)(5), 8 U.S.C. § 1481(a)(5).   The Department also has the general authority to set and collect fees for services that it provides. 31 U.S.C. § 9701; *see* 22 U.S.C. § 4219.   The Department of State acted within its authority in setting the current renunciation processing fee at the amount that it costs the Department to develop the case and determine whether loss of nationality has occurred.   As explained below, the fee does not violate the APA, the Constitution, or customary international law.   For these reasons, the Court should dismiss Plaintiffs' Eighth Amendment and customary international law claims and grant summary judgment for the government on the remaining claims.   Or, in the alternative, this Court should grant summary judgment for the government on all of Plaintiffs' claims.

## BACKGROUND

### I.      Expatriation is a Right Granted and Administered by Statute.

"Expatriation is the voluntary renunciation or abandonment of nationality and allegiance." *Perkins v. Elg*, 307 U.S. 325, 334 (1939).   "Voluntary relinquishment is 'not confined to a written renunciation,' but 'can also be manifested by other actions declared expatriative under the [Immigration and Nationality][A]ct . . . ." *Vance v. Terrazas*, 444 U.S. 252, 261–62 (1980) (quoting *Expatriation – Effect of Afroyim v. Rusk*, 42 Op. Atty. Gen. 397, 400 (1969)).   Non-renunciatory relinquishments require performance of an expatriating act voluntarily and with the intent to relinquish U.S. nationality under section 349(a)(1)-(a)(4) of the INA, 8 U.S.C. § 1481(a)(1)-(4).   Renunciatory relinquishments involve taking an oath of renunciation of citizenship abroad voluntarily and with intent to relinquish U.S. nationality under section 349(a)(5) of the INA, 8 U.S.C. § 1481(a)(5), or, if in the United States, under section 349(a)(6) of the INA,

8 U.S.C. § 1481(a)(6).  Plaintiffs' suit focuses on renunciatory relinquishments under section 349(a)(5) of the INA, 8 U.S.C. § 1481(a)(5).  Compl. ¶ 7.

The right to renounce U.S. citizenship is based in statute rather than in the Constitution. Under common law, there was no right of expatriation; a citizen had no power to renounce his or her citizenship without the consent of the sovereign.  *Shanks v. Dupont,* 28 U.S. 242 (1830).  But in 1868, in an effort to promote the right of newly naturalized U.S. citizens to divest themselves of their original nationality, Congress declared that expatriation was the "natural and inherent right" of all people.  *See An Act Concerning the Rights of American Citizens in Foreign States*, 40 Cong. Ch. 249, 15 Stat. 223, (sec. 1999, R.S., 1878).  In 1907, Congress created steps by which a U.S. citizen could relinquish his or her *U.S.* citizenship.  Expatriation Act of March 2, 1907, 34 Stat. 1228 (1907).

Today, the Immigration and Nationality Act codifies the potentially expatriating acts which, if performed voluntarily and with the intent to relinquish U.S. nationality as determined by the Department of State, result in a determination of loss of U.S. nationality.  Specifically, section 349(a) of the INA, 8 U.S.C. § 1481(a), provides that a U.S. citizen may lose his or her nationality by "voluntarily performing" at least one of seven specified acts "with the intention of relinquishing United States nationality."  These potentially expatriating acts are: (1) applying for and obtaining naturalization in a foreign state after turning eighteen years old; (2) "taking an oath or making an affirmation or other formal declaration of allegiance to a foreign state or a political subdivision thereof, after having attained the age of eighteen years"; (3) "entering, or serving in, the armed forces of a foreign state if (A) such armed forces are engaged in hostilities against the United States, or (B) such persons serve as a commissioned or non-commissioned officer"; (4) working in "any office, post, or employment under the government of a foreign state or a political

subdivision thereof, after attaining the age of eighteen years if" the person either acquires the

nationality of that foreign state or is required to take an oath or affirmation or declare allegiance

to that foreign state as part of his or her work; (5) "making a formal renunciation of nationality

before a diplomatic or consular officer of the United States in a foreign state, in such form as may

be prescribed by the Secretary of State"; (6) "making in the United States a formal written

renunciation of nationality in such form as may be prescribed by, and before such officer as may

be designated by, the Attorney General, whenever the United States shall be in a state of war and

the Attorney General shall approve such renunciation as not contrary to the interests of national

defense"; or (7) "committing any act of treason against, or attempting by force to overthrow, or

bearing arms against, the United States, violating or conspiring to violate any of the provisions of

section 2383 of Title 18, or willfully performing any act in violation of section 2385 of Title 18,

or violating section 2384 of Title 18 by engaging in a conspiracy to overthrow, put down, or to

destroy by force the Government of the United States, or to levy war against them, if and when he

is convicted thereof by a court martial or by a court of competent jurisdiction."  INA § 349(a);

8 U.S.C. § 1481(a).  At issue in this case is the fifth potentially expatriating act provided in the

statute—making a formal renunciation abroad before a U.S. diplomatic or consular officer, which

is referred to herein as "renunciation."[3]

This nation's courts have long recognized statutory authority as the source of the right to

expatriate.  For example, the Ninth Circuit recognized the Expatriation Act as "the only means by

which" a native-born American could expatriate.  *Leong Kwai Yin v. United States*, 31 F.2d 738,

_____

[3]The Department of State administers the first five of these provisions regarding expatriation.  *See*
INA §§ 349(a)(1)-(5).  The Department of Homeland Security is responsible for procedures for
renouncing U.S. citizenship while in the United States as provided for in INA § 349(a)(6) and for
procedures related to INA § 349(a)(7).

4

740 (9th Cir. 1929).  Decades later, the Supreme Court stated that "a citizen has the right to abandon or renounce his citizenship and Congress can enact measures to regulate and affirm such abjuration."  *Nishikawa v. Dulles*, 356 U.S. 129, 139 (1958).  The *constitutional* right that the Supreme Court has articulated with respect to expatriation is a right pertaining to *retention* of U.S. citizenship.  The Supreme Court has recognized the right of every citizen to remain a citizen unless he "voluntarily relinquishes that citizenship."  *Afroyim v. Rusk*, 367 U.S. 253, 268 (1967).  This right stems from the Fourteenth Amendment's grant of U.S. citizenship for certain individuals born in the United States.  That the Constitution protects against involuntary and unintentional expatriation, however, does not indicate that there is a constitutional right to expatriate under any circumstance and without any limitation or fee.  As another court in this district recently noted, "[a]lthough the Supreme Court has recognized that a citizen has the constitutional right to remain a citizen, it has not recognized that the right to abandon one's citizenship constitutes a *constitutional* right."  *Farrell v. Pompeo*, 424 F. Supp. 3d 1, 23 (D.D.C. Nov. 27, 2019), *appeal filed* (internal quotation marks, brackets, and citations omitted).  Instead, the right of a U.S. citizen to relinquish citizenship is a statutorily-granted one and is therefore subject to the statutory standards set by Congress, the implementation of which has been delegated to the Secretary of State.

## II.    The Authority for Issuing a Certificate of Loss of Nationality

Pursuant to the authority afforded under 8 U.S.C. §§ 1104(a) and 1501, the Secretary has issued regulations, forms, instructions, and procedures that prescribe the process by which the Department adjudicates CLN requests and consular officers certify the facts that form the basis for approval or denial of a CLN request.  Under INA § 358, 8 U.S.C. § 1501, a U.S. diplomatic or consular officer certifies the facts forming the basis for his belief that loss of U.S. citizenship

occurred and, if the consular officer's report is approved by the Secretary of State, a CLN is issued. Implementing regulations are found at 22 C.F.R. Part 50, Subpart C – Loss of Nationality, §§ 50.40-50.51; related Department of State policy and procedures are found in the 7 Foreign Affairs Manual Chapter 1200 (7 FAM 1200); and loss of nationality forms are Forms DS-4079, Request for Determination of Possible Loss of U.S. Nationality; DS-4080, Oath/Affirmation of Renunciation of Nationality of the United States; DS-4081, Statement of Understanding Concerning the Consequences and Ramifications of Relinquishment or Renunciation of U.S. Citizenship; and DS-4083, Certificate of Loss of Nationality of the United States.

