# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| L'ASSOCIATION DES AMÉRICAINS ACCIDENTELS, *et al.*, | Civil Action No. 1:20-cv-03573-TSC |
| Plaintiffs, |  |
| v. |  |
| UNITED STATES DEPARTMENT OF STATE, *et al.*, |  |
| Defendants. |  |

## OPPOSITION TO PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL DISMISSAL AND SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................... 1

I.     PLAINTIFFS' NON-CONSTITUTIONAL STATUTORY APA CLAIMS FAIL............ 1

       A.     The Court should consider Plaintiffs' non-constitutional statutory APA
              claims first...................................................................................................... 1

       B.     Defendants are entitled to summary judgment because the 2015 Final Rule
              is neither arbitrary nor capricious. .......................................................... 2

              1.     Processing and adjudicating a renunciation request under 8 U.S.C.
                     § 1481(a)(5) takes more than one hour. ....................................... 3

              2.     The renunciation services fee reasonably reflects the costs to the
                     State Department of providing the service.................................... 6

              3.     The amount of the fee for non-renunciation relinquishment
                     services is irrelevant........................................................................ 9

              4.     It was reasonable for the Department to increase the renunciation
                     services fee without explaining why fees for other Department
                     services are lower............................................................................ 10

              5.     The Department did not fail to consider an important aspect of the
                     problem. ........................................................................................... 10

              6.     The Department reasonably explained its shift to offering the
                     renunciation service at cost. ......................................................... 12

II.    PLAINTIFFS' FIFTH AMENDMENT CLAIM LACKS MERIT ................................. 14

III.   PLAINTIFFS' FIRST AMENDMENT CLAIM LACKS MERIT................................. 19

IV.    PLAINTIFFS' EIGHTH AMENDMENT CLAIM LACKS MERIT.............................. 22

V.     PLAINTIFFS' CUSTOMARY INTERNATIONAL LAW CLAIM LACKS
       MERIT. ................................................................................................................... 25

CONCLUSION.......................................................................................................... 27

## TABLE OF AUTHORITIES

### CASES

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .................................................................................. 23

*\*Austin v. United States*,
  509 U.S. 602 (1993) .............................................................................. 22, 24

*Auto. Parts & Accessories Ass'n v. Boyd*,
  407 F.2d 330 (D.C. Cir. 1968) ................................................................ 11

*Bens BBQ, Inc. v. Cnty. of Suffolk*,
  2020 WL 5900037 (E.D.N.Y. May 7, 2020), *report & recommendation adopted*,
  2020 WL 3790349 (E.D.N.Y. July 7, 2020) ........................................... 23

*\*Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*,
  492 U.S. 257 (1989) ....................................................................... 22, 23, 24

*Cath. Legal Immigr. Network, Inc. v. Exec. Off. for Immigr. Rev.*,
  ___F. Supp. 3d___, 2021 WL 184359 (D.D.C. Jan. 18, 2021) ......................... 10, 12

*City of Erie v. Pap's A.M.*,
  529 U.S. 277 (2000) ............................................................................. 20, 21

*Collins v. City of Harker Heights, Tex.*,
  503 U.S. 115 (U.S. 1992) ......................................................................... 16

*Collins v. SEC*,
  736 F.3d 521 (D.C. Cir. 2013) ................................................................. 22

*\*Cox v. New Hampshire*,
  312 U.S. 569 (1941) ........................................................................ 17, 18, 21

*Encino Motorcars, LLC v. Navarro*,
  136 S. Ct. 2117 (2016) ............................................................................. 12

*Farrell v. Blinken*,
  ___F.4th___, 2021 WL 2932152 (D.C. Cir. July 13, 2021) ............................... 15, 17

*Farrell v. Pompeo*,
  424 F. Supp. 3d 1 (D.D.C. 2019), *reversed on other grounds*,
  *Farrell v. Blinken*, 2021 WL 2932152 (D.C. Cir. July 13, 2021) ........................... 17

*FCC v. Prometheus Radio Project*,
  141 S. Ct. 1150 (2021), *remanded*, 846 F. App'x 88 (3d Cir. 2021) .......................... 2

*Gulf Oil Co. v. Bernard*,
  452 U.S. 89 (1981) ............................................................................................... 1

*Kirwa v. U.S. Dep't of Defense*,
  285 F. Supp. 3d 257 (D.D.C. 2018) ...................................................................... 16

*Kwok Sze v. Johnson*,
  172 F. Supp. 3d 112 (D.D.C. 2016), *aff'd sub nom. Kwok Sze v. Kelly*,
  2017 WL 2332592 (D.C. Cir. Feb. 21, 2017) ........................................................ 14

*Kwong v. Bloomberg*,
  723 F.3d 160 (2d Cir. 2013) .......................................................................... 17, 18

*Lozada Colon v. U.S. Dep't of State*,
  2 F. Supp. 2d 43 (D.D.C. 1998), *aff'd*, 170 F.3d 191 (D.C. Cir. 1999) .................... 17

*Marshall Cnty. Health Care Auth. v. Shalala*,
  988 F.2d 1221 (D.C. Cir. 1993) ............................................................................ 14

*McKesson Corp. v. Islamic Republic of Iran*,
  539 F.3d 485 (D.C. Cir. 2008) .............................................................................. 25

*Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. Ruckelshaus*,
  719 F.2d 1159 (D.C. Cir. 1983) .............................................................................. 2

*Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*,
  463 U.S. 29 (1983) ............................................................................................ 9, 14

*Murdock v. Pennsylvania*,
  319 U.S. 105 (1943) ............................................................................................. 18

*Murray v. Schooner Charming Betsy, The*,
  6 U.S. (2 Cranch) 64 (1804) ................................................................................. 25

*Nat'l Awareness Found. v. Abrams*,
  50 F.3d 1159 (2d Cir. 1995) ................................................................................. 22

*Nat'l Lifeline Ass'n v. FCC*,
  983 F.3d 498 (D.C. Cir. 2020) ................................................................................ 2

*Nishikawa v. Dulles*,
  356 U.S. 129 (1958) ............................................................................................. 15

*Pol'y & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*,
  313 F. Supp. 3d 62 (D.D.C. 2018), *dismissing appeal*,
  2018 WL 6167378 (D.C. Cir. Oct. 29, 2018) ........................................................ 14

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015) ........................................................................................................ 19, 20

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*,
  547 U.S. 47 (2006) ............................................................................................................... 21

*San Antonio Indep. Sch. Dist. v. Rodriguez*,
  411 U.S. 1 (1973) ................................................................................................................. 16

*Sobin v. District of Columbia*,
  480 F. Supp. 3d 210 (D.D.C. 2020) .................................................................................... 16

*United States v. Albertini*,
  472 U.S. 675 (1985) .............................................................................................................. 21

*United States v. Halper*,
  490 U.S. 435 (1989) ........................................................................................................ 22, 23

*United States v. O'Brien*,
  391 U.S. 367 (1968) .................................................................................................... 19, 20, 21

*United States v. Wells Fargo Bank*,
  485 U.S. 351 (1988) ............................................................................................................... 1

*Vance v. Terrazas*,
  444 U.S. 252 (1980) ............................................................................................................. 15

*Washington v. Glucksberg*,
  521 U.S. 702 (1997) ........................................................................................................ 15, 16

## STATUTES

5 U.S.C. § 706 ................................................................................................................................ 2

