## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **L'ASSOCIATION DES AMÉRICAINS ACCIDENTELS, ET AL.** | |
| *Plaintiffs* | |
| *v.* | Civil Action No. 20-cv-3573 |
| **U.S. DEPARTMENT OF STATE, ET AL.** | **ORAL ARGUMENT REQUESTED PER LCvR 78.1** |
| *Defendants* | |

## PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT

L. Marc Zell
ZELL & ASSOCIATES INTERNATIONAL
ADVOCATES, LLC
1345 Ave. of the Americas
2nd Floor
New York, NY 10105
(212)-971-1349
*Email:* mzell@fandz.com

Noam Schreiber, *pro hac vice*
34 Ben Yehuda St.
15th Floor
Jerusalem, Israel 9423001
011-972-2-633-6300
*Email:* schreiber.noam@gmail.com

*Counsel for Plaintiffs*

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ...........................................................................................ii

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 2

    I.    PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR FIFTH
        AMENDMENT CLAIM................................................................................... 2

           A. Plaintiffs have adequately described the right to voluntarily expatriate ................... 4

           B. *Cox v. New Hampshire* is inapposite ................................................................. 5

    II.   PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR FIRST
        AMENDMENT CLAIM:  THE RENUNCIATION FEE VIOLATES THE FIRST
        AMENDMENT RIGHT TO FREEDOM OF SPEECH.................................... 15

    III.  PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR
        CUSTOMARY INTERNATIONAL LAW CLAIM: 8 U.S.C. §1481(A)(5)
        SHOULD BE INTERPRETED TO CONFORM TO CUSTOMARY
        INTERNATIONAL LAW ............................................................................. 16

CONCLUSION.............................................................................................................. 19

# TABLE OF AUTHORITIES

## Supreme Court Cases

*Boddie v. Connecticut,*
401 U.S. 371 (1971) ..................................................................................................... 9

*Clark v. Martinez,*
543 U.S. 371 (2005) ..................................................................................................... 2

*Cox v. New Hampshire,*
312 U.S. 569 (1941) .................................................................................................. 1, 5

*Fed. Power Comm'n v. New England Power Co.,*
415 U.S. 345 (1974) ..................................................................................................... 6

*Forsyth County, Ga. v. Nationalist Movement,*
505 U.S. 123 (1992) ..................................................................................................... 8

*Jennings v. Rodriguez,*
138 S.Ct. 830 (2018) ..................................................................................................... 2

*M.L.B. v. S.L.J.,*
519 U.S. 102 (1996) ..................................................................................................... 9

*McDonald v. City of Chicago,*
561 U.S. 742 (2010) ..................................................................................................... 2

*Murray v. The Schooner Charming Betsy,*
6 U.S. (2 Cranch) 64 (1804) ....................................................................................... 18

*National Cable Television Ass'n, Inc. v. United States,*
415 U.S. 336 (1974) .................................................................................................. 1, 6

*Obergefell v. Hodges,*
576 U.S. 644 (2015) ..................................................................................................... 5

*Reno v. Flores,*
507 U.S. 292 (1993) ..................................................................................................... 4

*Savorgnan v. United States,*
338 U.S. 491 (1950) ..................................................................................................... 3

*Talbot v. Jansen,*
3 U.S. (3 Dall.) 133 (1795) ........................................................................................... 5

*United States v. O'Brien*,
391 U.S. 367 (1968) ................................................................................................. 15

*Washington v. Glucksberg*,
521 U.S. 702 (1997) ................................................................................................. 4, 5

**Cases**

*Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*,
495 F.3d 695 (D.C. Cir. 2007) ................................................................................. 2

*Farrell v. Blinken*,
4 F.4th 124, (D.C. Cir. 2021). ......................................................................... 1, 3, 4, 6

*Kwong v. Bloomberg*,
723 F.3d 160 (2d Cir. 2013) ................................................................................. 5, 9

*Montrois v. United States*,
916 F.3d 1056 (D.C. Cir. 2019) ................................................................................. 7

*Nat'l Cable Television Ass'n, Inc. v. F.C.C.*,
554 F.2d 1094 (D.C. Cir. 1976) ................................................................................. 6

*New York v. Microsoft Corp.*,
224 F. Supp. 2d 76 (D.D.C. 2002)…………………………………………………….5

*Seafarers Int'l Union of N. Am. v. U.S. Coast Guard*,
81 F.3d 179 (D.C. Cir. 1996) ................................................................................. 6

*Steele v. United States*,
260 F. Supp. 3d 52 (D.D.C. 2017) ................................................................................. 6

*United States v. Cox*,
906 F.3d 1170 (10th Cir. 2018) ................................................................................. 9

*United States v. Yakou*,
428 F.3d 241 (D.C. Cir. 2005) ................................................................................. 7

*Usoyan v. Republic of Turkey*,
__ F.4[th] __, 2021 WL 3160500 (D.C. Cir. July 27, 2021) ................................. 16

## Statutes

1868 Act Concerning the Rights of American Citizens in Foreign States,
  ch. 249, 15 Stat. 223 (1868)...................................................................................... 2
Independent Offices Appropriations Act ("IOAA")
of 1952, 65 Stat. B70, 31 U.S.C. §9701 ................................................................. 1, 6
31 U.S.C. §9701(b)............................................................................................................ 6
8 U.S.C. §1481 ................................................................................................................... 2
8 U.S.C. §1481(a)(5) ................................................................................................. *passim*

## Regulations

22 C.F.R. §50.51 ............................................................................................................. 12

## Restatement

RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES,
§102 (1987) ................................................................................................................. 16

## Treatises

Ian Brownlie, PRINCIPLES OF PUBLIC INTERNATIONAL LAW
(New York: Oxford University Press, 2008)...................................................... 17

## Law Review Articles

Alberto Alvarez-Jiménez,
*Methods for the Identification of Customary International Law in the International Court of Justice's
  Jurisprudence: 2000-2009,*
60 INT'L & COMP. L. Q. 3 (2011). ................................................................... 17