### III.    Department of State Authority to Set and Collect Fees

The Independent Offices Appropriations Act (IOAA), also referred to as the "user charge" statute, authorizes agencies to establish through regulation fees for services they provide. 31 U.S.C. § 9701.  This statute states that it is Congress's intent that the services agencies provide be "self-sustaining to the extent possible," and that the charges be "fair" and "based [up]on . . . the costs to the Government; [] the value of the service or thing to the recipient; [] public policy or interest served; and [] other relevant facts."  *Id.*

The Department of State derives its authority to set fees for the processing of requests for a CLN, including those arising under INA § 349(a)(5), 8 U.S.C. § 1481(a)(5), both through the user charge statute and through 22 U.S.C. § 4219, which gives the President the power to set the amount of fees to be charged for consular services provided at posts abroad.  Since 1957, that presidential authority has been delegated to the Secretary of State.  Exec. Order No. 10718, 22 Fed. Reg. 4632 (1957).

The Department of State has set many consular fees pursuant to these general fee-setting authorities and other specific fee authorities not applicable here.  The amount of each consular fee

is set out in the Schedule of Fees for Consular Services, which appears at 22 C.F.R. § 22.1.  With the exception of a few fees that are set at a specific amount by statute, the Department may set an amount of the fee by regulation, subject to legal restrictions and to policies prescribed by the President.  *See* 31 U.S.C. § 9701(b).  The President has delegated to the Office of Management and Budget (OMB) the authority to prescribe such policies, and OMB set out policies pertaining to user charges in Circular A-25.  That guidance provides that user charges should generally "be sufficient to recover the full cost to the Federal Government . . . of providing the service, resource, or good."  OMB Circular No. A-25, § 6(a)(2)(a).

Consistent with OMB Circular A-25 and 31 U.S.C. § 9701, the Department generally sets its fees based on the concept of full cost recovery to the U.S. government.  To determine the actual costs to the government of the various consular services that the Department of State provides, the Bureau of Consular Affairs' Office of the Comptroller (CA/C) uses a Cost of Service Model ("CoSM," formerly known as the Cost of Service Study or CoSS), which it updates periodically to determine whether fees need to be adjusted.  *Schedule of Fees for Consular Services, Department of State and Overseas Embassies and Consulates—Visa and Citizenship Services Fee Changes* ("2014 IFR"), 79 Fed. Reg. 51247-01, 51249 (Aug. 28, 2014); *see also Schedule of Fees for Consular Services, Department of State and Overseas Embassies and Consulates* ("2012 Final Rule"), 77 Fed. Reg. 5177-01, 5177 (Feb. 2, 2012); *Schedule of Fees for Consular Services, Department of State and Overseas Embassies and Consulates* ("2010 Supplemental NPRM"), 75 Fed. Reg. 14111-01, 14112 (Mar. 24, 2010).  The CoSM uses activity-based costing to determine the direct and indirect costs to the U.S. government associated with each consular good and service the Department provides.  Activity-based costing is a "set of accounting methods used to identify and describe costs and required resources for activities within processes."  2010 Supplemental

NPRM, 75 Fed. Reg. at 14112 (internal quotation marks omitted).  More specifically, activity-based costing "seek[s] to precisely identify and assign costs to processes and activities and then to individual products and services through the identification of key cost drivers referred to as 'resource drivers' and 'activity drivers.'"  *Id.*  The Department uses activity-based costing to determine the total costs for each consular service provided.  *Id.* at 14115.  CA/C generally determines the amount of a given fee by dividing the total cost of a given consular service by the estimated number of users of that service.  *Id.*

### IV.   Renunciation Processing Fee Rulemakings

#### A.  2010:  First Renunciation Processing Fee

In 2010, the Department promulgated a Notice of Proposed Rulemaking and Interim Final Rule, which instituted, for the first time, a fee for processing a U.S. citizen's renunciation of citizenship under INA § 349(a)(5), 8 U.S.C. § 1481(a)(5).  *Schedule of Fees for Consular Services, Department of State and Overseas Embassies and Consulates*, 75 Fed. Reg. 6321-01, 6324 (Feb. 9, 2010); *Schedule of Fees for Consular Services, Department of State and Overseas Embassies and Consulates* ("2010 IFR"), 75 Fed. Reg. 36522-01, 36525 (June 28, 2010).  The Department set the fee at $450, which was significantly below cost.  2010 IFR, 75 Fed. Reg. at 36525.  The Department noted that the "CoSS demonstrated that documenting a U.S. citizen's renunciation of citizenship is extremely costly, requiring American consular officers overseas to spend substantial amounts of time to accept, process, and adjudicate cases."  *Id.*  The $450 fee, it explained, would "help defray a portion of the total cost to the U.S. Government of documenting the renunciation of citizenship."  *Id.*  In fact, the fee represented "less than 25 percent" of the total cost to the government in 2010 for providing that service.  *Id.*  The Department chose to set the fee lower than the actual cost "in order to lessen the impact on those who need th[e] [renunciation] service and

not discourage the utilization of the service, a development the Department fe[lt] would be detrimental to national interests."  *Id.*

In 2012, the Department finalized the $450 fee and noted that the title for the fee would be changed from "Documentation of formal renunciation of U.S. citizenship" to "Administrative processing of formal renunciation of U.S. citizenship."  2012 Final Rule, 77 Fed. Reg. at 5177.

### B.  2014:  Fee Increase

After the Department implemented the $450 renunciation processing fee, it made several improvements to the CoSM to better identify and assign costs.  These improvements came in part from a new Overseas Time Survey "which collected extensive data on both consular activities and the time spent by consular staff performing consular services at all overseas locations."  2014 IFR, 79 Fed. Reg. at 51249.  The Overseas Time Survey revealed that demand for citizenship renunciation services under INA § 349(a)(5), 8 U.S.C. § 1481(a)(5) had "increased dramatically, consuming far more consular officer time and resources."  *Id.* at 51251.  The Department noted that consular officers processing potential renunciations "must confirm that the potential renunciant fully understands the consequences of renunciation" and must also verify that the potential renunciant is a U.S. citizen, "conducting a minimum of two intensive interviews with the potential renunciant, and reviewing at least three consular systems before administering the oath of renunciation."  *Id.*  The report and paperwork from the consular officer is then subject to review from domestic Department officials before the loss of nationality is approved.  *Id.*  The Department determined that the updated actual cost of processing a citizenship renunciation was $2,350.  *Id.*

In light of the results of the updated CoSM and new Overseas Time Survey, the Department set the renunciation processing fee at cost—$2,350—through an Interim Final Rule with a request

for public comment. *Id.* The Department determined that there was "no public benefit or other reason for setting this fee below cost." *Id.*

In 2015, the Department promulgated a Final Rule finalizing the fee increase to $2,350. *Schedule of Fees for Consular Services, Department of State and Overseas Embassies and Consulates* ("2015 Final Rule"), 80 Fed. Reg. 51464-01, 51464 (Aug. 25, 2015). In the Final Rule, the Department noted that it had received 70 comments and that the large majority of these expressed concern about the increased fee for renunciations. *Id.* The majority of those commenters sought to be "grandfathered in" to the prior $450 fee on various bases including that some had already begun the renunciation process. *Id.* The Department declined to grandfather these requesters into the prior fee because the Department collects whatever fee is in effect at the time the service is rendered, which in this case is when the oath to renounce one's nationality is sworn. *Id.* Those requesters had not yet taken the oath of renunciation, so the new fee applied. *Id.* One-third of the comments suggested an increased fee to process renunciations was a burden, that the new fee was too costly, and that the increased fee acts as a "deterrent" to renunciation, "thereby violating the right to expatriate," which is a "constitutional or human right." *Id.* at 5164-165. The latter commenters took the view that the fee should be offered at no or low cost. *Id.* at 5165.