8 U.S.C. § 1481 ..................................................................................................................... *passim*

31 U.S.C. § 9701 .......................................................................................................................... 14

## REGULATIONS

*Schedule of Fees for Consular Services, Department of State and Overseas Embassies and
  Consulates—Visa and Citizenship Services Fee Changes*,
  79 Fed. Reg. 51247-01 (Aug. 28, 2014) ........................................................................ 10, 13

*Schedule of Fees for Consular Services, Department of State and Overseas Embassies and
  Consulates*,
  80 Fed. Reg. 51464-01 (Aug. 25, 2015) ........................................................................ *passim*

## OTHER AUTHORITIES

7 FAM 1220 ........................................................................................................... 4

7 FAM 1227 ........................................................................................................... 4

7 FAM 1228.1 ........................................................................................................ 4

7 FAM 1230 ........................................................................................................... 4

7 FAM 1260 ........................................................................................................... 4

7 FAM 1292 ........................................................................................................ 4, 5

7 FAM 1293 ........................................................................................................ 4, 5

*2020 Supporting Statement for Paperwork Reduction Act Submission for Form DS-4079*,
   https://www.reginfo.gov/public/do/PRAViewICR?ref_nbr=202002-1405-
   03#section4_anchor ............................................................................................ 8

DS-4079 Form ....................................................................................................... 6

*North Sea Continental Shelf Cases (Federal Republic of Germany v. Denmark / Federal*
   *Republic of Germany v. Netherlands),* I.C.J. Reports 1969 ...................................... 27

Savannah Price, *The Right to Renounce Citizenship*,
   42 FORDHAM INT'L L.J. 1547 (2019) ...................................................................... 25

UN Convention on the Reduction of Statelessness, Art. 7 (Aug. 30, 1961) ................................ 26

William Thomas Worster, *Human Rights Law and the Taxation Consequences for*
   *Renouncing Citizenship*,
   62 ST. LOUIS U. L.J. 85 (2017) ....................................................................... 25, 26

**INTRODUCTION**

Plaintiffs' Combined Cross-Motion for Summary Judgment and Opposition to Defendants' Motion for Summary Judgment fails to demonstrate that the challenged fee for Department services associated with a request for a Certificate of Loss of Nationality (CLN) under Immigration and Nationality Act (INA) Section 349(a)(5), 8 USC 1481(a)(5) ("fee for renunciation services" or "renunciation services fee") violates the APA or is contrary to constitutional law.  Defendants have demonstrated that the fee has a reasoned basis in fact, and Plaintiffs' arguments to the contrary are unavailing.  Defendants are also entitled to dismissal of Plaintiffs' Eighth Amendment and customary international law claims because the renunciation services fee is not a "fine" for purposes of the Eighth Amendment and customary international law does not recognize a right to expatriation.  And Plaintiffs' theories that the fee violates the First and Fifth Amendments are meritless.  The Court should grant Defendants' motion for partial dismissal and summary judgment and deny Plaintiffs' cross-motion for partial summary judgment.

**ARGUMENT**

I.   **PLAINTIFFS' NON-CONSTITUTIONAL STATUTORY APA CLAIMS FAIL.**

  A. **The Court should consider Plaintiffs' non-constitutional statutory APA claims first.**

Under the doctrine of constitutional avoidance, courts should first consider statutory grounds for decision before reaching any constitutional grounds.  *See, e.g.*, *United States v. Wells Fargo Bank*, 485 U.S. 351, 354 (1988) ("[O]ur established practice is to resolve statutory questions at the outset where to do so might obviate the need to consider a constitutional issue."); *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99 (1981) ("[P]rior to reaching any constitutional questions, federal courts must consider nonconstitutional grounds for decision.").  For that reason, the Court should

1

first consider Defendants' motion for summary judgment on Plaintiffs' arbitrary and capricious and statutory authority claims under the APA.  As set forth below, those claims should be rejected.

### B.  Defendants are entitled to summary judgment because the 2015 Final Rule is neither arbitrary nor capricious.

Under the APA's well-established arbitrary-and-capricious standard of review, courts presume the validity of the agency's action, *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. Ruckelshaus*, 719 F.2d 1159 (D.C. Cir. 1983), and must affirm the agency's decision so long as the agency has "acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision," even if the court would have made a different policy judgment than the agency.  *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021), *remanded*, 846 F. App'x 88 (3d Cir. 2021).

As Defendants set forth in their initial briefing, the 2015 Final Rule reflects the Department of State's reasonable consideration of the relevant issues and explanation of its decision to increase the renunciation services fee to $2,350 in order to allow the Department to recover the full cost of adjudicating and processing requests for Certificates of Loss of Nationality based on renunciations. *Schedule of Fees for Consular Services, Department of State and Overseas Embassies and Consulates* ("2015 Final Rule"), 80 Fed. Reg. 51464-01, 51464-66 (Aug. 25, 2015).

Plaintiffs have not met their burden to show that the Department of State's rulemaking was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 706(2)(A); *Nat'l Lifeline Ass'n v. FCC*, 983 F.3d 498, 507 (D.C. Cir. 2020).  Each of Plaintiffs' six arguments for the arbitrariness and capriciousness of the 2015 Final Rule fail.

1. *Processing and adjudicating a renunciation request under 8 U.S.C. § 1481(a)(5) takes more than one hour.*

Plaintiffs' assertion that processing and adjudicating a request for a renunciation-based CLN under 8 U.S.C. § 1481(a)(5) takes merely one hour is simply wrong, and the Administrative Record does not suggest otherwise. Plaintiffs point to the hours reflected in the Administrative Record that are listed under the code labeled "[p]rovide assistance with renunciation of U.S. citizenship," Mem. of P. & A. in Opp'n to Defs.' Mot. for Partial Dismissal and Summ. J. and in Supp. of Pls.' Cross-Mot. for Partial Summ. J., at 31-32, Dkt. 14 ("Pls.' Cross-Mot. and Opp'n"), but fail to acknowledge that the time listed for *13 other* activity codes is also relevant to services associated with requests for renunciation-based CLNs. *See* Dkt. 11-2, Decl. of Stacy L. Pickard, at ¶ 10; A.R. at 331, 362; *see also* 2015 Final Rule, 80 Fed. Reg. at 51466 ("In addition to the time spent processing renunciations overseas and domestically, the full cost of processing renunciations includes a portion of overhead costs that support consular operations overseas per OMB Circular A-25, Revised."). These other activity codes include "[p]erform[ing] general O[ffice] [of] C[onsular] S[ervices] support activities, including public outreach and information dissemination," "[p]erform[ing] internal controls and reconciliation of controlled supplies," and engaging in "fraud prevention/detection." A.R. at 331; *see* 2015 Final Rule, 80 Fed. Reg. at 51466 (describing the "overhead costs" included in the renunciation processing fee as including "applicable headquarters support"). Although not all of the time reflected under each of these activity codes was devoted to renunciation-related activities, the Administrative Record and accompanying Declaration confirm that it was reasonable for the Department of State to account for these other activities in determining the cost of the renunciation services fee.