Cristieli Carvalho, Fernanda Graeff Machry, Pedro Barreto Vianna Rigon,
*Formation and Evidence of Customary International Law,*
1 UFRGS MODEL UNITED NATIONS JOURNAL, 182 (2013) ............................. 17

Jörg Kammerhofer,
*Uncertainty in the Formal Sources of International Law: Customary International Law and Some of
  its Problems,*
15 EUR. J. INT'L L. 523 (2004) ....................................................................... 16

**International Law Cases**

*North Sea Continental Shelf Cases (Federal Republic of Germany v. Denmark / Federal Republic of Germany v. Netherlands)*, 1969 I.C.J. Reports 3 (Feb. 20, 1969) ................................................... 16

*Military and Paramilitary Activities in and against Nicaragua (Nicaragua v. United States of America)*,
Merits, 1986 I.C.J. Reports 160, 165 (June 27, 1986)……………………………………...………17

**Other Authorities**

David Lefkowitz,
*(Dis)solving the Chronological Paradox in Customary International Law: A Hartian Approach*, Philosophy Faculty Publications 59 (2008) ................................................................................... 17

Genesa Cefali,
*Is First Amendment Fee Jurisprudence the Right Approach to the Second Amendment?*
Second Thoughts: A Blog From the Center for Firearms Law at Duke University (July 15, 2019) ......................................................................................................................................... 9

## INTRODUCTION

For over two centuries the United States Government never charged a penny for renouncing one's citizenship.  Today the price tag is an astronomical $2,350.   The government's protestations to the contrary, this case directly implicates Plaintiffs' fundamental constitutional right to renounce their U.S. citizenship. The government minimizes the constitutional dimensions of Plaintiffs' complaint by relying on *Cox v. New Hampshire*, 312 U.S. 569 (1941) (hereinafter *Cox*) and likening the renunciation fee to a municipal parade permit.  In so arguing, the government ignores the source of its authority to issue the Renunciation Fee in the first place.  31 U.S.C. §9701 is the sole source of authority for its $2,350 fee.  That statute allows a federal agency to assess a fair charge for providing a "service or thing of value."  It does not permit an agency to impose a tax on the exercise of constitutionally protected rights. It does not permit an agency to concoct a user-fee based almost entirely on indirect and overhead costs.  It does not grant an agency a blank check to assess a fee without providing a coherent and credible calculation of the fee.  It does not permit an agency to create a fee for something that the government lacks the authority to provide.[1]   The right to renounce is a fundamental and inherent right of all American citizens and its exercise does not require the consent or authorization of the government.  *Farrell v. Blinken*, 4 F.4th 124 (D.C. Cir. 2021) (hereinafter *Farrell*).  Despite specifying procedures for voluntary and involuntary renunciation and relinquishment, to this day Congress has never authorized the State Department or any other federal agency to charge any fee, let alone an exorbitant one, for exercising the right to renounce.

For the reasons enumerated below, the $2,350 fee contravenes the Fifth Amendment Due Process Clause as well as the the First and Eighth Amendments. Furthermore, the fee does not comport with customary international law.  Finally, the agency action increasing the Renunciation Fee from

---

[1] *National Cable Television Ass'n, Inc. v. United States,* 415 U.S. 336, 341 (1974).

$450 to $2,350 was arbitrary and capricious in violation of the Administrative Procedure Act.

## ARGUMENT

I.  **PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR FIFTH AMENDMENT CLAIM**[2]

As we have discussed at length, the right to voluntarily expatriate is deeply rooted in our nation's history and is necessary to ensure both liberty and justice.  *See* ECF 14, at 3-15.  For these reasons, the right to voluntarily expatriate is a fundamental right, protected by the Fifth Amendment's Due Process Clause.  *Id.*; *see McDonald v. City of Chicago,* 561 U.S. 742, 767 (2010); *see also Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 702 (D.C. Cir. 2007) (applying the "deeply rooted history" plus "necessary for liberty and justice" criteria to assess whether the right was fundamental).

The government suggests that the Supreme Court has never recognized the right to expatriate as a fundamental right.  The government misreads both the history of voluntary expatriation and the case law.  Referring explicitly to the 1868 *Act Concerning the Rights of American Citizens in Foreign States*, ch. 249, 15 Stat. 223 (1868), *codified* as a Note to 8 U.S.C. §1481, the Supreme Court stated that the "United States has supported the right of expatriation **as a natural and inherent right of all**

---

[2] Purporting to invoke the doctrine of constitutional avoidance, the government urges the Court to skirt Plaintiffs' constitutional claims (Counts I-III). ECF 17, at 1.  The government contends that the Court should "first consider Defendants' motion for summary judgment on Plaintiffs' arbitrary and capricious and statutory claims under the APA." *Id.*  However, a ruling on Plaintiffs' constitutional arguments, especially Count I, is unavoidable.  Even if the Court would grant the government's motion for summary judgment on the APA and statutory claims (Count IV), Plaintiffs' constitutional claims (Counts I-III) remain viable.  We note, along with the Supreme Court, that "the canon of constitutional avoidance comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction; and the canon functions as *a means* of *choosing between them.*" *Clark v. Martinez*, 543 U.S. 371, 385 (2005) [Emphasis in original]; *accord, Jennings v. Rodriguez,* 583 U.S. ___, 138 S.Ct. 830, 842 (2018).  No plausible interpretation of 8 U.S.C. §1481(a)(5) can eliminate Plaintiffs' constitutional objections as set forth in Counts I – III of the Complaint.

**people**.  Denial, restriction, impairment or questioning of that right was declared by Congress, in 1868, to be inconsistent with the fundamental principles of this Government." *Savorgnan v. United States*, 338 U.S. 491, 498 (1950) (emphasis added).