The Department responded as follows:

> In raising the fee to process renunciations, the Department has not restricted or burdened the right of expatriation. Further, the fee is not punitive, and is unrelated to the IRS tax legislation criticized in some comments, except to the extent that the legislation caused an increase in consular workload that must be paid for by user fees. Rather, the fee is a cost-based user fee for consular services. Conforming to guidance from the Office of Management and Budget (OMB), federal agencies make every effort to ensure that each service provided to specific recipients is self-sustaining, charging fees that are sufficient to recover the full cost to the

10

> government.   (See OMB Circular A–25, ¶ 6(a)(1), (a)(2)(a).)
> Because costs change from year to year, the Department conducts
> an annual update of the Cost of Service Model (CoSM) to obtain the
> most accurate calculation of the costs of providing consular services.
> In addition to enabling the government to recover costs, the study
> also helps the Department to avoid charging consumers more than
> the cost of the services they consume.   In sum, the increased fee for
> processing renunciations is a ''user charge,'' which reflects the full
> cost to the U.S. government of providing the service.

*Id.*  The Department further explained that, "[o]n a per-service basis, renunciation is among the

most time-consuming of all consular services." *Id.*  The Department added that, "[i]n the past, . . .

[it had] charged less than the full cost of the renunciation service," in part because "[t]he total

number of renunciations was previously small and constituted a minor demand on the

Department's resources." *Id.*  The increased volume of renunciations following the institution of

the $450 fee and the improvements to the CoSM model had made it easier to assess the true cost

to the Department of providing renunciation services. *Id.*  In addition, the Department added that

"the increased fee reflects the amount of resources necessary for the U.S. government to verify

that all constitutional and other requirements for expatriation are satisfied in every case." *Id.*

Finally, in response to comments questioning the accuracy of the actual cost of and time

involved in processing a renunciation request as reflected in the CoSM, the Department again

explained in detail each step of processing a renunciation request. *Id.*  A consular officer must

interview the potential renunciant in person one or two times. *Id.*  During these interviews, the

consular officer must determine whether the potential renunciant is a U.S. national and whether he

or she "fully intends to relinquish all the rights and privileges attendant to U.S. nationality,

including the ability to reside in the United States unless properly documented as an alien," and

whether the potential renunciant's taking of the oath of renunciation is voluntary or under duress.[4]

*Id.* Even after the renunciant takes the oath, the consular officer must document that action in multiple "consular systems . . . [and] memoranda" that are transmitted to headquarters for review by "a country officer and a senior approving officer within the Bureau of Consular Affairs." *Id.*; *see* INA § 358, 8 U.S.C. § 1501 (requiring a U.S. diplomatic or consular officer to certify in writing the facts upon which his belief that loss of nationality has occurred is based and submit that report for the approval of the Secretary of State). This review sometimes requires consultation with the Department's legal advisers and "multiple rounds of correspondence between post and headquarters." 2015 Final Rule, 80 Fed. Reg. at 5165. Once the Overseas Citizens Services directorate within the Bureau of Consular Affairs has approved a renunciation, the consular officer may create a CLN and issue it to the renunciant. *See* INA § 358, 8 U.S.C. § 1501.

A few months after publishing the Final Rule, the Department published an Interim Final Rule which expanded the applicability of the fee to cover any request for a CLN, regardless of the type of relinquishment at issue.[5] *Schedule of Fees for Consular Services, Department of State and Overseas Embassies and Consulates—Passport and Citizenship Services Fee Changes* ("2015 Expansion IFR"), 80 Fed. Reg. 53704-01, 53707 (Sept. 8, 2015). The Interim Final Rule also

---

[4] There is a rebuttable presumption that a person who commits an expatriating act does so voluntarily, INA § 349(b), 8 U.S.C. § 1481(b), but because that presumption is rebuttable, loss of citizenship is so consequential, and the Department must comply with Supreme Court requirements against involuntary expatriations, the Department assesses voluntariness to be certain. *See, e.g.,* 7 FAM 1221(b) (noting that *Terrazas* "stated that a person cannot lose U.S. nationality unless [they] voluntarily and intentionally relinquish[] that status" and specifying questions to analyze a potential expatriation case); 7 FAM Exhibit 1221: Loss-of-Nationality Flow Chart ("[I]t is [still] necessary to develop the case and assess voluntariness and intent.").

[5] Although the Complaint mentions the rulemakings for non-renunciatory relinquishments of U.S. citizenship, the Complaint does not challenge those rulemakings. Compl. ¶ 7 (noting that the 8 U.S.C. § 1481(a)(5) form of expatriation is the one that "forms the basis of the challenged governmental action" in this suit).

changed the official name of the processing fee from "Administrative Processing of Formal Renunciation of U.S. Citizenship" fee to "Administrative Processing of Request for Certificate of Loss of Nationality" fee, to more accurately reflect the scope of the service for the fee. *Id.* The Department finalized those changes in 2018. *Schedule of Fees for Consular Services, Department of State and Overseas Embassies and Consulates*, 83 Fed. Reg. 4423-02 (Jan. 31, 2018).

### STANDARD OF REVIEW

Courts should dismiss claims under Federal Rule of Civil Procedure 12(b)(6) when plaintiffs have failed to plead "sufficient factual matter" that, if "accepted as true," would "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). As for legal conclusions pled in a complaint, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." However, summary judgment is appropriate in a case involving review of a final agency action under the APA when the court determines, "as a matter of law" that the agency's action "is supported by the administrative record and otherwise consistent with the APA standard of review." *Cottage Health Sys. v. Sebelius*, 631 F. Supp. 2d 80, 90 (D.D.C. 2009); *see* 5 U.S.C. § 706 (requiring courts reviewing agency actions to do so by "review[ing] the whole record or those parts of it cited by a party"). "Judicial review of agency action is generally limited to the administrative record." *Chiayu Chang v. United States Citizenship & Immigr. Servs.*, 254 F. Supp. 3d 160, 161 (D.D.C. 2017). Even where a plaintiff raises constitutional challenges to an agency action, he or she is "not entitled to supplement the administrative record for any constitutional claim that requires the [c]ourt to analyze the substance

13

of an agency's decision that is, in turn, based on an evaluation of that record." *Bellion Spirits,*

*LLC v. United States*, 335 F. Supp. 3d 32, 43-44 (D.D.C. 2018).

## ARGUMENT

### I.     THE COURT SHOULD DISMISS PLAINTIFFS' CLAIMS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED OR, IN THE ALTERNATIVE, GRANT SUMMARY JUDGMENT FOR DEFENDANTS.

Plaintiffs raise five claims, all of which are encompassed by their claim under the APA.

*See* Compl. ¶ 14, 204-06.  They argue that the 2015 Final Rule and, for some claims, the earlier

rules regarding the renunciation processing fee are: 1) arbitrary and capricious; 2) unsupported by

substantial evidence; 3) not in accordance with law; 4) contrary to a constitutional right; and 5) in

excess of statutory authority.  *Id.*; *see* 5 U.S.C. § 706.

### A.  The 2015 Final Rule is Neither Arbitrary Nor Capricious.

The arbitrary and capricious standard is highly deferential, and it presumes the validity of

agency action.  *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. Ruckelshaus*, 719 F.2d 1159 (D.C. Cir.

1983).  A court may not substitute its judgment for that of the agency, *Citizens to Pres. Overton

Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), but must instead affirm an agency's decision if the

agency has "acted within a zone of reasonableness and, in particular, has reasonably considered

the relevant issues and reasonably explained the decision," even if the court would have made a

different policy judgment than the agency.  *F.C.C. v. Prometheus Radio Project*, No. 19-1231,

2021 WL 1215716, at *5 (U.S. Apr. 1, 2021); *see, e.g.*, *AT&T Corp. v. F.C.C.*, 220 F.3d 607, 616

(D.C. Cir. 2000); *Bowman Transp.*, *Inc. v. Ark. Best Freight Sys.*, 419 U.S. 281, 285 (1974).