Moreover, the columns that Plaintiffs used to make their "one hour" argument reflect only the time spent by Foreign Service Officers and Locally Employed Staff overseas. But domestic

staff at the Bureau of Consular Affairs in Washington, D.C., are also involved in adjudicating and processing requests for CLNs under INA 349(a)(5), 8 USC 1481(a)(5), and therefore their time must be added to the calculation of overall Department time spent on renunciation services. 2015 Final Rule, 80 Fed. Reg. at 51465 ("The application is reviewed both overseas and domestically, requiring a substantial amount of time to ensure full compliance with the law."). As described in the Final Rule and as detailed in 7 FAM 1220, 1230, and 1260, the consular officer sends all forms and memoranda to the Bureau of Consular Affairs for adjudication of the request, notification of approval or denial of the request, proper disposition of all documentation, and interagency notification.[1] The documents that comprise the request "are closely reviewed at headquarters by a country officer and a senior approving officer within the Bureau of Consular Affairs, and may include consultation with legal advisers within the Bureau of Consular Affairs and the Office of the Legal Adviser." 2015 Final Rule, 80 Fed. Reg. at 51465; *see* 7 FAM 1227(a), 1228.1. As the Final Rule notes, "[s]ome applications require multiple rounds of correspondence between post and headquarters." 2015 Final Rule, 80 Fed. Reg. at 51465. In cases involving minors or potential issues of mental competency, participation from the Office of the Legal Adviser is mandatory. 7 FAM 1292(i)(1) (prohibiting approval of a CLN "for a minor without the concurrence of [the Office the Legal Adviser]"); 7 FAM 1293(e) ("Should a situation arise of the evident compelling

---

[1] The time and cost of the service also includes the time that employees in the Office of Legal Affairs, Directorate of Overseas Citizens Service, Bureau of Consular Affairs spend conducting Administrative Reviews of loss of nationality determinations upon request by the individual who seeks to reverse his or her loss determination. 2015 Final Rule, 80 Fed. Reg. at 51465. This review considers the constitutionality of "the statute pursuant to which the initial finding of loss of nationality was made," "take[s] notice of any significant change in the analysis of expatriation cases" from Supreme Court holdings or Department interpretation, and "evaluate[s] evidence submitted by the expatriate that indicates that his or her commission of a statutory act of expatriation was either involuntary or done without intending to relinquish his/her U.S. nationality." *Id.* at 51465-66.

need for an incapacitated person to relinquish citizenship, you are asked to consult [the Office of the Legal Adviser] for guidance."). Such cases are also exceptions to the presumption of voluntariness, requiring additional time to adjudicate. 7 FAM 1292(i)(2); 7 FAM 1293(a), (g).

Additionally, an essential aspect of the overall cost of the renunciation service is the fact that loss of nationality is a *program* within the Department's Bureau of Consular Affairs. Programs require development, administration, and maintenance, and necessarily involve operational costs far beyond the cost of an hour's labor of a consular officer and locally employed staff overseas. *See* 2015 Final Rule, 80 Fed. Reg. at 51465. For example, in the loss of nationality program, there are electronic databases and software that consular systems technology experts must maintain, as well as forms and guidance to be continuously reviewed, revised, and updated in accordance with the Paperwork Reduction Act and current loss of nationality law. *See id.* at 51466 ("In addition to the time spent processing renunciations overseas and domestically, the full cost of processing renunciations includes a portion of overhead costs that support consular operations overseas per OMB Circular A–25, Revised. These costs include overseas rent and security, information technology equipment, and applicable headquarters support.").

Further, Plaintiffs' reference to the amount of time that government staff spent on *non-*renunciation relinquishment cases[2] in 2020 is incomplete and misleading. *See* Pls.' Cross-Mot. and Opp'n at 31-32. Plaintiffs cite the Supporting Statement for the Paperwork Reduction Act Submission related to the DS-4079, submitted to the Office of Information and Regulatory Affairs in 2020 (2020 Supporting Statement for the DS-4079), for the proposition that, on average, it takes

---

[2] "Non-renunciation relinquishment cases" are requests for a Certificate of Loss of Nationality under INA 349(a)(1)-(4), 8 USC 1481(a)(1)(4), *i.e.*, requests based on other potentially expatriating acts and not based on taking an oath of renunciation abroad, which is the "renunciation service" that is the subject of this lawsuit.

5

a Locally Employed Staff member, an overseas Foreign Service officer, a domestic Foreign Service officer, and a domestic Civil Service officer "five minutes each," or a total of 20 minutes, to review the DS-4079, Request for Determination of Possible Loss of United States Nationality, which is one of the forms that individuals seeking a CLN on the basis of a potentially expatriating act under INA 349(a)(1)-(4) must complete. But this comparison again singles out just one aspect of the information considered and fails to include other activities related to those services. The 20 minutes that Plaintiffs highlight account only for the amount of time required for each individual to read the form. As the form itself indicates, the process for a non-renunciatory relinquishment is more involved. For example, the form directs that an applicant must "complet[e] . . . [an] interview with [a] consular or diplomatic officer" who will then make a "recommendation regarding [the] case to the Department for determination." DS-4079 Form. The Department then has the authority "request further information" to assist in adjudicating the case. *Id.* All of these steps take significantly more time than the time required to review the DS-4079 Form.

> 2. *The renunciation services fee reasonably reflects the costs to the State Department of providing the service.*

Contrary to Plaintiffs' assertions, Defendants have supported the calculation of the renunciation services fee with information demonstrating that the calculation is reasonable and plausible. Pls.' Cross-Mot. and Opp'n at 32-37. As the Administrative Record reflects, the Department calculated the new renunciation services fee by surveying and compiling the relevant categories of costs and weighting them by actual and projected volumes to arrive at the actual cost to the Department of adjudicating and processing each request for a renunciation-based CLN. A.R. at 190, Consular Cost of Service Model Data Set; Pickard Decl. at ¶¶ 11-12, 18. As discussed

6

below, this calculation methodology was in line with the guidance provided in OMB Circular No. A-25.

Plaintiffs assert that the Administrative Record suggests that staff processing time for renunciation-based CLN requests is 23 hours and that this amount of time "defies credibility." Pls.' Cross-Mot. and Opp'n at 34.  Plaintiffs reached their 23 hour figure by dividing the total labor costs for the renunciation service by the number of renunciations per year, splitting the resulting figure of $808 into two categories based on Plaintiffs' assumption regarding the ratio of FSO and LES hours attributable to the renunciation service, and dividing both resulting categories of funds by the hourly wage rate for either FSOs or LES.  *Id.* at 34 n.35.  This calculation is flawed. Plaintiffs' assumption about the ratio of FSO and LES hours attributable to the renunciation service comes from a page in the Administrative Record which states that, based on "the average total number of hours performed by each staff type across each region/post size grouping," for all Department services, "[o]verall, for every 1 hour of work performed by FSO[s][,] LES perform 2.39 hours."  A.R. at 291.  This statement reveals nothing about the ratio of hours that different categories of Department staff spend on tasks *related to the renunciation service* and, therefore, the ratio cannot be used to calculate hours spent on that service.  Further, even assuming the hourly wage data were relevant, Plaintiffs make their calculation based on incomplete information because they use only the wage rates for FSOs and LES even though domestic Foreign Service officers and domestic Civil Service officers are also involved in providing the service.  *See, e.g.*, 2015 Final Rule, 80 Fed. Reg. at 51465.  Because the hourly wages for those staff ($69.60 per hour in 2020) are much higher than that of Locally Employed Staff ($24.60 per hour in 2020), even under Plaintiffs' calculation methodology, the time spent adjudicating renunciation-based CLN requests would be lower than Plaintiffs calculate it to be.  *2020 Supporting Statement for*

*Paperwork Reduction Act Submission for Form DS-4079*, at 7, available at https://www.reginfo.gov/public/do/PRAViewICR?ref_nbr=202002-1405-003#section4_anchor.