A recent decision of the United States Court of Appeals for the District of Columbia Circuit in *Farrell* further buttresses the fundamental nature of the right.  The Court of Appeals in *Farrell* asked whether the plaintiff – who had sought to expatriate for years – had Article III standing to challenge the government's refusal to issue him a Certificate of Loss of Nationality.  Judge Rao, writing for the majority, concluded that the right to expatriate in the "1868 Act as well as in the INA [Immigration and Nationality Act] reflects a longstanding recognition that such a right is rooted in natural law and the principle of consensual government at the heart of our constitutional republic." *Id*., at 132.  The majority found that the right to expatriate constitutes an "individual, private right," the violation of which is sufficient to establish injury-in-fact for purposes of Article III standing.[3]

*Farrell* is the latest addition to the expanding corpus of authority – legal, historical and jurisprudential – establishing beyond cavil the fundamental nature of the right to expatriate.  Against the weight of this authority, the government's belated denigration of this right rings hollow.

It is perhaps for this reason that the government does not challenge Plaintiffs' core assertion, namely that the right to voluntarily expatriate is a fundamental liberty interest, the interference with which is subject to strict scrutiny.  ECF 14, at 3-19.  Instead, the government advances two alternative arguments.  First, the government contends that Plaintiffs have failed to carefully describe the right to expatriate.  The government claims that the proper formulation of the right at issue is not the *general* right to expatriate – as Plaintiffs describe it – but rather as the "right to renounce citizenship *free of*

---

[3] Although the D.C. Circuit in *Farrell* recognized that the right to renounce is a natural right at the heart of our constitutional republic, it did not consider whether this right is grounded in the Constitution.

*charge* [...]" ECF 17, at 15 (emphasis added).  Second, the government suggests that even assuming that there is a general fundamental right to renounce, the Renunciation Fee does not pose any constitutional problem under the line of "fee jurisprudence" cases commencing with *Cox*.  *Id.*, at 16-19.  Both arguments are, in a word, meritless.

**A.  <u>Plaintiffs have adequately described the right to voluntarily expatriate</u>**

In substantive due process cases, such as the one at bar, the Supreme Court has traditionally required a "careful description of the asserted fundamental liberty interest." *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997), *quoting Reno v. Flores*, 507 U.S. 292, 302 (1993).  In their original brief, Plaintiffs make clear that the renunciation right is best described as *the right to voluntarily expatriate*.  ECF 14, at 5, n. 6.  Plaintiffs explained that this definition satisfies the Supreme Court's "careful description" requirement.  *Id*.

In its Opposition, the government claims that "a broad right to expatriate without limitation" does not "qualify" as a "careful description" because "it fails to acknowledge and account for the limitations on expatriation that courts have repeatedly upheld." ECF 17, at 14-15.[4]  The proper formulation of the right at issue, claims the government, is not the general right to voluntarily expatriate, but rather the right to do so "free of charge." *Id.*, at 15.  The government then claims that the right to voluntarily expatriate *free of charge* is neither deeply rooted in this nation's history nor

---

[4] The government exaggerates the legal significance of the procedural limitations on the right to voluntarily expatriate. Title 8 Section 1483(a)(5) of the U.S. Code and the regulations thereunder impose the following restrictions: (1) the renunciant must physically appear before a U.S. consulate abroad; and (2) the renunciant must take an oath demonstrating that the act of renunciation is both voluntary and intentional.  To the extent these "limitations" are imposed to ensure that the act is being done voluntarily and with intent (*see Farrell*, at 135 [the "in-person requirement serves as a protection against involuntary expatriation..."]), they are for the **benefit** of the renunciant and are therefore not limitations at all. There are no other restrictions on the right, save for the up-front payment of the Renunciation Fee.

implicit in the concept of ordered liberty.  *Id*.  Setting up a classic "straw-man" argument (*see New York v. Microsoft Corp.*, 224 F. Supp. 2d 76, 102 n.25 (D.D.C. 2002), *aff'd,* 373 F.3d 1199 (D.C. Cir. 2004)), the government misunderstands, and hence misstates, Plaintiffs' core constitutional claim, ignoring 210 years of history and executive practice during which renunciation was *gratis*.

At no point have Plaintiffs advocated for a "a broad right to expatriate without limitation." Plaintiffs do not challenge the constitutionality of the statutory and regulatory conditions for voluntary expatriation under 8 U.S.C. §1483(a)(5), other than the Renunciation Fee.  From the earliest days of the Republic, it was recognized that the right to voluntarily expatriate could be subject to procedural requirements. *See Talbot v. Jansen*, 3 U.S. (3 Dall.) 133 (1795) (Supreme Court recognized a right of expatriation before concluding that the defendant in the case had failed to follow the correct procedures for renouncing U.S. citizenship.).  That the government may impose certain conditions on the right to renounce does not mean that all such requirements are permissible.  *See Farrell supra.* The State Department's Renunciation Fee is a clear example of a procedural pre-condition that does not pass constitutional scrutiny.  Plaintiffs' description of the asserted right takes into account the authority the government possesses to regulate expatriation and, thus, satisfies the "careful description" requirement.[5]  *Washington v. Glucksberg*, *supra*, 521 U.S. at 721.

**B.  Cox v. New Hampshire is inapposite**

The government also defends the Renunciation Fee by relying principally on the Supreme Court's ruling in *Cox* which held that fees imposed when a state or municipal government incurs costs occasioned by the exercise of First Amendment rights are permissible.  ECF 17, at 16-19.  The government's reliance on *Cox* is misplaced for several reasons.