Plaintiffs bear the burden of proof to show that the Department of State's rulemaking was

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

5 U.S.C. § 706(2)(A); *Nat'l Lifeline Ass'n v. Fed. Commc'ns Comm'n*, No. 20-1006, 2020 WL 7511124, at *6 (D.C. Cir. Dec. 22, 2020).

Here, the Department of State considered the relevant issues and reasonably explained its decision to increase the renunciation processing fee to $2,350.  The Department's Interim Final Rule discussed in detail its Cost of Service Model and how it used the model to calculate the costs of each fee it proposed to update through the rule.  2014 IFR, 79 Fed. Reg. at 51250-51.  For renunciations of citizenship, the rulemaking explained how the CoSM demonstrated that "documenting a U.S. citizen's renunciation of citizenship is extremely costly, requiring American consular officers overseas to spend substantial amounts of time to accept, process, and adjudicate cases."  *Id.*  The Interim Final Rule detailed the various, time-consuming steps that consular officers must complete to perform this service.  *Id.* at 51251.  The Department also noted that demand had grown dramatically since the last time the fee was updated, and that it had since been able to better quantify through its Overseas Time Survey how much time consular officers were spending on this service.  *Id.*  In the Final Rule, the Department discussed the comments it received in response to the fee adjustment and responded thoughtfully, explaining why it could not grandfather in those requesters that had not yet taken the oath, reiterating the basis for its cost calculation, and underscoring that this was a cost-based fee and not intended as a deterrent to those seeking the service.  2015 Final Rule, 80 Fed. Reg. at 51464-66.

Plaintiffs' four arguments as to why the agency's rulemaking was arbitrary and capricious are unavailing.  Plaintiffs first argue that the fee is arbitrary and capricious because there is "nothing complex" about processing a renunciation under 8 U.S.C. § 1481(a)(5).  But that argument fails because, as explained in the Final Rule and the Department's related publications, processing a renunciation under 8 U.S.C. § 1481(a)(5) is "extremely costly" and time-consuming

15

despite Plaintiffs' perception that the task is not complex.  2015 Final Rule, 80 Fed. Reg. at 51465.

The Department assessed the costs of services provided by posts, including the service of

processing individual citizenship renunciation requests, by conducting an extensive Overseas

Time Survey, which gathered data from Department consular officials at more than 200 posts

across the world regarding "the amount of time consular staff spends per month performing the

underlying activities associated with consular services."  Administrative Record ("A.R.") at 270,

Overseas Time Survey Analysis Report; *see* Ex. 1, Decl. of Stacy L. Pickard, at ¶ 8.  It used that

information to "assign the cost of consular personnel to specific services" so that the fees for those

services can accurately reflect the actual cost of providing those services.  A.R. at 270.

As reflected in the data that the Department provided to OMB prior to the publication of

the IFR and Final Rule, the Department calculated the new renunciation processing fee by

surveying and compiling the relevant categories of costs and weighting them by actual and

projected volumes.  A.R. at 190, Consular Cost of Service Model Data Set; Ex. 1 at ¶ 11-12, 18.

These costs include direct costs for the renunciation service, such as the cost of staff time spent

providing the service, as well as the portion of indirect costs attributable to the renunciation service

incurred by the Bureau of Consular Affairs and other bureaus in the Department that support the

Bureau of Consular Affairs' operations.  A.R. at 190; Ex. 1 at ¶¶ 13-17.  The Department

individually calculated the "annual unit costs for F[iscal] Y[ear]s 2010-2014" for each of these

categories of expenses, using actual data from fiscal years 2010-2012 and projected data for 2013

and 2014, and "weighted [those costs] by the projected volume for that year," ultimately arriving

at a single unit cost for each category of costs "that incorporates estimated volume trends."  A.R.

at 190; *see* Ex. 1 at ¶ 11-12, 18.  The total of these averaged, weighted unit costs for all costs

related to processing citizenship renunciation requests came to $3,999,666.  A.R. at 190; Ex. 1 at

¶ 17.  The Department then took the actual volume of renunciations from fiscal years 2010, 2011, and 2012, and the projected volumes for 2013 and 2014, and averaged out those volumes, arriving at an average yearly volume of 1,703.  A.R. at 190, 262; Ex. 1 at ¶ 18.  Dividing the average total costs of processing citizenship renunciations each year by the average yearly volume of renunciations, the Department arrived at a unit cost of $2,349, which it rounded to $2,350.  A.R. at 190; Ex. 1 at ¶ 19-20.

As evidenced by these calculations, the $2,350 stems in large part from the time-intensive nature of processing citizenship renunciation requests.  2015 Final Rule, 80 Fed. Reg. at 51465 (stating that citizenship renunciation is a "thorough, serious, [and] time-consuming process").  *Id.*  In fact, "[o]n a per-service basis, renunciation is among the most time-consuming of all consular services."  *Id.*  When the yearly volume of renunciations was low, it "constituted a minor demand on the Department's resources" and it was "difficult to assess accurately the cost of the service."  *Id.*  The dramatically increased demand for the renunciation service took up a much higher percentage of the Department's resources than it had in the past and made it easier to assess the true costs of the service.  *Id.*  The 2015 Final Rule explained that the time spent processing citizenship renunciation requests is "not limited to the time spent with the renunciant at the appointment," but, rather, extends to the time required to write memoranda about the application, document it in the Department of State's systems, and review it both overseas and domestically to ensure compliance with the law.  *Id.*  In sum, regardless of Plaintiffs' perception that processing a renunciation case is not complex, the processing procedure is time-consuming and therefore very costly.  The Department of State reasonably documented the costs associated with processing renunciation cases that justify a fee of $2,350, and Plaintiffs have not met their burden to prove that the imposition of the fee was arbitrary and capricious over the presumption of validity.

17

Plaintiffs' second argument—that the renunciation processing fee is arbitrary and capricious because the Department of State "fail[ed] to differentiate" between the time required to process the renunciation requests of minors or individuals with developmental disabilities or mental illnesses and the time required to process renunciation requests of other individuals—also fails.  Compl. ¶ 203.  Again, it was reasonable for the Department to base its fee on the total cost of processing all citizenship renunciation requests, divided by the total number of such requests, without differentiating between different categories of requesters, *see* A.R. at 190, and Plaintiffs point to no legal authority requiring such differentiation when setting fees.  The Final Rule's statement that determining voluntariness, which is only one piece of a multi-step procedure for processing renunciations, "can be demanding in the case of minors or individuals with a developmental disability or mental illness" merely provided an example of one way in which this step of the process could be time-consuming.  2015 Final Rule, 80 Fed. Reg. at 51465.  This example in no way diminishes the significant time commitment necessary to process even the most seemingly straightforward of renunciation cases.  Moreover, government fees for general services should not vary based on an individual's developmental status.  It was not arbitrary or capricious for the Department of State to apply the costs for processing requests for CLNs based on an oath of renunciation evenly across the pool of individuals seeking the service rather than charging an individualized fee that varies depending on the requester's personal characteristics.

Plaintiffs' third argument—that it was arbitrary and capricious for the Department to "fail[] to distinguish between services for renunciation cases and services for non-renunciation relinquishment cases," because the latter services are more complex and should therefore cost more money to administer—is also unavailing.  Compl. ¶ 203.  The $2,350 fee was initially set based on the costs of processing requests for renunciations only, without taking into account non-

18

renunciatory relinquishments.  It was only several months after the $2,350 fee was finalized that the Department of State promulgated a rule to apply the fee to *all* individuals requesting a CLN, regardless of what type of relinquishment formed the basis for it.  2015 Expansion IFR, 80 Fed. Reg. at 53707.  In that rule, the Department explained that the Cost of Service Model demonstrated "that documenting a U.S. national's relinquishment is extremely costly whether the service is for a relinquishment under 8 U.S.C. 1481(a)(1) to 1481(a)(4) or a relinquishment by renunciation under 8 U.S.C. 1481(a)(5)," as "[b]oth require American consular officers overseas to spend substantial amounts of time to accept, process, and adjudicate cases."  *Id.*  Thus, Plaintiffs' claim that processing a non-renunciatory relinquishment may be more difficult is 1) not relevant to the Department's basis for determining the cost of processing renunciation requests, which focused only on data for relinquishments under INA § 349(a)(5), 8 U.S.C. § 1481(a)(5), and 2) not supported by the Department's later rulemaking, which explained that all CLN requests are quite time-consuming for consular officers and thus costly, regardless of which expatriating act in INA § 349(a) is claimed.