Even assuming, *arguendo*, that Plaintiffs' 23 hours calculation is accurate, 23 hours represents approximately three workdays. When considering that each requester must be interviewed by Department staff, that each request must be processed by multiple overseas consular staff and multiple domestic Department staff, and that there are other time-consuming programmatic elements that make the service possible, this time estimate—assuming its accuracy—would not be far-fetched.  As discussed above, it takes much more than one hour for the Department to process non-renunciation-based relinquishments, and there is no evidence of the disparity of which Plaintiffs complain.  *See* Pls.' Cross-Mot. and Opp'n at 35.

Similarly, Plaintiffs' assertion that the "Other Bureau Services" included in the fee "do not relate in any manner to the voluntary renunciation process" is inaccurate.  *Id.*  As explained in Stacy Pickard's Declaration, the "[c]osts captured in the CoSM" for the Functional, Regional, and Support Bureaus that comprise the "Other Bureau Services" category "include a share of the costs for the staff time those bureaus spend supporting consular activities, as well as other costs, such as residential leases for consular personnel overseas."  Pickard Decl. ¶ 15.  In other words, the Other Bureau Services costs are related to the renunciation service because they reflect the share of consular activities support from the various bureaus that makes the renunciation service possible.

Plaintiffs' assertion that the ICASS (International Cooperative Administrative Support Services) costs included in the fee "have nothing to do with the voluntary renunciation process" is also incorrect.  *See* Pls.' Cross-Mot. and Opp'n at 37.  As Plaintiffs acknowledge, the Government uses ICASS to "provide[] and share[] the cost of common services."  *Id.*  These common services

are relevant to the renunciation process because they represent the backbone of administrative support necessary to ensure that all consular services, including the renunciation service are possible. *See* Pickard Decl. at ¶ 16.  OMB Circular No. A-25 condones this distribution of costs by advising agencies that the "full cost" of a government service under the user charge statute "includes all direct and indirect costs to any part of the Federal Government of providing [the] . . . service[,] . . . includ[ing] . . . [p]hysical overhead, consulting, and other indirect costs including material and supply costs, utilities, insurance, travel, and rents or imputed rents on land, buildings, and equipment[,] . . . [and] management and supervisory costs."  A.R. at 438.

3.  *The amount of the fee for non-renunciation relinquishment services is irrelevant.*

Plaintiffs also claim that the fee for renunciation-based relinquishment cases must be too high because it is set at the same level as the fee for the non-renunciation relinquishment services, services which they contend are "inherently more complex and difficult to adjudicate."  Compl. ¶ 203(C).  Plaintiffs assert that "[t]he government has failed to provide any explanation for th[e] anomaly" that the fees for both services are the same, Pls.' Cross-Mot. and Opp'n at 37.  This argument is a non-sequitur and meritless.

To begin with, the fee for non-renunciation requests for a CLN was set *after* the fee challenged here.  So, as a procedural matter, it would not have been possible for the Government to provide an explanation in its rulemaking for how the renunciation services fee would compare to a fee not yet in existence.  As Plaintiffs acknowledge, the arbitrary and capriciousness inquiry asks whether the agency "offered an explanation for its decision that runs counter to the evidence *before the agency*" at the time of the agency's decision.  *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co*., 463 U.S. 29, 43 (1983) (emphasis added).  Moreover, the fact that the fee for requests for a CLN based on potentially expatriating acts was later set at the same

level as the renunciation services fee has no bearing on the reasonableness of the Department's decision to set the renunciation services fee at $2,350, which, as explained above, is based on an assessment of the costs associated with providing that service.

4. *It was reasonable for the Department to increase the renunciation services fee without explaining why fees for other Department services are lower.*

Plaintiffs assert that they have identified allegedly more time-consuming consular services that bear lower fees for the public and suggest that "something more than recoupment" must be at play for the renunciation services fee. Pls.' Cross-Mot. and Opp'n at 38. But this difference does not itself render the challenged fee unreasonable, because the Department assessed the cost of the renunciation service using the same methodology that it uses to set all other Department fees, *see Schedule of Fees for Consular Services, Department of State and Overseas Embassies and Consulates—Visa and Citizenship Services Fee Changes* ("2014 IFR"), 79 Fed. Reg. 51247-01, 51249 (Aug. 28, 2014), and determined that the cost of the service is $2,350 per request. Moreover, Plaintiffs present no reason to believe that a visa service is comparable to CLN services.

5. *The Department did not fail to consider an important aspect of the problem.*

Contrary to Plaintiffs' contention, the State Department did not "fail[] to consider an important aspect of the problem" regarding the constitutional rights that the renunciation services fee purportedly implicates. *Cath. Legal Immig. Network, Inc. v. Exec. Off. for Immigr. Rev.*, ___F. Supp. 3d___, 2021 WL 184359, at *12 (D.D.C. Jan. 18, 2021) (citation omitted). As an aside, the requirement for agencies to not "entirely fail[] to consider an important aspect of the problem" is not "particularly demanding." *Id.* (citation omitted). And Plaintiffs' contention that the State Department failed to consider constitutional implications that Plaintiffs see as "an important aspect of the problem" at the time the Department crafted the 2015 Final Rule is largely

an exercise in trying to shoe-horn their present legal theories into factors the agency should have considered.  This is not a flaw with the record under the APA, however.

To begin with, the Department had no reason to assess Plaintiffs' First or Fifth Amendment theories that expatriation is a fundamental right for purposes of due process, or that speech was at issue, because it was examining only the actual cost of processing an application, not whether someone could expatriate or engage in expression.  Similarly, because the fee has never been conceptualized as a fine, the Department had no reason to address whether it fell under the Eighth Amendment's purview.  In the context at issue here—where the Department was assessing the actual costs of its staff time for rendering a service—the Department's failure to examine constitutional issues that might be considered by the judicial branch in a subsequent challenge is not a flaw with the record.

Nonetheless, the Department did acknowledge the sole comment to the rulemaking that mentioned the Constitution, which stated that "[i]t is every American's constitutional right to renounce his citizenship" and that "[t]he $2350.00 fee effectively denies [citizens] their constitutional right to renounce."  A.R. at 453.  The Department responded, first, by acknowledging the comment, and second, by concluding that "the Department has not restricted or burdened the right of expatriation" as expressed in the Expatriation Act of 1868 and the Universal Declaration of Human Rights.  2015 Final Rule, 80 Fed. Reg. at 51465.  While brief, an agency need not "discuss every item of fact or opinion included in the submissions made to it in informal rule making" so long as it concisely states "what major issues of policy were ventilated by the informal proceedings and why the agency reacted to them as it did."  *Auto. Parts & Accessories Ass'n v. Boyd*, 407 F.2d 330, 338 (D.C. Cir. 1968).  Even assuming Plaintiffs' legal theories (with which Defendants disagree, as discussed *infra*) are retroactively superimposed as

11

something the Department should have anticipated and considered, the agency considered the issues to the extent they were raised. *Cath. Legal Immigr. Network, Inc.*, 2021 WL 184359, at *12.