*First and foremost*, *Cox* dealt with the state's exercise of the police power to protect the public

---

[5] We note that in *Obergefell v. Hodges*, 576 U.S. 644, 663 (2015), the Supreme Court seems to have dispensed with the "careful description" requirement.  *See* ECF 14, at n. 5.

order within its municipal jurisdictions.  By contrast, the sole authority for imposing the Renunciation Fee is the Independent Offices Appropriations Act ("IOAA") of 1952, 65 Stat. B70, *codified at* 31 U.S.C. §9701, which was enacted strictly to ameliorate fiscal administration.  The Renunciation Fee serves no other public purpose.  The exercise of the expatriation right does not depend on the government's discretion or largesse.  It is a natural and inherent right of every U.S. citizen.  *See Farrell, supra.*

The IOAA was enacted to permit agencies to charge user fees for "a service or thing of value provided by the agency." 31 U.S.C. §9701(b).  The Supreme Court has read the language of the Act narrowly in order to distinguish between fees for benefits conferred and taxes. Only Congress has the authority to levy taxes under our Constitution.  *See Nat'l Cable Television Ass'n, Inc. v. United States*, *supra,* 415 U.S. at 340–41.  Fees are "incident to a voluntary act" and involve the bestowal of a benefit. *Id*.  Agencies may impose fees for granting special benefits to individuals not shared by the general public. *Id*.; *Fed. Power Comm'n v. New England Power Co*., 415 U.S. 345, 350–51 (1974).[6]

For several reasons, the IOAA does not authorize the Renunciation Fee. To charge a fee under the IOAA, the government must provide "a service or thing of value." Here, the government does not provide any "service or thing of value."  The act of renunciation is not a benefit or service provided by the federal government, unlike the state municipal services supplied by the local authorities in *Cox*. Once the oath of renunciation is taken, the expatriation occurs "automatically."[7] *See Farrell*, at 130

---

[6] Courts have further held that there must be "a sufficient nexus between the agency service for which the fee is charged and the individuals who are assessed." *Seafarers Int'l Union of N. Am. v. U.S. Coast Guard*, 81 F.3d 179, 183 (D.C. Cir. 1996). In addition, agencies must "make clear the basis for a fee it assesses under the IOAA." *Nat'l Cable Television Ass'n, Inc. v. F.C.C.*, 554 F.2d 1094, 1100 (D.C. Cir. 1976).

[7] *Cf.  Steele v. United States*, 260 F. Supp. 3d 52, 65 (D.D.C. 2017), *vacated and remanded sub nom*. *Montrois v. United States*, 916 F.3d 1056 (D.C. Cir. 2019), *cert. denied,* 140 S. Ct. 39 (2019).  In *Steele*, the district court concluded that the IRS may not charge fees for issuance of a "preparer tax identification number" ("PTIN") because the "IRS is attempting to grant a benefit that it is not allowed

and 145 [by performing an expatriating act, the citizenship is "lost automatically, without any administrative or judicial determination" (*citing United States v. Yakou*, 428 F.3d 241, 249 (D.C. Cir. 2005)].   Because the government is not *granting* expatriation, it cannot be said to be providing a service.  *Cf. Seafarers*, *supra*, 81 F.3d at 186 (an "agency is not free to add extra licensing procedures and then charge a user fee merely because the agency has general authority to regulate in a particular area.").[8]

The IOAA also requires an agency to take into account the "public policy or interest served" and other "relevant facts."  The purpose of the Renunciation Fee is general cost recoupment, not the facilitation of the exercise of the right to expatriate.  As we discuss below, the effort by the government to ensure that renunciation is done voluntarily is *de minimis*.   Had the government properly identified the public interest at stake – *i.e.*, facilitating the exercise of the right to renounce – it would have either declined to impose a fee, as it did for 200 years, or charge a nominal fee.

Additionally, the IOAA requires any agency fee to be reasonable and fair.  The Renunciation Fee is unreasonable and unfair because, among other things, approximately 62% of the Fee is justified on the basis of "indirect" and "overhead" costs not at all related to the voluntary renunciation process.[9] *See Montrois v. United States*, *supra*, 916 F.3d at 1062 (§9701 analysis requires assessment of the reasonableness of the fee).  *See generally,* Complaint, ¶¶205-206; ECF 14, at 31-40, and 41 n. 45.

_____

to grant, and charge fees for granting such a benefit."  The same logic applies here to the Renunciation Fee because the government is not authorized to "grant" expatriation, which is the exclusive prerogative of the individual.  On appeal, the D.C. Circuit upheld the PTIN fee on alternative grounds. *Montrois v. United States*, *supra*, 916 F.3d at 1064.

[8] Under *Farrell* both the majority and the dissent concluded that "an individual has the right to expatriate without the government's approval or official recognition." *Id*., at 130 and 143 ("[…] executive recognition is neither legally nor practically necessary to expatriate.").

[9] According to the Administrative Record (AR-190; ECF 14-1), the average total of indirect and overhead costs between 2010-2014 ostensibly allocable to voluntary renunciation processing totaled approximately $2.5 million, whereas the total costs of renunciation services were said to be roughly $3.9 million.

Hence, the Renunciation Fee resembles a tax levied to bolster federal revenue as opposed to a *Cox*-like user fee.  *See* Complaint, ¶¶159, 206.

*Second*, *Cox* did not apply the strict scrutiny standard because the challenged fee was regulating content-*neutral* speech.  *Cox* does not apply to fees based on the content of the speech, where strict scrutiny applies.  Such content-based fees would be prohibited under the First Amendment.  *See Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123 (1992) (striking down permit fee based on content of the speech and distinguishing *Cox*).  In other words, when the applicable standard of review is strict scrutiny, *Cox* is irrelevant.

Plaintiffs contend that the implicated right is fundamental, thereby triggering strict scrutiny review, as in content-based infringements in First Amendment cases.  *See Forsyth County, Ga. v. Nationalist Movement, supra* (Court applied strict scrutiny in the First Amendment context.[10]).  By invoking *Cox*, the government erroneously presumes that the proper standard of review is something less than strict scrutiny.  But, once classified as a fundamental right, any governmental interference with that right by way of charging a Renunciation Fee is subject to strict scrutiny.[11]

*Third*, any analogy between the present case and the Supreme Court's First Amendment fee jurisprudence is problematic.  *Cox* is a First Amendment case.  No court, to our knowledge, has ever

---

[10] This argument should not be construed as a concession by the Plaintiffs that their claims would not survive intermediate, or even rational based scrutiny.  Plaintiffs' APA claim (Count IV) has shown that the Renunciation Fee would fail under both lesser degrees of scrutiny.