Plaintiffs' fourth argument—that the renunciation processing fee is arbitrary and capricious because the Department of State "failed to take into account that the Supreme Court cases it relied upon are irrelevant in the context of *renunciation*"—is also meritless, because the Supreme Court cases cited by the Department in its Final Rule *are* relevant in the context of renunciation.  Compl. ¶ 203.  In particular, Plaintiffs point to *Afroyim v. Rusk*, 387 U.S. 253 (1967), and *Vance v. Terrazas*, 444 U.S. 252 (1980), which the Final Rule cites as stating that "expatriation requires the voluntary commission of an expatriating act with the intention or assent of the citizen to relinquish citizenship."  2015 Final Rule, 80 Fed. Reg. at 51465; *see* Compl. ¶ 203.  It was reasonable for the Department to note in the 2015 Final Rule that the requirement of voluntariness makes it necessary

for the Department "to maintain and implement procedures . . . that allow consular officers and other Department employees to ensure [that] these requirements are satisfied in every expatriation case." 2015 Final Rule, 80 Fed. Reg. at 51465. While *Afroyim* and *Terrazas* do not specifically mention renunciation, they both indicate that voluntariness and intent are required for all expatriations. *Terrazas*, 444 U.S. at 263 (holding that *Afroyim* "requires that the record support a finding that the expatriating act was accompanied by an intent to terminate United States citizenship"); *Afroyim*, 387 U.S. at 268 (holding that U.S. citizens have "a constitutional right to remain a citizen in a free country unless [t]he[y] voluntarily relinquish[] that citizenship"). In light of these requirements, the Department must act with the same care when an individual seeks to expatriate by taking an oath of renunciation of U.S. citizenship. Nor does the existence of a presumption of voluntariness for expatriating acts, *see* 8 U.S.C. § 1481(b), diminish the Department's obligation to comply with Supreme Court requirements and to protect every U.S. citizen's right to retain citizenship unless he or she voluntarily relinquishes it. If anything, the rebuttable nature of this presumption makes the Department's obligation to assess voluntariness even more serious. *See* 8 U.S.C. § 1481(b) (indicating that "[a]ny person who commits or performs, or who has committed or performed, any act of expatriation under the provisions of this chapter or any other Act shall be presumed to have done so voluntarily, but such presumption may be rebutted upon a showing, by a preponderance of the evidence, that the act or acts committed or performed were not done voluntarily"). Accordingly, the Department repeatedly directs consular officers to assess voluntariness and intent. *See, e.g.,* 7 FAM Exhibit 1221: Loss-of-Nationality Flow Chart ("[I]t is [still] necessary to develop the case and assess voluntariness and intent."); 7 FAM 1226(b) (directing consular officers to assess an individual's demeanor, state of mind, and composure, and the issues of voluntariness and intent); 7 FAM Exhibit 1226 (sample consular

officer opinion including an assessment of whether the individual appeared to understand the irrevocable consequences of relinquishment when performing the expatriating act).

For all these reasons, the record supports the conclusion that the State Department "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between facts found and the choice made.'" *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted).

**B.  The Substantial Evidence Standard is Inapplicable Here.**

Plaintiffs raise a separate APA claim that the substantial evidence standard is applicable to assessing the challenged fee.  That contention is wrong – as that standard applies only to actions under the APA that challenge an agency adjudication.  5 U.S.C. § 706(2)(E) (authorizing courts to hold unlawful and set aside agency action that is "unsupported by substantial evidence" only in cases "subject to section 556 and 557 of [the APA, which cover administrative hearings and adjudications,] or otherwise reviewed on the record of an agency hearing provided by statute").  Here, the agency action at issue is a rulemaking setting the fee.  Plaintiffs provide no reason why the Court should apply the substantial evidence standard in this context.  In any event, the Department has set forth detailed reasons and data in support of the current fee.

**C.  The 2015 Final Rule is In Accordance with Law and Not In Excess of Statutory Jurisdiction.**

**1.  The 2015 Final Rule Complies With 31 U.S.C. § 9701.**

Plaintiffs also argue that the 2015 Final Rule is "not in accordance with the law" and "in excess of statutory jurisdiction" because it violates the user charge statute, 31 U.S.C. § 9701.  Compl. ¶¶ 205-06.  This statute provides that "each service or thing of value provided by an agency . . . to a person . . . is to be self-sustaining to the extent possible." 31 U.S.C. § 9701(a).  It authorizes agencies to "prescribe regulations establishing the charge for a service or thing of value provided

21

by the agency." *Id.* § 9701(b).  All such charges shall be "fair" and "based [up]on . . . the costs to the Government; [] the value of the service or thing to the recipient; [] public policy or interest served; and [] other relevant facts." *Id.*

Plaintiffs contend that the 2015 Final Rule's imposition of the $2,350 processing fee violated these statutory requirements because the fee "does not truly reflect the costs to the Government" and the Department of State "utterly ignored the value of the service to the recipient and the public policy or interest served." Compl. ¶ 205.  As discussed above, however, the fee is a true reflection of the costs to the government to process citizenship renunciation requests, determined through extensive data collection and analysis.  Additionally, the Department of State considered the value of the service to the recipient and the public policy interests involved but determined that there was "no public benefit or other reason for setting th[e] [renunciation processing fee] below cost." 2014 IFR, 79 Fed. Reg. at 51251.  The Department also explained its shift from charging a fraction of the actual cost for the renunciation service to charging the full amount by noting that the "dramatic[]" increase in the demand for the renunciation service resulted in the service demanding a much higher percentage of the Department's resources.  2015 Final Rule, 80 Fed. Reg. at 51465.  Because the fee accurately reflects the true costs to the government, it does not "amount to an improper tax," as Plaintiffs contend.  Compl. ¶ 206.

The user charge statute does not require that agencies set fees *below* their actual costs in the interest of public policy.  Rather, it requires agencies to "base[] [the fee] on . . . the costs to the Government; [] the value of the service or thing to the recipient; [] public policy or interest served; and [] other relevant facts." 31 U.S.C. § 9701(b).  While the statute does not require that the agency weigh any of these considerations more heavily than the others, it does state Congress's intent that government services "be self-sustaining to the extent possible." *Id.*; *see* OMB Circular

22

No. A-25, § 6(a)(2)(a) (stating that user charges should generally "be sufficient to recover the full cost to the Federal Government . . . of providing the service, resource, or good"). Thus, while it is *permissible* for an agency to set a fee below cost for public policy reasons, an agency is not required to do so, and setting a fee at cost is entirely consistent with the user charge statute and the guidance interpreting that statute. The only requirement is that the agency consider all the factors mentioned in the statute, which the Department of State did here. For all these reasons, the renunciation processing fee is in accordance with law and not in excess of statutory jurisdiction.

        2.   <u>The 2015 Final Rule Does Not Violate Customary International Law</u>.

Plaintiffs also assert that "[v]oluntary expatriation is recognized as a right under customary international law." Compl. ¶ 208. Based on this alleged rule of customary international law, Plaintiffs argue that the $2,350 renunciation processing fee "fails to comport with customary international law" because it "preconditions Plaintiffs' right to expatriate on the payment of an exorbitant fee." *Id.* ¶ 217. Only a "nominal modest fee," they argue, would comport with the customary international norm of the right to expatriate. *Id.* ¶ 15. This claim also lacks merit.