> 6. *The Department reasonably explained its shift to offering the renunciation service at cost.*

Plaintiffs also object to the fact that the State Department shifted from adjudicating requests for renunciation-based CLNs at below cost to offering the service at cost. "Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). The Department provided this reasoned explanation by recognizing that "[i]n the past, . . . the Department charged less than the full cost of the renunciation service," but it was increasing the fee to the full cost of the service because "the number of people requesting the renunciation service ha[d] risen dramatically," which "materially increas[ed] the resources devoted to providing the service." 2015 Final Rule, 80 Fed. Reg. at 51465. The Department also explained that "improvements to [its] CoSM [(Cost of Service Model)] made the cost of the renunciation service more apparent." *Id.* As the Department stated in the Final Rule, it was "[f]or all th[o]se reasons[] [that] the Department decided to raise the fee to reflect the full cost of the service." *Id.* This thorough explanation met the Department's burden to provide a reasoned explanation for its change to the fee. *See Encino*, 136 S. Ct. at 2126 (stating that when an agency changes its policy, it "must at least display awareness that it is changing position and show that there are good reasons for the new policy") (citation omitted).

Plaintiffs' argument that the Department "contradict[ed]" its public policy reasons for offering the service below its actual cost "devoid of any explanation or evidentiary support" is also inaccurate. *See* Pls.' Cross-Mot. and Opp'n at 40. The sentence from the 2014 Interim Final Rule that Plaintiffs cite to support this assertion states succinctly that the Department "believe[d] there

[wa]s no public benefit or other reason for setting th[e] fee below cost." *Id.* (citing 2014 IFR, 79 Fed. Reg. at 51251). But the previous sentence sets the stage for that conclusion by stating that, in the time between implementation of the $450 fee and the publication of the IFR, "demand for the service ha[d] increased dramatically, consuming far more consular officer time and resources." 2014 IFR, 79 Fed. Reg. at 51251. And as the Final Rule explains, the increased volume of renunciations and the improved study methodology that showed the high cost of providing the service convinced the Department of the necessity of raising the fee to charge the actual cost of the service. 2015 Final Rule, 80 Fed. Reg. at 51465.

Plaintiffs' response to these justifications is unavailing. They claim that "[n]othing in the Administrative Record" supports the Department's explanation. Pls.' Cross-Mot. and Opp'n at 40. But the Administrative Record reflects a dramatic increase in requests for CLNs based on renunciation. A.R. at 262. The percentage of the Department's time spent on this service necessarily increased when the volume increased. Plaintiffs' confusing assertion that "a higher volume of requests would contribute to a *reduction* in cost per service" is far from "[i]ntuitive[]." Pls.' Cross-Mot. and Opp'n at 40. Because time and resources are key drivers of the cost per service, a higher volume of requests may – and in fact did – increase the overall costs attributable to the service. For these reasons, the Department's justifications for its shift from offering the service below cost to offering it at cost were sufficient and reasonable.

In sum, the Administrative Record supports the conclusion that the State Department "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a

'rational connection between the facts found and the choice made.'"[3] *Motor Vehicles Mfrs. Ass'n.*, 463 U.S. at 43 (citation omitted).

## II.     PLAINTIFFS' FIFTH AMENDMENT CLAIM LACKS MERIT.[4]

Plaintiffs' Fifth Amendment challenge to the renunciation service fee seeks to put at issue whether expatriation is a fundamental right for purposes of the Fifth Amendment.  As an initial matter, Plaintiffs do not dispute that no court has recognized expatriation as a fundamental right. *See Kwok Sze v. Johnson*, 172 F. Supp. 3d 112, 121 (D.D.C. 2016), *aff'd sub nom. Kwok Sze v. Kelly*, 2017 WL 2332592 (D.C. Cir. Feb. 21, 2017) ("[T]he Supreme Court has not recognized that the right to abandon one's citizenship constitutes a *constitutional* right.").  Nevertheless, Plaintiffs argue that this Court should recognize a fundamental right to expatriation, and that the right should not be so narrowly defined as the right to expatriate *free of charge* or free of a fee like the renunciation services fee.  Pls.' Cross-Mot. and Opp'n at 5 n.6.  But a broad right to expatriate

---

[3]  As Plaintiffs acknowledge, their argument that the 2015 Final Rule is in excess of Defendants' statutory authority is "coterminous" with Plaintiffs' other statutory APA arguments.  Pls.' Cross-Mot. and Opp'n at 41 n. 45.  For the reasons discussed above, the 2015 Final Rule complies with the user charge statute, 31 U.S.C. § 9701, and is within Defendants' statutory authority.

[4]  To the extent the Court disagrees with Defendants' arguments in favor of summary judgment on Plaintiffs' statutory APA claims, it of course need not reach their various constitutional theories and, in the interests of constitutional avoidance, should avoid addressing significant and complex issues that could impact other areas of law.  The fact that Plaintiffs have not moved for summary judgment on the APA statutory claims, potentially as a tactical matter to induce the Court to reach the constitutional issues, would be no impediment to granting  summary judgment for Plaintiffs on the APA claims (again should the Court find their arguments have merit), because, due to "the character of the questions before the district court when an agency action is challenged[,] [t]he entire case on review is a question of law, and only a question of law."  *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993); *see also Pol'y & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62, 74 (D.D.C. 2018) ("[I]n APA cases, the summary judgment standard functions slightly differently, because the reviewing court generally reviews the agency's decision as an appellate court addressing issues of law.") (citation and alterations omitted), *dismissing appeal*, 2018 WL 6167378 (D.C. Cir. Oct. 29, 2018).  In any event, because the Court should grant summary judgment for the Government on the APA claims, we address the constitutional theories Plaintiffs raise.

without limitation does not qualify as "a careful description of the asserted fundamental liberty interest." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (citation omitted); *see id.* at 722 ("[W]e have a tradition of carefully formulating the interest at stake in substantive-due-process cases."). This broad purported right is not a careful formulation because it fails to acknowledge and account for the limitations on expatriation that courts have repeatedly upheld. *See, e.g.*, *Vance v. Terrazas*, 444 U.S. 252, 266 (1980) (upholding, as against a Fifth Amendment Due Process Clause challenge, 8 U.S.C. § 1481(c)'s evidentiary standard for relinquishment of citizenship, and holding that "it is untenable to hold that [Congress] has no power whatsoever to address itself to the manner or means by which Fourteenth Amendment citizenship may be relinquished"); *Nishikawa v. Dulles*, 356 U.S. 129, 139 (1958) (acknowledging that even though "a citizen has the right to abandon or renounce his citizenship[,] . . . Congress can enact measures to regulate and affirm such abjuration"); *Farrell v. Blinken*, ___F.4th___, 2021 WL 2932152, at *8 (D.C. Cir. July 13, 2021) ("While Farrell has a statutory right to expatriate, Congress has conferred substantial authority on the Secretary of State to administer . . . laws governing the expatriation of U.S. citizens[,] . . . includ[ing] discretion to determine the forms and requirements for individuals seeking loss of nationality . . . ."); *see also* Mem. in Support of Defs.' Mot. for Partial Dismissal & Summ. J. at 27-28, Dkt. 11-1 (describing various limitations on expatriation that courts have upheld, including limitations on the ability to expatriate while incarcerated). In light of the Government's well-recognized authority to prescribe *how* a citizen may renounce citizenship and determine whether the citizen has done so in an adequate manner, and Plaintiffs' failure to challenge that long-standing authority, the right that Plaintiffs seek recognition of is most "careful[ly] descri[bed]" as a right to renounce citizenship free of charge or free of the fee that the Department currently charges. *Glucksberg*, 521 U.S. at 721 (1997).