[11] The government also invokes *Kwong v. Bloomberg*, 723 F.3d 160 (2d Cir. 2013), *cert. denied,* 572 U.S. 1149 (2014),  to support its "fee jurisprudence" argument.  However, the *Kwong* court explicitly stated that it was applying "intermediate" – not strict – scrutiny. *Id*., at 168.  The *Kwong* court went on to explain that under this test, "a regulation that burdens a plaintiff's Second Amendment rights passes constitutional muster if it is substantially related to the achievement of an important governmental interest." *Id*. (internal quotations omitted).  The *Kwong* court concluded that the "record demonstrates that the licensing fee is designed to allow the City of New York to recover the costs incurred through operating its licensing scheme, which is designed to promote public safety and prevent gun violence" and therefore satisfies "intermediate scrutiny." *Id*.  Thus, *Kwong* is irrelevant because the substantial interest underlying the gun license fee was not simply cost recoupment as it is here.

applied the Court's First Amendment fee jurisprudence to a Fifth Amendment substantive due process right.  The government cites *Kwong v. Bloomberg*, *supra*, that applied the Supreme Court's fee jurisprudence to the Second Amendment. The rule in *Kwong*, however, is not universally accepted. Other courts have been reluctant to extend the fee jurisprudence doctrine to other fundamental constitutional rights, including the Second Amendment.  *See*, *e.g.*, *United States v. Cox*, 906 F.3d 1170, 1187-1188 (10th Cir. 2018) (declining to apply *Cox* to Second Amendment fee challenges and citing cases).  Other authorities also question the logic of applying *Cox* outside the context of the First Amendment.  *E.g.*, Genesa Cefali, *Is First Amendment Fee Jurisprudence the Right Approach to the Second Amendment?* SECOND THOUGHTS:  A BLOG FROM THE CENTER FOR FIREARMS LAW AT DUKE UNIVERSITY (July 15, 2019).[12]

There is good reason for limiting *Cox* to First Amendment challenges and not applying it in the present context.  The exercise of First Amendment rights in certain cases naturally involves secondary effects which generate ancillary costs to government bodies for which reasonable fees could be legitimately assessed as a condition to the exercise of the right.  The same may be true in the Second Amendment context (*see* n. 11, *supra*).  However, that is not the case when it comes to the right to expatriate where there are no associated costs and no secondary effects on the public at large emanating from the act of renunciation.

*Fourth*, the Renunciation Fee at issue is more appropriately compared to a court filing fee than to a parade or gun license.  The government explicitly analogizes the Renunciation Fee to an adjudication fee. ECF 17, at 19 (the Renunciation Fee is "directed at the undisputed fact that the process of *administering* an oath [...] and *adjudicating* a request for a CLN imposes administration costs on the Department.") (emphasis added).  In *Boddie v. Connecticut*, 401 U.S. 371 (1971)

---

[12]    Available    at    https://sites.law.duke.edu/secondthoughts/2019/07/15/is-first-amendment-fee-jurisprudence-the-right-approach-to-the-second-amendment/ (last accessed on Aug. 19, 2021).

(hereinafter *Boddie*), the Supreme Court held that a $60 filing fee for divorce violated an indigent's right to due process under the Fourteenth Amendment. *Id*., at 787. *See also M.L.B. v. S.L.J.*, 519 U.S. 102 (1996) (hereinafter *M.L.B.*) (Mississippi statutes that required appellant to pay in advance record preparation fees estimated at $2,352 violated the Due Process Clause of the Fourteenth Amendment). Thus, where fundamental due process rights are compromised by the assessment of a governmental fee, the fee-jurisprudence doctrine under *Cox* is inapplicable.[13]

*Fifth*, *Cox* does not allow for fees that are arbitrary and capricious.   In their original Memorandum, Plaintiffs described the manifold weaknesses in the government's economic rationale for charging the Renunciation Fee. *See* ECF 14, at 30-39.  Plaintiffs showed that voluntary expatriation under 8 U.S.C. §1481(a)(5) is a short and simple process that should not – and in fact does not – take more than an hour of government staff time per application. ECF 14, at 31-32.

i.      *Processing a renunciation request does **not** take more than one hour*

The Administrative Record ("AR") indicates that the total amount of time that government staff spend on processing and "adjudicating" voluntary renunciation applications by Foreign Service Officers ("FSO") and Locally Employed Staff ("LES") is approximately **one hour**. *See* ECF 14, at 31-31. **The government does not dispute this.**  Instead, the government claims that Plaintiffs failed to take into account other *indirect* costs such as "overhead costs" and "public outreach."  ECF 17, at 3.  The government also contends that Plaintiffs failed to consider the time spent by *domestic* staff at the Bureau of Consular Affairs in Washington, D.C.  *Id*., at 4.  According to the government, the vast majority of costs allocable to the voluntary renunciation process comprise (a) direct labor costs for

---

[13] Notably, *Boddie* and its progeny do not refer to *Cox* at all, even though *Cox* was decided thirty years prior to *Boddie*.  Moreover, in both *Boddie* and *M.L.B.*, the Court rejected the defendant's recoupment-of-costs arguments.  *See M.L.B.*, at 557 ("Mississippi's countervailing interest in offsetting the costs of its court system is unimpressive when measured against the stakes for M.L.B."); *Boddie*, at 382 (rejecting Connecticut's "cost recoupment" argument.).

*domestic* staff and (b) indirect/overhead costs.