Customary international law is formed based on two factors: (1) consistent state practice that (2) flows from a sense of legal obligation. *See, e.g.*, *McKesson Corp. v. Islamic Republic of Iran*, 539 F.3d 485, 488 n.1 (D.C. Cir. 2008). *Cf. North Sea Continental Shelf (Federal Republic of Germany v. Denmark / Federal Republic of Germany v. Netherlands),* I.C.J. Reports 1969, p. 3, para. 77 ("Not only must the acts concerned amount to a settled practice, but they must also be such, or be carried out in such a way, as to be evidence of a belief that this practice is rendered obligatory by the existence of a rule of law requiring it."); Restatement (Third) of Foreign Relations Law § 102(2) (1987) ("Customary international law results from a general and consistent practice of states followed by them from a sense of legal obligation."). Such customary

international law is incorporated into domestic law as a matter of federal common law through the *Charming Betsy* principle, which states that "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains." *Murray v. Schooner Charming Betsy, The*, 6 U.S. 64, 118 (1804).

The Court need not reach any *Charming Betsy* analysis in this case, however, because Plaintiffs' customary international law claim—that there is, essentially, an absolute right under customary international law to expatriate free of a fee that is more than nominal—fails. Plaintiffs do not and cannot point to any rule of customary international law specifically prohibiting a country from charging more than a nominal fee to process a citizenship renunciation request. *See* Compl. ¶ 208-18. Plaintiffs fail to support their claim with evidence based in the general and consistent practice of states stemming from a sense of legal obligation, the elements that must be established to identify the existence of a rule of customary international law. Plaintiffs cite a law review article asserting that individuals have "the right under international law to expatriate," but that article makes no mention of any restriction on the fee that may be charged for expatriation. *The Right of Nonrepatriation of Prisoners of War,* 83 YALE L. J. 358; *see* Compl. at ¶ 209. Similarly, Plaintiffs' citation to the Universal Declaration of Human Rights of 1948 indicates only that no person shall be "denied the right to change his nationality," *see* Compl. ¶ 210, but fails to indicate that a processing fee of a certain amount would be inappropriate. Thus, even assuming, *arguendo*, that a *general* rule of customary international law existed regarding expatriation, there is no indication that such a general rule would extend to a prohibition of a processing fee that charges the actual cost of providing the renunciation service, and there is certainly no evidence of consistent state practice to that effect based on a sense of legal obligation to keep fees nominal.

24

In the absence of evidence of consistent state practice based on a sense of legal obligation, there is no rule of customary international law. And, "[i]f there is no relevant international legal norm, then there is no *Charming Betsy* analysis." Justin Hughes, *The Charming Betsy Canon, American Legal Doctrine, and the Global Rule of Law*, 53 Vand. J. Transnat'l L. 1147, 1192 (2020). Courts may only recognize existing customary international law; they cannot create an international legal obligation where none exists under such law. Because Plaintiffs have failed to identify the existence of a rule of customary international law prohibiting more than a nominal fee for expatriation, the renunciation processing fee cannot violate customary international law.

Plaintiffs' failure to identify a rule of customary international law forbidding the current renunciation processing fee warrants dismissal under Rule 12(b)(6) for failure to state a claim. In the alternative, Defendants are entitled to summary judgment on Plaintiffs' customary international law claim.

### D. The Renunciation Processing Fee is Not Contrary to a Constitutional Right.

Plaintiffs also raise three claims that the renunciation processing fee allegedly violates various constitutional rights, none of which has merit.

#### 1. The Renunciation Processing Fee Does Not Violate the Fifth Amendment Right to Substantive Due Process.

Plaintiffs first argue that the right to expatriate is a fundamental right under the Fifth Amendment's Substantive Due Process Clause, and that the renunciation processing fee is therefore subject to strict scrutiny, which it fails. Compl. ¶¶ 10-11, 162-67. This argument is meritless, principally because expatriation is not a fundamental right under the Fifth Amendment's Substantive Due Process Clause. To sufficiently allege a substantive due process claim under the Fifth Amendment, plaintiffs "must allege that the defendant deprived them of a constitutionally

cognizable liberty or property interest." *Doe v. D.C.*, 206 F. Supp. 3d 583, 604 (D.D.C. 2016); *see Washington v. Glucksberg*, 521 U.S. 702, 722 (1997) (describing the Court's substantive due process jurisprudence as "establishing a threshold requirement—that a challenged . . . action implicate a fundamental right" before applying strict scrutiny); *see also* U.S. CONST. amend. V ("No person shall be . . . deprived of life, liberty, or property, without due process of law."). The fundamental rights that the Supreme Court has recognized as being protected under the Fifth Amendment "include[] the rights to marry; to have children; to direct the education and upbringing of one's children; to marital privacy; to use contraception; to bodily integrity; and to abortion." *Glucksberg*, 521 U.S. at 720 (internal citations omitted). The Supreme Court has expressed "reluctan[ce]" about "expand[ing] the concept of substantive due process" beyond these categories "because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992). When assessing whether a right falls within the orbit of substantive due process, the Supreme Court considers whether it is a "fundamental right[] [or] libert[y] which [is], objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if the[] [right] w[as] sacrificed." *Glucksberg*, 521 U.S. at 720-21 (internal quotation marks and citations omitted); *see Hutchins v. D.C.*, 188 F.3d 531, 538 (D.C. Cir. 1999) (same). The Court also requires plaintiffs to provide "a careful description of the asserted fundamental liberty interest." *Glucksberg*, 521 U.S. at 721 (internal quotation marks omitted); *see id.* at 722 ("[W]e have a tradition of carefully formulating the interest at stake in substantive-due-process cases.").

Plaintiffs have failed to adequately allege that the right to expatriate, including by taking an oath of renunciation, is a constitutionally cognizable fundamental right. First, no court has ever

recognized the right to expatriate as a fundamental right under the Fifth Amendment's Substantive Due Process clause. *See, e.g.*, *Farrell*, 424 F. Supp. 3d at 23-24 (noting that the Supreme Court and the D.C. Circuit have not recognized expatriation as a constitutional right and holding that, "even assuming the plaintiff ha[d] a constitutional right to expatriate, the Court cannot conclude that the defendants have acted contrary to that right"); *Kwok Sze v. Johnson*, 172 F. Supp. 3d 112, 121 (D.D.C. 2016), *aff'd sub nom. Kwok Sze v. Kelly*, No. 16-5090, 2017 WL 2332592 (D.C. Cir. Feb. 21, 2017) ("[T]he Supreme Court has not recognized that the right to abandon one's citizenship constitutes a *constitutional* right.") (emphasis in original); *see also Lozada Colon v. U.S. Dep't of State*, 2 F. Supp. 2d 43, 45 (D.D.C. 1998), *aff'd*, 170 F.3d 191 (D.C. Cir. 1999) ("[E]ven if one were to concede Plaintiff's argument that an individual has a fundamental right to expatriate, the Secretary of State still would have the discretion to determine whether an individual has adequately renounced affiliation with the United States so as to trigger that right.").

Second, this Court should not recognize expatriation as a fundamental right as a matter of first impression because doing so would be in tension with a long-standing line of case law. Courts have repeatedly acknowledged the legality of limitations on the ability to relinquish U.S. citizenship without applying strict scrutiny analysis to their review of those limitations. *See, e.g.*, *Kwok Sze*, 172 F. Supp. 3d at 121-22 (finding that an incarcerated plaintiff had "no right to abandon his citizenship under the Due Process Clause" and that "courts have repeatedly—and uniformly—held that an incarcerated U.S. citizen has no constitutional right to renounce his U.S. citizenship during the course of his incarceration"); *Scott v. United States*, No. 1:13-CV-2030 LJO-BAM, 2014 WL 2807652, at *2 (E.D. Cal. June 20, 2014) (holding that although "[a] United States citizen has the right to renounce his citizenship[,] . . . Congress has broad authority over the circumstances and the procedures a citizen must satisfy to expatriate") (citation omitted); *see also Tutora v. U.S.*

27

*Attorney Gen. for E. Dist. of Pennsylvania*, No. CV 16-MC-195, 2017 WL 2126321, at *5 n.6 (E.D. Pa. May 16, 2017) ("The right to renounce is based in statute and is not rooted in the Constitution.") (citation omitted).  This Court should exercise caution in "expand[ing] the concept of substantive due process" to include expatriation when other courts have not, particularly considering that "guideposts for responsible decisionmaking in this unchartered area [of as-yet-unrecognized rights] are scarce and open-ended."  *Collins*, 503 U.S. at 125.