The Court should not take Plaintiffs' invitation to be the first court to recognize such a right. Courts consistently recognize that "[t]he doctrine of judicial self-restraint requires" the exercise of "the utmost care whenever [they] are asked to break new ground in th[e] [substantive due process] field." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (U.S. 1992); *see also Kirwa v. U.S. Dep't of Defense,* 285 F. Supp. 3d 257, 275 (D.D.C. 2018) ("The D.C. Circuit has been reticent to recognize new substantive due process rights."); *Sobin v. District of Columbia,* 480 F. Supp. 3d 210, 223 (D.D.C. 2020) ("[S]ubstantive due process claims have only been recognized for conduct rising to a serious deprivation of constitutional rights."). Given the Supreme Court's "reluctan[ce]" to "expand the concept of substantive due process" beyond these categories of rights already recognized, this Court should decline to do so. *Glucksberg*, 521 U.S. at 720 (citation omitted). This is especially true considering that a right to expatriate free of a fee or free of a charge like the renunciation services fee is neither "deeply rooted in this Nation's history and tradition" nor "implicit in the concept of ordered liberty." *Id.* at 721 (citations omitted).

Because there is no basis to now recognize a fundamental right to expatriate free of charge or free of a fee like the renunciation services fee, the applicable standard for assessing the legality of the renunciation services fee is the rational basis test. *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 40, 44 (1973) (applying rational basis review where the challenged action did not "impinge upon constitutionally protected rights"). The at-cost renunciation services fee survives rational basis review because it bears a rational relationship to the legitimate state purpose of recovering the costs that the government incurs in providing this service.

Even if the Court agreed with Plaintiffs that the asserted fundamental right is best framed as a *general* right to expatriate, however, there is no need to reach the question of whether such a right exists under the Fifth Amendment. That is because, even assuming *arguendo* that such a

right existed, the renunciation services fee still would be permissible because it merely collects the cost of administering the service.  Cf. *Lozada Colon v. U.S. Dep't of State*, 2 F. Supp. 2d 43, 45 (D.D.C. 1998) ("[E]ven if one were to concede Plaintiff's argument that an individual has a fundamental right to expatriate, the Secretary of State still would have the discretion to determine whether an individual has adequately renounced affiliation with the United States so as to trigger that right."), *aff'd*, 170 F.3d 191 (D.C. Cir. 1999); *Farrell v. Pompeo*, 424 F. Supp. 3d 1, 23–24 (D.D.C. 2019) ("[E]ven assuming the plaintiff has a constitutional right to expatriate, the Court cannot conclude that the defendants have acted contrary to that right."), reversed on other grounds *Farrell v. Blinken*, 2021 WL 2932152.  The Supreme Court and other courts have upheld fees that "meet the expense[s] incident to the administration of" constitutionally protected rights, such as free speech or the right to bear arms.  *Cox v. New Hampshire*, 312 U.S. 569, 577 (1941); *see Kwong v. Bloomberg*, 723 F.3d 160, 165 (2d Cir. 2013) (upholding a city gun licensing fee that covered the associated administrative processing costs because "imposing fees on the exercise of constitutional rights is permissible when the fees are designed to defray (and do not exceed) the administrative costs of regulating the protected activity").  The renunciation services fee is just such a fee.  As detailed above, the fee meets the expenses incident to administering the oath of renunciation and adjudicating requests for CLNs based on renunciations.

Plaintiffs argue that *Cox* and *Kwong* "do not grant the government a blank check to charge fees as a condition to the exercise of a constitutional right," but that statement misses the point of Defendants' argument.  Pls.' Cross-Mot. and Opp'n at 22.  Those cases do not hold that the government may *always* condition the exercise of a constitutional right on the payment of a fee. Rather, they uphold the constitutionality of fees that are intended to offset the cost to the government of administering the system through which an individual may exercise his or her

constitutional right.  For example, in *Cox*, the parade licensing fee covered "the expense incident to the administration of the act and to the maintenance of public order in the matter licensed."  312 U.S. at 577.  In *Kwong*, the gun licensing fee covered the processing costs for issuance of the licenses.  723 F.3d at 166.  Similarly, here, the renunciation services fee covers the costs of adjudicating requests for CLNs based on an oath of renunciation.  Far from falling into Plaintiffs' "blank check" scenario, the justification for the renunciation services fee falls squarely within "the Supreme Court's fee jurisprudence."[5]  *Id.* at 164 (citation omitted).

Plaintiffs' attempt to analogize the renunciation services fee to the fee at issue in *Murdock v. Pennsylvania*, 319 U.S. 105 (1943), is unavailing.  *See* Pls.' Cross-Mot. and Opp'n at 22.  In *Murdock*, the Supreme Court struck down a requirement that "all persons canvassing for or soliciting within" the area must pay a fee to obtain a license to do so, which the Court characterized as a "license tax—a flat tax imposed on the exercise of a privilege granted by the Bill of Rights."  319 U.S. at 113.  The *Murdock* Court distinguished the fee at issue from the fee in *Cox*, which it noted had been "imposed as a regulatory measure and calculated to defray the expense of protecting those on the streets and at home against the abuses of solicitors."  *Id.* at 116.  But here, as in *Cox* and *Kwong*, there is an actual cost to the Government each time an individual seeks a CLN.  In *Murdock*, on the other hand, the fee functioned as a flat tax, unmoored from any actual cost shown to be at issue.  *Murdock* prohibits fees in those circumstances, but it does not prohibit

---

[5]  Plaintiffs assert that *Cox* and *Kwong* are inapplicable because they do not discuss an increase in the number or volume of services requested, whereas the 2015 Final Rule does.  Pls.' Cross-Mot. and Opp'n at 23.  But this detail is irrelevant because the renunciation services fee meets the criteria discussed in *Cox* and *Kwong*, and the Government's consideration of the increased volume of requests does not undermine its conclusion that the actual cost of providing the service is $2,350 per requester.

fees based on actual costs to the Government when it charges for the costs of a service related to a protected activity.

Thus, under a careful framing of Plaintiffs' asserted fundamental right to expatriate free of charge or free of a charge like the renunciation services fee, no such right exists, and the Court should not recognize one; and even under the broadest framing of the asserted right—a general right to expatriation—it is not necessary to decide whether such a right exists, because the renunciation services fee would not violate it.  For these reasons, the Court should deny Plaintiffs' cross-motion for summary judgment on their Fifth Amendment claim and grant summary judgment for Defendants on this claim.

## III.   PLAINTIFFS' FIRST AMENDMENT CLAIM LACKS MERIT.

Plaintiffs' First Amendment claim should also be rejected.  As an initial matter, the renunciation services fee is not reasonably viewed as imposing a charge on speech – that is, for the expression of point of view.  Rather, the fee is directed at the undisputed fact that the process of administering an oath of renunciation and adjudicating a request for a CLN imposes administrative costs on the Department.  As the Supreme Court has observed, "[w]e cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea."  *United States v. O'Brien*, 391 U.S. 367, 376 (1968).