The AR does not support the government's position regarding the time spent by *domestic* staff [*i.e.,* D.C.-based employees].  In its original Memorandum (ECF 11-1), the government did emphasize the time spent by domestic staff.  The Pickard Decl. (ECF 11-2) similarly does not discuss domestic staff or justify the charge by reference to time spent by domestic staff.[14]  Moreover, there is no indication in the AR that the Overseas Time Survey ("OTS") – the basis for the government's justification for the increase in the Renunciation Fee – recorded any data related to time spent by domestic staff.  As its name indicates, the *Overseas* Time Survey, "collected data from personnel at […] embassies and consulates *overseas*." ECF 11-2, ¶8 (emphasis added) and utterly ignored time spent by domestic staff.

Realizing that the OTS does not address domestic staff costs, the government refers the Court to portions of the Foreign Affairs Manual (the "FAM") and 80 Fed. Reg. 51465-01 (Aug. 28, 2014) which ostensibly show that domestic staff spend time on renunciation services.  ECF 17, at 4.  The government asserts that "*some applications* require multiple rounds of correspondence" and that applications "*may* include consultations with legal advisors." ECF 17, at 4 (emphasis added).  These speculative and self-serving statements do not constitute substantial evidence that would justify a drastic increase in the Renunciation Fee.  These sources only show that, as a general proposition, domestic staff *may* spend time on renunciation services.  Neither the FAM nor the Federal Regulations establishes the amount of time *actually* spent by domestic staff on voluntary renunciation services.  These sources do not even remotely address the actual costs attributable to domestic staff and appear to be a *post hoc* rationalization for the 2015 increase.  The Court is asked to take the government's

---

[14] The only reference to domestic staff in the Pickard Decl. is in connection with "fraud prevention" and "consular affairs management" which characterized as direct costs to the renunciation process. *Id*., at ¶14(c) and (e).

word that the time spent by domestic staff accounts for additional direct labor costs over and above

the undisputed **one hour** spent by FSOs and LES in consulates overseas.[15]  Nothing in the FAM or the

Federal Regulations supports a $1,900 increase in the Renunciation Fee.

      Furthermore, the government's reference to "overhead costs" is not supported by anything in

the AR.  Overhead costs are not recorded in the AR under any specific cost category.  The AR contains

no substantial evidence to support the government's claim that these overhead costs can be rationally

allocated to voluntary renunciation services.  The government concedes this.[16]  The Court is again

asked to take the government's word that these "overhead costs" justify adjusting the Renunciation

Fee, over and above the hour of time spent by FSOs and LES in processing a voluntary renunciation

case.  The government has provided no substantial evidence to support this claim.[17]

---

[15] The government also seeks to include in their cost evaluation the "time spent conducting Administrative Reviews of loss of nationality determinations upon request by the individual who seeks to reverse his or her loss determination." ECF 17, at 4 n. 1. This argument is simply irrelevant. Reversal of nationality loss determinations are a completely different procedure, independent of voluntary renunciation under 8 U.S.C. §1481(a)(5). 22 C.F.R. §50.51.  Significantly, no fee is charged for reconsideration applications submitted under 22 C.F.R. §50.51.

[16] See ECF 17, at 3:

    Although not all of the time reflected under each of these activity codes was devoted to renunciation-related activities, the Administrative Record and accompanying Declaration confirm that it was reasonable for the Department of State to account for these other activities in determining the cost of the renunciation services fee.

[17] In their Memorandum, Plaintiffs also argued that "Other Bureau Services" and ICASS-related services – totaling over $2.5 million per annum in indirect costs – are unrelated to renunciation services.  ECF 14, at 34.  Plaintiffs argue as well that the "Model Data Set" does not provide any explanation as to the nature of the costs or the method used to allocate these indirect costs to voluntary renunciation services.  In its Opposition, the government claims that these services are related to renunciation because "they reflect the share of consular activities support from the various bureaus that makes the renunciation service possible" and they represent the "backbone of administrative support." ECF 17, at 8-9.  Again, the government evades the core issue: how were these astronomical costs calculated and attributable to renunciation services? If Plaintiffs are correct that only one hour is spent by FSOs and LES per application, then all indirect and "backbone" costs should be reduced *pro rata*. The Administrative Record contains nothing to validate these costs.  Again, we are asked to take the government's word – without substantial evidence – that $2.5 million in overhead and indirect costs per year are reasonable and accurate.

Even if *Cox* is applicable (which Plaintiffs contest), it does not allow government agencies to inflate their cost-recovery fees by including indirect and unrelated expenses.[18] Moreover, *Cox* does not legitimize cost recoupment for unexplained and unsupported direct costs such as the domestic staff labor expense in the present case.

> ii.    *The Renunciation Fee does not reasonably reflect the costs to the government*

Despite having been given multiple opportunities to do so, the government has conspicuously evaded answering a key question posed by Plaintiffs' Complaint:  How much staff time does it actually take to process a single voluntary renunciation application.[19]  The AR contains raw, heavily redacted,

---

[18] Having relied almost exclusively on the Overseas Time Survey, the government now radically changes course arguing, without specifying, that "loss of nationality is a *program* within the Department's Bureau of Consular Affairs" […] and that programs require "development, administration, and maintenance and necessarily involve operational costs far beyond the cost of an hour's labor of a consular officer and locally employed staff overseas." ECF 17, at 5 (emphasis in original).  Nowhere in the AR does the government explain why "program"-related costs make voluntary renunciation more expensive.  The government has also failed to explain why these extra hours were not accounted for in the Overseas Time Survey which purportedly recorded all the time spent by overseas staff on renunciation related services.

[19] Even before this litigation commenced, the government had multiple opportunities to detail the amount of time it takes government staff to process a voluntary renunciation application.  On September 2, 2014, the government received the following comment from Joan Ingram, a London-based attorney, in response to the notice-and-comment period pursuant to the Interim Final Rule, 79 Fed. Reg. 51247 (August 28, 2014):

> I find it hard to believe that the provision of this service actually costs $2,350 per renunciant. That represents some 17 hours of attention at the $135 hourly rate. The right approach to the problem of having to administer so many more renunciations than previously must be to reduce the paperwork and bureaucracy involved, rather than increase the fee.