Third, the Court should reject Plaintiffs' asserted Fifth Amendment right to expatriate free of charge or, at least, at a level somewhere below the current renunciation processing fee.  *See* Compl. ¶ 10 ("By levying the $450 fee in the first place . . . Defendants have violated Plaintiffs' fundamental rights . . . under the Fifth Amendment's Due Process [C]lause . . . ."); *see also id.* ¶ 4 n.2.  This formulation of the purported right fails because, as explained above, there is not even a general constitutional right to expatriate, much less a right to do so free of charge, or at some lesser charge.

Because the right to expatriate or to do so free of charge or without paying the current fee is not a fundamental right under the Fifth Amendment's Substantive Due Process Clause, this Court should analyze the constitutionality of the processing fee under the rational basis test.  *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 40, 44 (1973) (holding that strict scrutiny was inappropriate and instead applying rational basis review where the challenged action did not "impinge upon constitutionally protected rights").  Under rational basis review, courts uphold government actions that "bear[] some rational relationship to a legitimate state purpose."  *Id.*

As explained in response to Plaintiffs' "arbitrary and capricious" APA claim, the renunciation processing fee bears a rational relationship to a legitimate state purpose.  The lawful governmental purpose at issue here is as reflected in 31 U.S.C. § 9701—for government services

28

to be self-sustaining to the extent possible, through collection of user fees set to recover the costs of providing the service.  Additionally, the government has a legitimate interest in the correct processing of loss of nationality cases and in ensuring that expatriations are voluntary and are undertaken with intent to lose U.S. nationality.  The current fee plainly bears a rational relationship to these governmental interests because, as discussed above, it is based on the actual costs of renunciation processing, which are influenced by the time required to correctly process renunciation requests and assess voluntariness and intent.  Because the processing fee passes rational basis review, Plaintiffs' Fifth Amendment claim fails.

Indeed, even if the right to expatriate had some constitutional status, the imposition of the current fee would present no constitutional concerns.  Courts have routinely upheld fees that are directly tied to the administrative burden on the government caused by an individual's exercise of rights.  For example, the Supreme Court has upheld government fees for parade permits that "meet the expense[s] incident to the administration of the [speech or expressive] act" in question, even though the First Amendment protects freedom of speech.  *Cox v. New Hampshire*, 312 U.S. 569, 577 (1941).  Courts have also upheld city gun licensing fees "designed to defray, and . . . not exceed[ing], the administrative costs of regulating an individual's right to bear arms."  *Kwong v. Bloomberg*, 723 F.3d 160, 164-67 (2d Cir. 2013).  Similarly, as discussed above, the renunciation processing fee reflects the cost of processing a citizenship renunciation.  And as also explained above, it was reasonable for the Department to increase the fee to account for the increased amount of time that Department employees spend processing renunciation requests following the rise in such requests.

29

For all these reasons, the Court need not decide whether Plaintiffs have a constitutional right to expatriate, and it should grant summary judgment to Defendants on the Fifth Amendment claim.

    2.  <u>The Renunciation Processing Fee Does Not Violate the First Amendment Right to Freedom of Speech</u>.

Plaintiffs also contend that both the amount of the current fee and the imposition of *any* fee for renunciation infringe upon Plaintiffs' First Amendment rights.  Compl. ¶¶ 4 n.2, 10, 159, 186. They maintain that voluntary expatriation is "both speech and expressive conduct, and a manifestation of political and societal association."[6]  *Id.* ¶ 12.  They argue that the fee is a content-based restriction that does not survive strict scrutiny review.  *Id.* ¶ 182, 184-86.  Again these arguments lack merit.

To begin with, it is questionable whether renunciation is merely expressive, given its serious legal consequences – including the inability to reside in the United States unless properly documented as an alien.  2015 Expansion IFR, 80 Fed. Reg. at 53707.  And in any event, the action challenged here is not a restriction on expression but a processing fee for developing a loss of nationality case and determining whether to approve and issue a CLN.  *See* U.S. Department of State, Certificate of Loss of Nationality of the United States, Form DS-4083, https://eforms.state.gov/Forms/ds4083.pdf (requiring the consular official to certify that the requester performed an expatriating act before the official signs the certificate).  In other words,

---

[6]  Plaintiffs do not elaborate on the associational argument beyond stating that "by deterring and preventing Plaintiffs and those similarly situated [from] disassociat[ing] with the United States, Defendants are essentially forcing Plaintiffs to associate themselves with and embrace a political ideology they find repugnant."  Compl. ¶ 183.  This argument fails, however, because the fee does not force association with the United States.  The association with the United States is pre-existing, and there is a clear path to disassociating.

the fee is paid in exchange for the government's action of developing the case and determining whether to approve a CLN. *See* U.S. Department of State, Certificate of Loss of Nationality of the United States, Form DS-4083, https://eforms.state.gov/Forms/ds4083.pdf (requiring the consular official to certify that the requester performed an expatriating act before the official signs the certificate).

But even if the renunciation processing fee is viewed as related to expression, it is certainly not a content-based regulation, as Plaintiffs contend. The "content-based" test for regulations of speech is designed to encompass government regulations that "draw[] distinctions based on the message a speaker conveys." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). The renunciation processing fee does not draw any such distinctions.

Absent a regulation that is, on its face, content-based, the Court must consider whether the law is nonetheless subject to strict scrutiny either because it "cannot be justified without reference to the content of the regulated speech" or because it was "adopted by the government because of disagreement with the message the speech conveys." *Reed*, 576 U.S. at 164 (internal brackets and quotation marks omitted). But neither of these circumstances exists. The renunciation processing fee *can* be "justified without reference to the content of the regulated speech." As explained, the fee is designed to cover the actual costs of providing the requested service. And because the fee is based on the amount of time required to process renunciations and the volume of renunciations, *see, e.g.*, A.R. at 190, it is set using the same methodology as the Department uses for almost all its services, regardless of their subject matter. Thus, not only is the fee amount unrelated to the content of any speech, the content of the purported speech is completely irrelevant to the amount of the fee.

31

Assuming, *arguendo*, the processing fee might have some relationship to expression, it is at most a law that may "impose burdens on speech without reference to the ideas or views expressed." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 643 (1994).  In such circumstances, courts look to the standard set forth in *United States v. O'Brien*, 391 U.S. 367 (1968).  In *O'Brien*, the Supreme Court upheld against a First Amendment challenge a law prohibiting destruction of draft cards.  Because the law prohibited willful mutilation or destruction of draft cards, regardless of the intent behind that act, the Court determined that "both the governmental interest and the operation of the [law] [we]re limited to the noncommunicative aspect of O'Brien's conduct" of burning a draft card.  *Id.* at 381-82.  The Court contrasted this scenario with cases in which "the alleged governmental interest in regulating conduct arises in some measure because the communication allegedly integral to the conduct is itself thought to be harmful."  *Id.*  The Supreme Court later described the test flowing from *O'Brien* as follows: "[t]he *O'Brien* test indicates that a government action or regulation is [not in violation of the First Amendment] if it meets the following four criteria: (1) the government acted within its constitutional power when it enacted the regulation; (2) the regulation furthers an important or substantial governmental interest; (3) the government's interest is unrelated to the suppression of free expression; and (4) the restriction is no greater than is essential to furthering the government interest."  *City of Erie v. Pap's A.M.*, 529 U.S. 277, 296, 301 (2000).  For a court to uphold a government regulation under the *O'Brien* test, the restriction on First Amendment rights need not be *necessary* to support a *compelling* government interest.  Instead, the *O'Brien* test calls for intermediate scrutiny—the restriction need only be "no greater than is essential" to furthering an "*important* or *substantial* governmental interest."  *Id.* (emphasis added); *see Packingham v. North Carolina*, 137 S. Ct. 1730, 1736 (2017) (stating that content neutral regulations are "subject to intermediate scrutiny"); *Turner Broad. Sys.*,

32

512 U.S. at 661–62 (citing *O'Brien* and stating that "the appropriate standard by which to evaluate the constitutionality of [the regulation at issue] [wa]s the intermediate level of scrutiny applicable to content-neutral restrictions that impose an incidental burden on speech").