But even assuming that the renunciation services fee is sufficiently linked to speech or expression to trigger First Amendment scrutiny, it is not a facially *content*-based restriction on speech or expression because it does not "draw[] distinctions based on the message a speaker conveys."  *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).  The fee is the same regardless of an individual's reason for requesting the CLN and is not directed at the content of any expression

concerning why a person seeks to expatriate.   As discussed above and in the Administrative Record, the State Department arrived at the fee's amount by calculating the amount of time and resources required to process and adjudicate renunciation-based requests for a CLN, which is unrelated to what speech, if any, may be at issue.  The renunciation services fee does not bear any of the other markers of a content-based regulation either.  It can be "justified without reference to the content of the [purportedly] regulated speech," and it was not "adopted by the government because of disagreement with the message the [purported] speech conveys."  *Id.* at 164 (citation and alterations omitted).

Laws that incidentally burden speech are subject to the *O'Brien* test, 391 U.S. 367, which examines whether (1) "the government regulation is within the constitutional power of the government to enact"; (2) "the regulation furthers an important or substantial government interest"; (3) "the government interest is unrelated to the suppression of free expression"; and (4) "the restriction is no greater than is essential to the furtherance of the government interest." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 296, 301 (2000).

The renunciation services fee satisfies the *O'Brien* test.  First, Defendants acted within their constitutional power in enacting the regulation setting the current renunciation services fee. Plaintiffs do not contend that the State Department lacks authority delegated by Congress to the Executive Branch to set fees for services it provides – they challenge *this fee* as an impermissible impingement on speech.  *See O'Brien*, 391 U.S. at 377-78 (assessing, under the first prong of the test, whether the Government had "[t]he constitutional power" to create the regulation at issue— not whether the regulation withstood legal challenges under other constitutional provisions). Second, Defendants' interest in recovering the costs of adjudicating requests for renunciation-based CLNs, including the time-consuming task of ensuring that such requests are voluntary, is

important and substantial.  Plaintiffs make a conclusory statement that this interest cannot possibly be important or substantial, Pls.' Cross-Mot. and Opp'n at 26, but this bald assertion is unavailing. *O'Brien* itself recognized that the Government may have an important or substantial interest in the "just and efficient administration of [a] system."  *O'Brien*, 391 U.S. at 379.  Third, as discussed above, the Government's interest in charging the fee is unrelated to the suppression of free expression.  Fourth, because the costs associated with the renunciation service justify the renunciation services fee, the fee is "no greater than is essential to the furtherance of the government interest." *City of Erie*, 529 U.S. at 301.  Plaintiffs argue that the fee is greater than is essential because there are alternative ways to reduce the costs that are passed on to the consumer. Pls.' Cross-Mot. and Opp'n at 26.  But such alternatives, even if viable, are beside the point.  Under the fourth prong of the *O'Brien* test, a regulation cannot be deemed "invalid simply because there is some imaginable alternative that might be less burdensome on speech."  *United States v. Albertini*, 472 U.S. 675, 689 (1985).  "Instead, an incidental burden on speech is no greater than is essential, and therefore is permissible under *O'Brien*, so long as the neutral regulation promotes a substantial government interest that would be achieved less effectively absent the regulation."  *Id.* The Supreme Court has added that the question of whether less burdensome alternatives would still be as effective is "a judgment for Congress, not the courts."  *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 67 (2006).  Here, the Government's interest in recovering the cost of its services would certainly be achieved less effectively if the fee set aside or disregarded the actual cost of offering the service.

Plaintiffs' argument that *any* renunciation services fee would violate the First Amendment is especially meritless.  The Government is permitted to impose fees, so long as those fees "meet the expense[s] incident to the administration of the [speech or expressive] act" in question.  *Cox*,

312 U.S. at 577; *see also Nat'l Awareness Found. v. Abrams,* 50 F.3d 1159, 1165 (2d Cir. 1995) ("[F]ees that serve not as revenue taxes, but rather as means to meet the expenses incident to the administration of a regulation and to the maintenance of public order in the matter regulated are constitutionally permissible."). Because the renunciation services fee meets the expenses incident to the administration of the service, the amount and existence of the fee satisfy constitutional requirements.

## IV.    PLAINTIFFS' EIGHTH AMENDMENT CLAIM LACKS MERIT.

Defendants are entitled to dismissal or summary judgment on Plaintiffs' Eighth Amendment claim because the renunciation services fee is not a fine and is therefore not subject to the Eighth Amendment's purview. A charge is only a "fine" under the Eighth Amendment if it constitutes "a payment to a sovereign as punishment for some offense." *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 265 (1989); *see Austin v. United States*, 509 U.S. 602, 609-10 (1993) (same); *Collins v. SEC*, 736 F.3d 521, 526 (D.C. Cir. 2013) ("A civil penalty violates the Excessive Fines Clause if it is grossly disproportional to the gravity of the offense.") (citation omitted). As explained in Defendants' opening Memorandum, renunciation of citizenship has never been and is not now considered an "offense." Mem. in Support of Defs.' Mot. for Partial Dismissal & Summ. J. at 35-36. Therefore, by definition, the renunciation services fee cannot be a "punishment for some offense," which excludes it from classification as a "fine" under the Eighth Amendment.

The cases that Plaintiffs cite are inapposite because they discuss the application of the Eighth Amendment to "fine[s]," "civil forfeiture[s]" or other "civil sanction[s]." Pls.' Cross-Mot. and Opp'n at 27; *see Austin*, 509 U.S. at 622 (holding that "civil forfeiture" under certain statutory provisions constitutes a "fine" for purposes of the Eighth Amendment); *United States v. Halper*,

22

490 U.S. 435, 448 (1989) (holding that "a civil [sanction] . . . constitutes punishment when the sanction as applied in the individual case serves the goal of punishment"); *see also* Pls.' Cross-Mot. and Opp'n at 27-28 (citing *Bens BBQ, Inc. v. Cnty. of Suffolk*, 2020 WL 5900037, at \*2, \*7-\*8 (E.D.N.Y. May 7, 2020), *report and recommendation adopted*, 2020 WL 3790349 (E.D.N.Y. July 7, 2020) (holding that a "fine" for false alarms under the False Alarm Act falls "within the purview of the [Excessive Fines Clause]"). The renunciation services fee, on the other hand, is not characterized as a forfeiture, sanction, or fine. It is a fee that flows directly from the cost to the Department of providing the service. Thus, Plaintiffs' citations to legal standards for "civil sanction[s] . . . [that] can only be explained as also serving either retributive or deterrent purposes" put the cart before the horse. *Halper*, 490 U.S. at 448. A court need only reach an inquiry about the possible retributive or deterrent purposes of a charge if the charge is first found to be tied to an "offense." *Browning-Ferris*, 492 U.S. at 265. A civil sanction, fine, or forfeiture passes this threshold inquiry. But the renunciation services fee does not.