AR-508.

The government acknowledged the receipt of the comment in 80 Fed. Reg. 51464 (Aug. 25, 2015) [*See* AR-2], but failed to detail the amount of hours it takes to process a renunciation application. Instead, as it has done here multiple times, the government described in general fashion those steps that need to be taken to renounce citizenship.  In addition, the government relied upon its Cost of Service Model ("CoSM") – part of the OTS – which ostensibly "demonstrated that documenting a U.S. national's renunciation of nationality is extremely costly." *Id*. As we have already discussed, the CoSM says nothing of the sort.

data.  Still, based on this incomplete data, Plaintiffs have been able to show that, according to the government's own information, it takes approximately 23 hours of staff time to process a voluntary renunciation application.  ECF 14, at 33-34.  While criticizing Plaintiffs' methodology, the government refuses to explain exactly how much time it takes to process a single application. ECF 17, at 7.

The government essentially agrees that Plaintiffs' 23-hour per application estimate is accurate, stating that it "represents approximately three workdays," and when considering the "time consuming" factors "that make the service possible," the 23-hour figure – "assuming its accuracy – would not be far-fetched." *Id*., at 8.  **Three workdays <u>per application</u>, however, multiplied by the average annual volume of renunciation applications (*i.e.*, 1,703 per year) <u>would result in a total of 5,109 workdays</u>, <u>almost 14 man years</u> and <u>39,169 man hours within a single year</u>**.  On its face, these statistics are absurd and strongly suggest that the State Department is grossly mismanaging the renunciation "program."  Nothing in *Cox* or its progeny permit a governmental agency to justify fixing and inflating a fee based on such arbitrary cost data and far-fetched analysis.

In sum, recognizing that justifying the Renunciation Fee is problematic, the government seeks refuge in the Supreme Court's fee jurisprudence, citing *Cox* and the Second Circuit decision in *Kwong*.  As we have demonstrated, there are numerous reasons why neither case along with the Supreme Court's fee-jurisprudence doctrine, is relevant to Plaintiffs' substantive Due Process claim in this case.  Consequently, the Court is requested to deny the government's motion for summary judgment on Count I and grant Plaintiffs' motion for summary judgment under the Fifth Amendment's Due Process Clause.

II.     **PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR FIRST AMENDMENT CLAIM: THE RENUNCIATION FEE VIOLATES THE FIRST AMENDMENT RIGHT TO FREEDOM OF SPEECH**

In their original Memorandum, Plaintiffs argued that the Renunciation Fee is a content-based restriction on the exercise of free speech because of "the highly expressive nature, historical pedigree, the legal consequence bestowed upon the renunciant, and the uniqueness of voluntary expatriation." ECF 14, at 25.  In its Opposition, the government claims that that the Renunciation Fee is a content-neutral restriction and is therefore subject to *O'Brien* intermediate scrutiny review.[20]  *United States v. O'Brien*, 391 U.S. 367 (1968).  ECF 17, at 20-21.

A general government policy the sole purpose of which is budgetary administration pales in importance when compared to, for example, regulating public nudity and maintaining the integrity of the Selective Service System.  *See* ECF 14, at 26, n. 30 (citing cases).  Precedent demonstrates that a general cost recoupment policy cannot be characterized as "important" or "substantial" for purposes of *O'Brien*.  *Id.*, at 19-20.  The government disregards these authorities. The second *O'Brien* factor is, therefore, not satisfied.

Under the fourth *O'Brien* criterion, the restriction must be no greater than is essential to furthering the important governmental interest.  The government claims in its Opposition that its interest "in recovering the cost of its services would certainly be achieved less effectively if the fee set aside or disregarded the actual cost of offering the service."  However, as we have discussed earlier, the government has failed to establish that the $2,350 Renunciation Fee reflects the actual cost of

---

[20] Under the *O'Brien* standard, government action that burdens speech will survive a First Amendment challenge if the following four conditions are satisfied: (1) the government acted within its constitutional power; (2) the regulation furthers an important governmental interest; (3) the government's interest is unrelated to the suppression of free expression; and (4) the restriction is no greater than is essential to furthering the government interest.  *United States v. O'Brien*, 391 U.S. 367 (1968).

processing renunciation applications.[21]

### III.    PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR CUSTOMARY INTERNATIONAL LAW CLAIM: 8 U.S.C. §1481(A)(5) SHOULD BE INTERPRETED TO CONFORM TO CUSTOMARY INTERNATIONAL LAW

Plaintiffs are also entitled to summary judgment on their customary international law ("CIL") claim.  Contrary to the government's argument (ECF 17, at 25-26), international practice and American policy – executive, judicial and legislative –  show that the right to voluntarily choose one's nationality is part of CIL.  ECF 14, at 43; *see also* 7 FAM 1290(e), App'x "A", "Later Twentieth Century Developments," (where the State Department notes unequivocally: "The United States has recognized the right of expatriation as an inherent right of all people."); *see also Usoyan v. Republic of Turkey*, __ F.4[th] __, 2021 WL 3160500, at *7 (D.C. Cir. July 27, 2021) ("[…] United States' legal position is itself evidence of international law.").

The government argues that Plaintiffs have failed to demonstrate that there is a right to expatriate under CIL that is "so absolute as to be violated by the imposition of" a $2,350 Renunciation Fee."  Plaintiffs have never taken the position that the right to voluntarily renounce citizenship *free of charge* is part of CIL.  Rather, Plaintiffs contend that CIL recognizes a right to voluntarily expatriate and, therefore, any restriction on that right making its exercise almost impossible for large classes of individuals violates CIL.  *See* ECF 14-4 (compendium of Plaintiffs' declarations stating that the Renunciation Fee is prohibitively expensive).