Assuming expression is impacted by the renunciation processing fee, the *O'Brien* test is met here. First, the Department acted within its power in imposing the processing fee, which is authorized by 31 U.S.C. § 9701 and 22 U.S.C. § 4219. Second, the processing fee furthers important government interests—keeping government services financially self-sustainable and ensuring proper development and processing of requests for a CLN under INA § 349(a)(5), 8 U.S.C. § 1481(a)(5). Third, the government's interest in charging the fee is unrelated to the suppression of free expression. The fee is not aimed at limiting speech or expressive conduct. Both the governmental interest in charging the fee and the operation of the fee are "limited to the noncommunicative aspect" of citizenship renunciation—they ensure that the processing costs of a request for a CLN are recovered through the collection of fees. The imposition of the fee is not tied to a notion that "the communication allegedly integral to the conduct is itself thought to be harmful." *O'Brien*, 391 U.S. at 382.

Fourth, the fee is no greater than what is necessary to furthering the government's interest in charging at-cost fees for the services it provides. To satisfy this prong of the *O'Brien* test, "a regulation need not be the least speech-restrictive means of advancing the Government's interests." *Turner Broad. Sys.*, 512 U.S. at 662. Instead, "the requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Id.* (internal quotation marks and ellipses omitted). Not only would the government's interest in self-sustaining fees be achieved less effectively without the at-cost renunciation processing fee, it would not be achievable at all. For these reasons, the Court

should uphold the renunciation processing fee because the government has a substantial interest in ensuring the sustainability of offering loss of nationality services, and because the processing fee is a sufficiently narrow means of protecting that interest and affects only the noncommunicative aspect of the conduct of citizenship renunciation, namely, the government's development of the case and determination of whether to approve or deny a CLN in each case.

Plaintiffs' argument that the imposition of *any* fee for processing a citizenship renunciation, no matter the amount, violates the First Amendment, is also meritless.  As noted, the First Amendment does not prohibit the imposition of fees on protected speech.  An agency fee that "meet[s] the expense[s] incident to the administration of the [speech or expressive] act" in question is not unconstitutional.  *Cox*, 312 U.S. at 577; *see also Kwong*, 723 F.3d at 164-67 (upholding, as against a Second Amendment challenge, a city's gun licensing fee using First Amendment fee jurisprudence because the licensing fee "was designed to defray, and did not exceed, the administrative costs of regulating an individual's right to bear arms"); *Nat'l Awareness Found. v. Abrams,* 50 F.3d 1159, 1165 (2d Cir. 1995) ("[F]ees that serve not as revenue taxes, but rather as means to meet the expenses incident to the administration of a regulation and to the maintenance of public order in the matter regulated are constitutionally permissible.").  As explained above, the renunciation processing fee does not exceed the expenses incident to processing a citizenship renunciation.

3.   The Renunciation Processing Fee Does Not Violate the Eighth Amendment's Prohibition of Excessive Fines.

Finally, Plaintiffs contend that both the initial $450 fee and the current fee violate the Eighth Amendment's prohibition on charging excessive fines.  Compl. ¶ 4 n.2, 10.  They allege that the fee constitutes a "fine" for purposes of the Eighth Amendment because "[t]he government's primary purpose" in instituting a processing fee for citizenship renunciation "was

not, as [the government] claimed, to recoup administrative costs ostensibly associated with the renunciation process." *Id.* ¶ 135. Rather, Plaintiffs assert, the renunciation processing fee "operated from its inception as a punitive exit tax." *Id.* This claim also lacks merit because the renunciation processing fee is not a fine.

The Supreme Court has recognized that, "at the time of the drafting and ratification of the [Eighth] Amendment, the word 'fine' was understood to mean a payment to a sovereign as punishment for some offense." *Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 265 (1989). Therefore, to determine that a charge by the government is a "fine" for purposes of the Eighth Amendment, a court must find that the charge "can only be explained as serving in part to punish." *Austin v. United States*, 509 U.S. 602, 610 (1993); *see id.* at 609-10 (describing the Excessive Fines Clause as a limitation on "the government's power to extract payments . . . as a punishment for some offense") (internal quotation marks omitted); *Collins v. S.E.C.*, 736 F.3d 521, 526 (D.C. Cir. 2013) ("A civil penalty violates the Excessive Fines Clause if it is grossly disproportional to the gravity of the offense.") (internal quotation marks omitted). To make such a finding, a court should "consider whether, at the time the Eighth Amendment was ratified," the charge was or would have been "understood at least in part as punishment" and whether it "should be so understood today." *Austin*, 509 U.S. at 610-11. In other words, the question is not whether *Plaintiffs* view a charge as a punishment but whether the Constitution's drafters and the Court today view the charge as a punishment.

Under this approach, the renunciation processing fee cannot be viewed as punishment for an offense. First, expatriation has never been an offense, nor is it currently viewed as an offense under U.S. law, either civilly or criminally. Plaintiffs even admit that "a U.S. citizen's exercise of his/her right to expatriate does not constitute reprehensible nor culpable conduct." Compl. ¶ 196.

Second, the processing fee can certainly be explained without referring to a punitive purpose. The fee covers the actual costs, as calculated according to the CoSM, of processing a renunciation and associated request for a CLN. Third, when a fine is levied for an offense, the government must "extract" the payment from the offending party. *Austin*, 509 U.S. at 609. In contrast, the Department of State does not "extract" the renunciation processing fee from anyone. Rather, individuals voluntarily choose to avail themselves of the service for which the fee pays. For these reasons, this Court should dismiss Plaintiffs' Eighth Amendment claim for failure to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6).

To the extent that Plaintiffs challenge the imposition of *any* fee whatsoever on Eighth Amendment grounds, *see, e.g.*, Compl. ¶ 10, that argument fails for the same reasons. Under the plain language of the Eighth Amendment, a renunciation fee of any amount that is designed to allow the government to recoup its administrative processing costs cannot be found unconstitutional as an "excessive fine."

Lastly, even if this Court were to find that Plaintiffs have stated a colorable Eighth Amendment claim, it should grant Defendants summary judgment as to this claim as well. The record makes clear that the motivation underlying the imposition of the current processing fee was to make the provision of the service for renunciation processing self-sustaining through collection of the fee. *See, e.g.*, 2015 Final Rule, 80 Fed. Reg. at 51465 (explaining why processing renunciation requests is so costly and that the number of renunciation requesters had significantly increased, and stating that, "[f]or all th[o]se reasons, the Department decided to raise the fee to reflect the full cost of the service"). Plaintiffs' allegations to the contrary have no basis in and are entirely unsupported by the record.

36

**CONCLUSION**

For the foregoing reasons, the Court should grant Defendants' motion to dismiss the Third and Fifth Counts of Plaintiffs' Complaint and grant summary judgment in Defendants' favor on the First, Second, and Fourth Counts, or, in the alternative, grant Defendants' motion for summary judgment on all counts of the Plaintiffs' Complaint.

Dated:  April 23, 2021                          Respectfully submitted,

                                                BRIAN M. BOYNTON
                                                Acting Assistant Attorney General

                                                ANTHONY J. COPPOLINO
                                                Deputy Director, Federal Programs Branch

                                                */s/ Laurel H. Lum*
                                                LAUREL H. LUM
                                                Trial Attorney
                                                United States Department of Justice
                                                Civil Division, Federal Programs Branch
                                                P.O. Box 883
                                                Washington, DC 20044
                                                Phone: (202) 305-8177
                                                Email: laurel.h.lum@usdoj.gov

                                                *Counsel for Defendants*