Plaintiffs argue that if the Court accepts their factual allegations as true, their Eighth Amendment claim survives Defendants' motion to dismiss. Pls.' Cross-Mot. and Opp'n at 27. Plaintiffs misapply the standard for the non-movant's allegations at the dismissal stage, however. The Eighth Amendment claim presents a pure legal issue, indeed the core allegations in support of this claim are legal conclusions, and "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). For example, Plaintiffs' first allegation—that "a deterrent purpose is sufficient to bring the fee within the purview of the Eighth Amendment," Pls.' Cross-Mot. and Opp'n at 27, is a legal conclusion which the Court need not accept as true. Likewise, Plaintiffs' second allegation includes statements that "the Renunciation Fee is a punishment" or that it "constitutes retribution

for [an applicant's] political views which may be antithetical to those of the government." *Id.* at 27-28. Again, both statements are legal conclusions, as "punishment" and, by extension, "retribution" are terms of art in the Eighth Amendment context. Indeed, almost the entirety of the Supreme Court's nineteen-page opinion in *Austin v. United States* is devoted to determining whether the civil forfeiture at issue constitutes a "punishment" for purposes of the Eighth Amendment. 509 U.S. at 610, 622.

Moreover, to the extent Plaintiffs' Eighth Amendment allegation "that the government's economic justification for the Fee is implausible," *see* Pls.' Cross-Mot. and Opp'n at 28, is perceived to be factual in nature and taken as true, Plaintiffs' claim still fails as a matter of law. The core problem with this claim remains a legal one: a charge does not qualify as a "fine" under the Eighth Amendment unless it is, at least in part, "a payment to a sovereign as punishment for some offense." *Browning-Ferris*, 492 U.S. at 265; *see Austin*, 509 U.S. at 609-10 ("The Excessive Fines Clause limits the government's power to extract payments, whether in cash or in kind, 'as *punishment* for some offense.'") (quoting *Browning-Ferris*, 492 U.S. at 265). Because renunciation is not an offense, the renunciation services fee cannot, by definition, be a punishment for an offense, regardless of what the Court assumes to be true about the reason the Department created the fee. For this reason, the Court should grant Defendants' motion for dismissal of Plaintiffs' Eighth Amendment claim.[6] For the same reasons, the claim is ripe for summary judgment, which the Court should grant in Defendants' favor.

---

[6] To the extent that Plaintiffs argue that no renunciation services fee is permissible under the Eighth Amendment, this claim also fails for the same reason and entitles Defendants to dismissal.

24

## V.    PLAINTIFFS' CUSTOMARY INTERNATIONAL LAW CLAIM LACKS MERIT.

Defendants are also entitled to dismissal or summary judgment on Plaintiffs' customary international law claim, because the renunciation services fee does not violate any such purported law.  Plaintiffs' customary international law claim hinges on a purported application of the *Charming Betsy* principle, which states that "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains."  *Murray v. Schooner Charming Betsy, The*, 6 U.S. (2 Cranch) 64, 118 (1804).  Thus, in order for Plaintiffs to succeed on their cross-motion for summary judgment on this claim and defeat Defendants' motion for summary judgment, Plaintiffs must show that the renunciation services fee violates customary international law.  And to prove the existence of such a law, Plaintiffs must show both that there is consistent State practice and that the practice flows from a sense of legal obligation.  *See, e.g.*, *McKesson Corp. v. Islamic Republic of Iran*, 539 F.3d 485, 488 n.1 (D.C. Cir. 2008).  Plaintiffs have failed to carry their burden of demonstrating the existence of a rule of customary international law prohibiting a renunciation processing fee like the one at issue in this case.

Even assuming, for the sake of argument, that all of Plaintiffs' statements about a general right of expatriation being recognized under customary international law are accurate, which Defendants do not concede, Plaintiffs point to nothing suggesting that such a right is so absolute as to be violated by the imposition of the renunciation services fee.  Instead, Plaintiffs and their sources frame the purported right as a "right to voluntar[il]y expatriat[e]."  Pls.' Cross-Mot. and Opp'n at 42; *see* Savannah Price, *The Right to Renounce Citizenship*, 42 FORDHAM INT'L L.J. 1547, 1581 (2019) (stating that "[t]he prevalence of" "procedures to renounce citizenship . . . supports the argument that this has become an international customary right"); William Thomas Worster, *Human Rights Law and the Taxation Consequences for Renouncing Citizenship*, 62 ST. LOUIS U.

L.J. 85, 95 (2017) (concluding that evidence "suggests that the right to renounce nationality also exists under customary international law"). Plaintiffs fail to reconcile their assertion of an absolute right to expatriate with the limitations on any such right that exist under international law. For example, the 1961 UN Convention on the Reduction of Statelessness prohibits the 61 states who are a party to it from permitting renunciation of citizenship, "[i]f [their law even] permits [such] renunciation," "unless the person concerned possesses or acquires another nationality." UN Convention on the Reduction of Statelessness, Art. 7(1)(a) (Aug. 30, 1961). Not only do Plaintiffs fail to address the suggestion in Article 7(1)(a) that state practice with respect to renunciation, at least as of 1961, was not consistent, but they do not explain, in light of Article 7(1)(a) and its restrictions on renunciation, how a right to expatriate could be so absolute as to prohibit the requirement of fees related to its exercise.

Moreover, some of Plaintiffs' sources expressly recognize that a fee for processing and adjudicating a renunciation-based request for a CLN does *not* violate customary international law. For example, one article that Plaintiffs cite recognizes that "the right to expatriate . . . must be subject to some limitation" and notes that "some states assess a significant fee." Worster, 62 ST. LOUIS U. L.J. at 95-97; *see id.* at 98 (stating that "any fee that goes beyond the administrative costs would be unlawfully burdening the underlying right"). Consistent with the entitlement to renunciation that Plaintiffs assert, the United States provides a procedure through which individuals may renounce their U.S. citizenship. The fact that the cost of the procedure is passed on to the applicant does not violate customary international law, because there is no customary international law prohibiting a fee for renunciation services.

In response to this argument, Plaintiffs contend that most countries either charge no fee or a fee that is lower than the United States' fee. Pls.' Cross-Mot. and Opp'n at 44. But that alone is

insufficient to establish that the fee charged by the United States contravenes a rule of customary international law.  Even if the fee practice of other states cited by Plaintiffs reflected a consistent practice of states, it is insufficient to claim that such practice alone reflects a rule of customary international law because, to form customary international law, such practice "must also be such, or be carried out in such a way, as to be evidence of a belief that this practice is rendered obligatory by the existence of a rule of law requiring it."  *North Sea Continental Shelf Cases (Federal Republic of Germany v. Denmark / Federal Republic of Germany v. Netherlands),* I.C.J. Reports 1969, p. 44, ¶ 77.  Plaintiffs do not point to any evidence that states set their renunciation fees at a level that is dictated by a sense of legal obligation.  In the absence of such evidence, the Court cannot find that the fee at issue here violates customary international law.  And without such a finding, *Charming Betsy* analysis does not even come into play.  Therefore, the Court should grant Defendants' motion to dismiss Plaintiffs' customary international law claim or, in the alternative, grant Defendants' summary judgment motion on that claim.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' cross-motion for summary judgment and grant Defendants' motion to dismiss the Third and Fifth Counts of Plaintiffs' Complaint and grant summary judgment in Defendants' favor on the First, Second, and Fourth Counts, or, in the alternative, grant Defendants' motion for summary judgment on all counts of the Plaintiffs' Complaint.

Dated: July 16, 2021                                     Respectfully submitted,

                                                         BRIAN M. BOYNTON
                                                         Acting Assistant Attorney General

                                                         ANTHONY J. COPPOLINO
                                                         Deputy Director, Federal Programs Branch

*/s/ Laurel H. Lum*
LAUREL H. LUM
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044
Phone: (202) 305-8177
Email: laurel.h.lum@usdoj.gov

*Counsel for Defendants*

28