Most western countries do not charge for voluntary renunciation of citizenship and, where they do, the fee is far less than the $2,350 Renunciation Fee.  ECF 14-3.  The government counters that this

---

[21] The first *O'Brien* factor is not met as well because, as discussed in Plaintiffs' original brief and above, the Renunciation Fee violates the IOAA.  Thus, the government lacked authority to levy the charge in the first place.  With regard to the third factor (the government's interest is unrelated to the suppression of free expression), Plaintiffs have previously argued that the renunciation fee is a content-based restriction, the effect of which is to suppress free expression.

is "insufficient" because such practice "must also be such […] as to be evidence of a belief that this practice is rendered obligatory by the existence of a rule of law requiring it." ECF 17, at 27, *quoting North Sea Continental Shelf Cases (Federal Republic of Germany v. Denmark / Federal Republic of Germany v. Netherlands)*, 1969 I.C.J. REPORTS 3, 44, ¶77 (Feb. 20, 1969).

    The government's reliance on the *North Sea* cases is out of date.  The subjective element of CIL discussed in the *North Sea* cases, known by its Latin expression *opinio juris sive necessitates*, has been described as "the most disputed and least comprehended component of the workings of customary international law." Jörg Kammerhofer, *Uncertainty in the Formal Sources of International Law: Customary International Law and Some of its Problems*, 15 EUR. J. INT'L L. 523-553, 532 (2004); *see also* RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES, §102 reporters' note 2 (1987) (noting the paradox between the "state practice" and "*opinio juris*" elements as sources of CIL).[22]  Proving why states refrain from levying a charge for voluntary renunciation is difficult, if not impossible.  *See* Ian Brownlie, PRINCIPLES OF PUBLIC INTERNATIONAL LAW (New York: Oxford University Press, 2008), at 8-9.  It is for this reason that the modern trend in international law is to assume the existence of *opinio juris* from the evidence of state practice. *See e.g.*, *Military and Paramilitary Activities in and against Nicaragua (Nicaragua v. United States of America)*, Merits, 1986 I.C.J. REPORTS 160, 165 (June 27, 1986);  André da Rocha Ferreira, Cristieli Carvalho, Fernanda Graeff Machry, Pedro Barreto Vianna Rigon, *Formation and Evidence of Customary International Law*, 1 UFRGS[23] MODEL UNITED NATIONS JOURNAL, 182-201, 191 (2013) (noting that the more

---

[22] H.W.A. Thirlway, INTERNATIONAL CUSTOMARY LAW AND CODIFICATION 47 (1972):

> The precise definition of the *opinio juris*, the psychological element in the formation of custom, the philosophers' stone which transmutes the inert mass of accumulated usage into the gold of binding legal rules, has probably caused more academic controversy than all the actual contested claims made by States on the basis of alleged custom, put together.

[23] UFRGS stands for "Universidade Federal do Rio Grande do Sul."

flexible approach [*i.e.*, focusing on state practice] has been followed by the ICJ in "many cases" and that the *North Sea Continental Shelf* cases represent the more restrictive and less applied approach); David Lefkowitz, *(Dis)solving the Chronological Paradox in Customary International Law: A Hartian Approach*, Philosophy Faculty Publications 59. (2008) (advocating the "state preference" approach).

According to one leading scholar, the more flexible approach adopted by the ICJ regarding the requirements for the identification of customary norms is reflected in three factors, two of which are directly related to this litigation. The first factor is that "complete uniformity of State practice is not necessary for a customary rule of international law to emerge." Alberto Alvarez-Jiménez, *Methods for the Identification of Customary International Law in the International Court of Justice's Jurisprudence: 2000-2009*, 60 INT'L & COMP. L. Q. 3, 681-712, 687 (2011). In fact, states' "behaviour contrary to the practice could constitute a violation of the rule rather than preventing it from crystallizing as customary." *Id*. The second factor "of this flexible trend is the loosening of the requirements for inference of the existence of *opinio juris*." *Id*.

The uniform international recognition of the general right to voluntarily expatriate, coupled with the uniform state practice of allowing citizens to expatriate free of charge or for a nominal fee, including the statements by the State Department itself, is more than enough to permit the Court to conclude that the imposition of an exorbitant fee which effectively prevents or chills expatriation contravenes CIL.

Under *Murray v. The Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804) (*see* ECF 14, at 42), 8 U.S.C. §1481(a)(5) should be interpreted and applied to the extent possible to conform to CIL. As a result, Section 1481(a)(5) should be construed either to prohibit assessment of the Renunciation Fee altogether or, at a minimum, to limit the charge to a reasonable and fair amount. For these reasons, the Court is requested to deny the government's motion for summary judgment as to Count V and to grant Plaintiffs' motion for partial summary judgment as to that Count.

**CONCLUSION**

For all the reasons set forth above and in Plaintiffs' Motion for Partial Summary Judgment (ECF 13 and 14), and supporting authorities, the Court is respectfully requested to:

1. Deny Defendants' motion to dismiss Counts III and V;

2. Deny Defendants' motion for summary judgment as to Counts I-V;

3. Grant Plaintiffs' motion for partial summary judgment as to Counts I-II and V.

Dated: August 19, 2021.


Respectfully submitted,

/s/ L. Marc Zell                                    /s/ Noam Schreiber
_____          _____
L. Marc Zell                                         Noam Schreiber, *pro hac vice*
ZELL & ASSOCIATES INTERNATIONAL       34 Ben Yehuda St.
ADVOCATES, LLC                              15th Floor
1345 Ave. of the Americas                    Jerusalem, Israel 9423001
2nd Floor                                            011-972-2-633-6300
New York, NY 10105                           *Email:* schreiber.noam@gmail.com
(212)-971-1349
*Email:* mzell@fandz.com

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on Aug. 19, 2021, the foregoing was filed via the Court's CM/ECF system, which serves the same on counsel for Defendants through notice of such filing.

*/s/ Noam Schreiber*

_____

Noam Schreiber, *pro hac vice*
34 Ben Yehuda St.
15th floor
Jerusalem, Israel 9423001

*Counsel for Plaintiffs*