**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **L'ASSOCIATION DES AMERICAINS ACCIDENTELS,** *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> **UNITED STATES DEPARTMENT OF STATE,** *et al*, <br><br> Defendants. | Civil Action No. 20-cv-03573 (TSC) |

<u>**MEMORANDUM OPINION**</u>

Plaintiffs L'Association des Américains Accidentels and twenty named individuals have sued the United States Department of State, the Secretary of State, and the Assistant Secretary of State for Consular Affairs. Plaintiffs allege that the State Department's 2015 Final Rule finalizing a citizenship renunciation processing fee violates the Administrative Procedure Act ("APA") and customary international law, and that the imposition of any fee is unconstitutional under the Fifth, First, and Eighth Amendments. Compl., ECF No. 1 ¶¶ 10–15. Defendants have moved for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) on the customary international law and Eighth Amendment claims, for summary judgment pursuant to Federal Rule of Civil Procedure 56 on the remaining claims, and in the alternative for summary judgment on the customary international law and Eighth Amendment claims. Defs.' Mot., ECF No. 11 at 1. Plaintiffs have cross-moved for summary judgment on the Fifth Amendment, First Amendment, and customary international law claims. Pls.' Cross-Mot., ECF No. 13 at 1–2. For

the reasons set forth below, the court will grant Defendants' motion to dismiss and for summary judgment and deny Plaintiffs' cross-motion for summary judgment.

## I.      BACKGROUND

L'Association des Américains Accidentels is a Paris-based non-profit organization whose stated goal is to "represent and defend Accidental Americans who live outside the United States from the adverse effects of certain American extraterritorial laws."  Compl. ¶ 20.  Plaintiffs describe "Accidental Americans" as "individuals whom the U.S. deems to be American citizens as a result of being born in the U.S., but who have lived abroad most if not all of their lives as citizens of another country."  *Id.* ¶ 127 (citing Peter J. Spiro, *Citizenship Overreach*, 38 MICH. J. INT'L L. 167, 167 (2017)).

Plaintiffs claim that the State Department's $2,350 fee ("Renunciation Fee") to process a request for a Certificate of Loss Nationality ("CLN") in renunciation cases, violates the APA, the Constitution, and customary international law.  They seek declaratory and injunctive relief.

## A.  **Statutory Background**

The process for renunciation of U.S. citizenship outside of the U.S. is governed by the Immigration and Nationality Act (INA) § 349(a)(5), 8 U.S.C. § 1481(a)(5), which provides that a U.S. citizen can expatriate and renounce their U.S. citizenship by "making a formal renunciation of nationality before a diplomatic or consular officer of the United States in a foreign state, in such form as may be prescribed by the Secretary of State."  A U.S. citizen seeking to renounce their citizenship while abroad must appear in person before a U.S. consular or diplomatic officer and sign an oath of renunciation.[1]  Under 8 U.S.C. § 1501, a U.S. diplomatic or consular officer

---

[1] According to the State Department, the Department of Homeland Security is responsible for administering domestic expatriations under § 1481(a)(6)–(7).  *See* Defs' Mem. in Supp. of Mot., ECF No. 11-1 at 4 n. 3.

certifies the facts forming the basis for their belief that a loss of U.S. citizenship has occurred

and, if the consular officer's report is approved by the Secretary of State, a CLN is issued to the

renunciant. *See also* 22 C.F.R. §§ 50.40 (c), (e) ("Whenever a diplomatic or consular officer has

reason to believe that a person, while in a foreign country, has lost his U.S. nationality . . .[,] he

shall prepare a certificate of loss of nationality containing the facts upon which such belief is

based and shall forward the certificate to the [State] Department. . . . If the certificate of loss of

nationality is approved by the Department," the "diplomatic or consular office in which the

certificate was prepared shall then forward a copy of the certificate to the person to whom it

relates or his representative.").

The Independent Offices Appropriations Act ("IOAA") authorizes an agency to "charge

for a service or thing of value provided by the agency."  Compl. ¶ 98 (citing 31 U.S.C. § 9701).

"Each charge shall be—(1) Fair; and (2) based on- (A) the costs to the Government; (B) the

value of the service or thing to the recipient; (C) public policy or interest served; and (D) other

relevant facts."  31 U.S.C. § 9701(b).  To determine the actual cost for providing consular

services, the Bureau of Consular Affairs' Office of the Comptroller uses a Cost of Service Model

("CoSM").  Compl. ¶ 102; Pickard Decl., ECF No. 11-2 ¶ 3.  The CoSM uses "an activity-based

costing . . . methodology to identify, describe, assign costs to, and report on agency operations"

for various consular products and services.  Pickard Decl. ¶ 4 (internal citation omitted).

Activity-based costing "seek[s] to precisely identify and assign costs to processes and activities

and then to individual products and services through the identification of key cost drivers

referred to as resource drivers and activity drivers."  Schedule of Fees for Consular Services,

Department of State and Overseas Embassies and Consulates ("2010 Supplemental NPRM"), 75

Fed. Reg. 14111-01, 14112 (Mar. 24, 2010) (internal quotation marks omitted).  Using this

model, the State Department determines the total costs for a consular service provided, then divides the total cost by the estimated number of users of that service.  *Id*.

## B.  Renunciation Fee Rulemaking 2010 through 2015

In 2010, the State Department issued a notice of proposed rulemaking, recommending a $450 charge for administrative processing of a request for a CLN in renunciation cases under 8 U.S.C. § 1481(a)(5).  Schedule of Fees for Consular Services, Department of State and Overseas Embassies and Consulates ("2010 IFR"), 75 Fed. Reg. 6321-01, 6324 (Feb. 9, 2010). Explaining its proposal to impose a renunciation fee for the first time, the State Department stated that "documenting a U.S. citizen's renunciation of citizenship is extremely costly, requiring American consular officers overseas to spend substantial amounts of time to accept, process, and adjudicate cases."  *Id*.  The State Department further explained that the fee would "help defray a small portion of the total cost to the U.S. Government of documenting the renunciation of citizenship."  *Id*.  It received almost 1,800 comments during the comment period, some of which challenged the $450 Renunciation Fee as too high, primarily because the services were previously provided at no charge.  Schedule of Fees for Consular Services, Department of State and Overseas Embassies and Consulates ("2012 Final Rule"), 77 Fed. Reg. 5177-01 (Feb 2, 2012).  The State Department finalized the $450 fee in 2012.  *Id*.

In 2014, the State Department issued an interim final rule increasing the cost of the Renunciation Fee to $2,350.  Schedule of Fees for Consular Services, Department of State and Overseas Embassies and Consulates—Visa and Citizenship Services Fee Changes ("2014 IFR"), 79 Fed. Reg. 51247-01, 51251 (Aug. 28, 2014).  Defending the fee increase, the State Department noted that an overseas time survey—"which collected extensive data on both consular activities and the time spent by consular staff performing consular services at all overseas locations"—allowed the CoSM to better identify and assign costs.  *Id*. at 51249.  The

survey further revealed that demand for renunciation services had "increased dramatically, consuming far more consular officer time and resources." *Id*. at 51251.  The State Department concluded that, in contrast to its 2010 Interim Rule and 2012 Final Rule, there was "no public benefit or other reason for setting [the renunciation processing] fee below cost."  *Id*.

On August 25, 2015, the State Department finalized the $2,350 Renunciation Fee. Schedule of Fees for Consular Services, Department of State and Overseas Embassies and Consulates, 2015 Final Rule, 80 Fed. Reg. 51464–01, 51464 (Aug. 25, 2015).  It noted that it had received seventy comments, most of which expressed concern with the high cost of the fee. Several commenters complained about the effect of recently passed bank and tax laws, including the Foreign Account Tax Compliance Act ("FATCA"), affecting U.S. citizens living abroad.[2] Admin. R., ECF No. 21-11 at 3, 31, 42, 61, 65.  Some commenters sought to be "grandfathered in to the previous" $450 fee, and others took the position that renunciation should remain free of charge.  2015 Final Rule, 80 Fed. Reg. at 51464–65.  One-third of the comments suggested that the fee increase was a "deterrent" that violated the "constitutional or human right" to expatriate. *Id*. at 51465.  The State Department responded that it had not "restricted or burdened the right of expatriation," that "the fee is not punitive and is unrelated to the IRS tax legislation," and that "the fee is a cost-based user fee for consular services."  *Id.*  It went on to describe the renunciation process in detail, the fact that the demand for renunciation services had increased since 2010, and that the increase in demand was a drain on consular resources.  *Id.*

In 2018, three years after publishing the 2015 Final Rule, the State Department finalized a separate rule applying the $2,350 Renunciation Fee to any request for a CLN, regardless of the

---

[2] *See* Compl.  ¶¶ 8, 131 (describing FATCA as a data collection program enacted in 2010 that requires foreign financial institutions to report to the IRS detailed information about the accounts of U.S. citizens living abroad).

type of citizenship expatriation at issue.  Schedule of Fees for Consular Services, Department of State and Overseas Embassies and Consulates, 83 Fed. Reg. 4423-02 (Jan. 31, 2018).

## C. **Plaintiff's Claims**

Plaintiffs assert that they "generally do not regard themselves as U.S. citizens," in part because they "never chose to be U.S. citizens."  Compl. ¶ 130.  They contend that the "current legal and regulatory regimes promulgated by the U.S. government have created a reality where it simply is not worth it anymore" to hold U.S. citizenship.  *Id*. ¶ 126.

Plaintiffs claim the $450 Renunciation Fee and subsequent $2,350 fee were enacted to "discourage U.S. citizens abroad from exercising their fundamental right to expatriate."  *Id*. ¶ 135.  They also claim that the $450 Renunciation Fee was announced in the same year that Congress passed FATCA because the primary purpose of the fee was not to "recoup administrative costs," but was instead "part and parcel of an overarching scheme the effect of which was to stigmatize overseas Americans as tax cheats, while at the same time preventing them from escaping the U.S. citizenship-based tax regime through renunciation of citizenship."  *Id*.

Plaintiffs complain that many of them have been unable to open foreign bank accounts, have not been considered for workplace promotions, and have otherwise been burdened because of FATCA.  *Id*. ¶¶ 136–44.  They contend that before FATCA was enacted, many of them "were not even conscious of the fact that they held United States citizenship," *id*. ¶ 142, and only began pursuing expatriation after the Act's passage.  Some Plaintiffs seek to "renounce their U.S. citizenship as an expression of their disenchantment of United States policies and political ideology."  *Id*. ¶ 145.  All of them seek to express their frustration with FATCA—which they perceive as an act of discrimination by the U.S. government against Americans residing abroad—by renouncing their citizenship.  *Id*. ¶¶ 148–49.  Still others seek to renounce their

citizenship to express a "different political philosophy than that which underlies the American form of government and American society." *Id*. ¶ 150.  Plaintiffs argue that the State Department's imposition of the $2,350 fee is a "heavy burden . . . forcing these Plaintiffs— Americans by happenstance—to continue to associate themselves with a political body that they feel no connection with and with which they vehemently disagree." *Id*. ¶ 160.

## II.    LEGAL STANDARD

### A.  **Motion to Dismiss**

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) a complaint must contain sufficient factual allegations to "state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), meaning "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "However, the court need not accept inferences . . . [that] are unsupported by the facts set out in the complaint.  Nor must the court accept legal conclusions cast in the form of factual allegations." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).

### B.  **Summary Judgment**

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

In an APA action, the court's role at the summary judgment stage is to decide "as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Stuttering Found. of Am. v. Springer*, 498 F. Supp. 2d 203, 207 (D.D.C.2007). "[T]he district judge sits as an appellate tribunal," and the "[e]ntire case on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (internal quotation marks omitted). Because the court shall "have before it neither more nor less information than did the agency when it made its decision," its review is generally limited to the administrative record, and it need not engage in "lengthy fact finding." *Gilbert v. Wilson*, 292 F. Supp. 3d 426, 433 (D.D.C. 2018) (internal quotation marks and citations omitted).

### III.   ANALYSIS

#### A.  APA Claims

##### a.   Arbitrary or Capricious Claim

Under the APA, a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious . . . or otherwise not in accordance with law[.]"  5 U.S.C. § 706 (2)(A). The court's review is "highly deferential" and begins with a presumption that the agency's actions are valid. *Env't. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981). The court is limited to reviewing the "administrative findings that were made at the same time as the decision," it may not "inquir[e] into the mental processes of administrative decision makers" absent "a strong showing of bad faith or improper behavior," and it is "not empowered to substitute its judgment for that of the agency." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 420 (1971). Instead, the court must consider only "whether the agency acted within the scope of its legal authority, whether the agency has explained its decision, whether the facts on which the agency purports to have relied have some

basis in the record, and whether the agency considered the relevant factors." *Fulbright v. McHugh*, 67 F. Supp. 3d 81, 89 (D.D.C. 2014) (quoting *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 105 (D.D.C. 1995)).  The plaintiff bears the burden of establishing the invalidity of the agency's action.  *Fulbright*, 67 F. Supp. 3d at 89.

Plaintiffs argue that the State Department's 2015 Final Rule, increasing the renunciation fee to $2,350, was arbitrary or capricious because the decision "(1) runs counter to the evidence before the agency; (2) lacks any coherence and plausibility; and (3) fails to consider an important aspect of the problem."  Pls.' Cross-Mot. and Opp'n Mem., ECF No. 14 at 43.  Plaintiffs further argue that the State Department's justification for the Renunciation Fee is unlawful under the APA for six reasons.  Pls.' Cross-Mot. and Opp'n Mem. at 44.  The court considers each of these in turn and concludes that Plaintiffs have failed to meet their burden.

i.   *Time to Process and Adjudicate Applications*

Based on their review of the administrative record and their own calculations, Plaintiffs claim that "the average time spent per [renunciation] application [in fiscal year 2012] was approximately one hour," and that this calculation is "consistent with other publicly accessible information" regarding non-renunciation relinquishment cases under 8 U.S.C. §1481(a)(1)-(4). Pls.' Cross-Mot. and Opp'n Mem. at 44 (citing Admin. R. 331–40).  But as Defendants point out, Plaintiffs' calculations ignored thirteen identified activity drivers, including "[p]erform general [Office of Consular Services] support activities," "[p]erform internal controls and reconciliation of controlled supplies," and "fraud prevention and detection."  Admin. R. 331–40.  And the 2015 Final Rule noted that "addition[al] . . . time [is] spent processing renunciations overseas and domestically, [and] the full cost of processing renunciations includes a portion of overhead costs that support consular operations overseas . . . ."  2015 Final Rule, 80 Fed. Reg. at 51466.

Having considered the full administrative record, the court is not persuaded by Plaintiffs'

argument that the State Department's 2015 Final Rule lacks "a rational connection between the

facts found and the choice [it] made."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.

Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Moreover, the amount of time the State Department

spends processing non-renunciation cases under 8 U.S.C. §1481 (a)(1)-(4) is of lesser weight, as

those cases are processed under different statutory provisions and different State Department

regulations and procedures.

ii.    <u>*Explanation for Cost Estimates*</u>

The crux of Plaintiffs' argument here is that they simply do not believe, and do not

accept, the State Department's cost calculations for providing renunciation services.  *See* Pls.'

Cross-Mot. and Opp'n Mem. at 45–50 (arguing that $2,350 to process a single application "is

totally implausible and lacks any coherence"; the cost data set supplied by the government is

"completely incomprehensible"; "[t]hat it takes the government 23 person-hours to process a

single voluntary renunciation case defies credibility"; and the State Department's identified

"indirect costs . . . have nothing to do with voluntary renunciation").  Plaintiffs maintain that

"[v]oluntary renunciation is a straightforward procedure, requiring the renunciant to complete

two simple forms and take an oath"; thus, they argue, Defendants have not "adequately

explain[ed]" the $2,350 cost, and the 2015 Final Rule should be set aside.  Pls.' Cross-Mot. and

Opp'n Mem. at 47–48 (internal citations omitted).

As the administrative record indicates, the State Department calculated the Renunciation

Fee by surveying relevant categories of costs, 2015 Final Rule, 80 Fed. Reg. at 51465, and the

actual cost was calculated using the CoSM Data Set, Admin. R. 190, ECF No. 21-6 at 1, in line

with guidance from the Office of Management and Budget, OMB Circular No. A-25; Pickard

Decl. ¶¶ 11–12, 18.  Here again, the State Department provided a "rational connection between

the facts found"—i.e., the cost model inputs—"and the choice made," i.e., assessing the costs of

providing renunciation services at $2,350 per applicant. *State Farm*, 463 U.S. at 43.

    *iii.*     <u>*Renunciation Fee is Identical to the Fee for Non-Renunciation Relinquishment*</u>

Under § 1481(a)(1)–(4), a U.S. citizen abroad may relinquish their citizenship by

> (1) becoming a naturalized citizen of a foreign state after the age of eighteen; or

> (2) making a formal declaration of allegiance to a foreign state or a political subdivision thereof after the age of eighteen; or

> (3) serving in the armed forces of a foreign state engaged in hostilities against the United States, or serving as an officer in the armed forces of a foreign state; or

> (4) serving in the government of a foreign state after having become a citizen of that state, after the age of eighteen; or serving in the government of a foreign state in a position requiring an oath, affirmation, or declaration of allegiance, after the age of eighteen.

These so-called non-renunciation relinquishment provisions apply when a U.S. citizen has not

explicitly renounced their U.S. citizenship but has indicated allegiance to a foreign nation.

Plaintiffs contend that the State Department failed to explain the fact that it charges the same fees

for voluntary renunciation, under 8 U.S.C. § 1481(a)(5), and non-renunciation relinquishment,

under 8 U.S.C. § 1481(a)(1)-(4). Pls.' Cross-Mot. and Opp'n Mem. at 50.

Defendants make two arguments in response, Defs' Opp'n and Reply, ECF No. 16 at 8–

9. First, the 2015 Final Rule, finalizing the $2,350 fee for renunciation under Section 1481(a)(5),

was promulgated before the 2018 Final Rule setting the fee for non-renunciation relinquishment.

Because an agency is required only to "offer[] an explanation for its decision" based on the

"evidence before the agency," *State Farm*, 463 U.S. at 43, the State Department, in 2015, could

not explain actions it would take in 2018. Second, the fee assessed for non-renunciation

relinquishment has no bearing on the reasonableness of the fee for renunciation services, as the

Renunciation Fee is based on the assessment of actual costs associated with providing that service.  *See* 31 U.S.C. § 9701; *infra* Section III. A. b.  The court agrees with both of Defendants' arguments.

> iv.    *Consular Services Requiring More Time per Application have Lower Fees than the Renunciation Fee*

Plaintiffs argue that because more time-consuming consular services charge lower fees, the $2,350 Renunciation Fee is based on "something more than recoupment."  Pls.' Cross-Mot. and Opp'n Mem. at 51.  This argument, too, is unpersuasive.

The administrative record indicates that the State Department used the same CoSM methodology to set the Renunciation Fee that it uses to set fees for other consular services.  *See* 2010 Supplemental NPRM, 75 Fed. Reg. at 14112.  Plaintiffs have not proffered any reason why the State Department should have utilized some other methodology in assessing the appropriate fee for renunciation services.  To the extent that Plaintiffs argue that the State Department misapplied its CoSM methodology, that claim has been addressed.  *See supra* Sections III, A. a. i.–ii.  Moreover, the State Department was not required to explain why the Renunciation Fee was higher or lower than the fees for other consular services because those fees are not an "important aspect" of determining the actual cost of renunciation services.  *State Farm*, 463 U.S. at 43; *see supra* Section III. A. a. iii.

> v.    *Constitutional Dimension of Plaintiffs' Expatriation Rights*

Plaintiffs contend that the State Department "cavalierly wr[ote] off any constitutional concerns by making the self-serving statement that 'the [State] Department has not restricted or burdened the right of expatriation.'"  Pls.' Cross-Mot. and Opp'n Mem. at 51–52 (citing 2015 Final Rule, 80 Fed. Reg. at 51464-01).

The APA's requirement that an agency "respond to 'relevant' and 'significant' public comments" is not "particularly demanding." *Pub. Citizen, Inc. v. F.A.A.*, 988 F.2d 186, 197 (D.C. Cir. 1993) (internal citation omitted).  The D.C. Circuit has explained that "the agency is not required to discuss every item of fact or opinion included in the submissions made to it in informal rulemaking.  Instead, the agency's response to public comments need only enable us to see what major issues of policy were ventilated and why the agency reacted to them as it did." *Id.* (internal quotation marks and citations omitted).  Accordingly, an agency must respond to "major substantive comments." *Sierra Club v. E.P.A.*, 863 F.3d 834, 838 (D.C. Cir. 2017) (citing *Pub. Citizen, Inc.*, 988 F.2d at 197).

Of the comments the State Department received, only one mentioned the Constitution: "It is every American's constitutional right to renounce his citizenship," and the $2350 fee "effectively denies" that right.  Admin. R. at 453.  The State Department acknowledged the comment and responded that it "has not restricted or burdened the right of expatriation" as expressed in the Universal Declaration of Human Rights and the Expatriation Act of 1868.  2015 Final Rule, 80 Fed. Reg. at 51465.  Given that the single comment received was not a "major substantive comment[]" and "merely referenced" the Constitution, the State Department's response—considering the commenter's objections—satisfied its APA obligation. *Env't Def. Fund v. EPA*, 922 F.3d 446, 458 (D.C. Cir. 2019) (quoting *Sierra Club v. E.P.A.*, 863 F.3d 834, 838 (D.C. Cir. 2017)).

vi.   <u>The Renunciation Fee is Inconsistent with Past Agency Practice</u>

Finally, Plaintiffs argue that the State Department failed to justify its departure from past agency practice in 2010, when "after 239 years, it decided to begin charging for voluntary renunciation."  Pls.' Cross-Mot. and Opp'n Mem. at 52.  Plaintiffs assert that the agency did so yet again in 2014 and 2015 when it increased the Renunciation Fee from $450 to $2,350 without

explaining why considerations which formerly resulted in setting the fee below cost to the government were no longer relevant.  *See id*.

"Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change."  *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).  An agency provides a reasoned explanation by "at least displaying awareness that it is changing position and showing that there are good reasons for the new policy."  *Gentiva Health Servs., Inc. v. Becerra*, 31 F.4th 766, 780 (D.C. Cir. 2022) (quoting *F.C.C. v. Fox Television Stations, Inc.*, 5556 U.S. 502, 515 (2009)) (internal quotation marks and brackets omitted).  In its 2015 Final Rule, the State Department acknowledged its change in position by stating that the Renunciation Fee was being "raise[d to] reflect the full cost of the service."  80 Fed. Reg. at 51465.  It explained that the fee was increasing because (1) "the number of people requesting the renunciation service ha[d] risen dramatically, . . . materially increasing the resources devoted to providing the service"; and (2) "improvements to the CoSM made the cost of the renunciation service more apparent."  2015 Final Rule, 80 Fed. Reg. at 51465.  That reasoned explanation was sufficient to explain the change in the fee.

> b.  **Not in Accordance with Law and in Excess of Statutory Jurisdiction Claims**

Plaintiffs claim the 2015 Final Rule is "not in accordance with the law" and in "excess of statutory jurisdiction," in violation of 5 U.S.C. §§ 706(2)(A), (C), because the Renunciation Fee violates the IOAA.  Compl. ¶¶ 200, 205–06.  They further argue that the 2015 Final Rule is "clearly not intended to cover the costs of the services rendered," and "the imposition and increase in the fee exceed the Congressional authorization" of the IOAA, "amount[ing] to an improper tax."  *Id*. ¶ 206.  Defendants move for summary judgment on both claims, arguing that the State Department fully complied with the demands of the IOAA.  Defs.' Mem. in Supp. of Mot. at 29–31.  In response, Plaintiffs merely reference—in a footnote—their not in accordance

with law claim, stating that it is "coterminous" with their arbitrary and capricious claim and "need not be further expounded upon," Pls.' Cross-Mot. and Opp'n Mem. at 41 n. 45, and they do not address Defendants' arguments regarding their in excess of statutory jurisdiction claim under § 706(2)(C). Because Plaintiffs have made substantively the same claim under both statutory provisions, the court addresses them together.

Under the IOAA, an agency may "prescribe regulations establishing the charge for a service or thing of value provided by the agency." 31 U.S.C. § 9701(b). The IOAA requires that "each service or thing of value provided by an agency . . . to a person . . . is . . . self-sustaining to the extent possible." 31 U.S.C. § 9701(a). It further mandates that any charges be "(1) fair; and (2) based on—(A) the costs to the Government; (B) the value of the service or thing to the recipient; (C) public policy or interest served; and (D) other relevant facts." 31 U.S.C. § 9701(b)(1)-(2).

When reviewing an agency fee promulgated pursuant to the IOAA, the court need only assess whether there is a "sufficient nexus between the agency service for which the fee is charged and the individuals who are assessed [the fee]." *Seafarers Int'l Union of N. Am. v. U.S. Coast Guard*, 81 F.3d 179, 182 (D.C. Cir. 1996). "An agency may not charge more than the reasonable cost it incurs to provide a service, or the value of the service to the recipient, whichever is less." *Engine Mfrs. Ass'n v. E.P.A.*, 20 F.3d 1177, 1180 (D.C. Cir. 1994) (citing *Nat'l Cable Television Ass'n v. F.C.C.*, 554 F.2d 1094, 1104–07 (D.C. Cir. 1976)). The State Department asserts, and the administrative record does not refute, that it has endeavored to charge no more than its cost for providing renunciation services, 2015 Final Rule, 80 Fed. Reg. at 51465; *see also supra* Section III. A. a. Consequently, the court finds a "sufficient nexus" between renunciation services provided and CLN applicants, *Seafarers Int'l*, 81 F.3d at 182, and

that the 2015 Final Rule is both in accordance with the law and not in excess of the State Department's statutory jurisdiction.

### c.   Unsupported by Substantial Evidence

Plaintiffs claim the 2015 Final Rule is unsupported by substantial evidence, in violation of 5 U.S.C. § 706(2)(E), Compl. ¶ 203, and Defendants move to dismiss under Federal Rule of Civil Procedure 12(b)(6), arguing that the "standard applies only to actions under the APA that challenge an agency adjudication." Defs.' Mem. in Supp. of Mot. at 29. Because Plaintiffs did not respond to Defendants' arguments—with which the court agrees—the court addresses this claim only briefly.

Under 5 U.S.C. § 706(2)(E), a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . unsupported by substantial evidence in a case subject to sections 556 and 557 of [the APA] or otherwise reviewed on the record of an agency hearing provided by statute." 5 U.S.C. § 706(2)(E). Sections 556 and 557 govern agency adjudicatory hearings where the agency considers evidence in the record. 5 U.S.C. §§ 556, 557. "In other words, the substantial evidence standard applies only to agency findings of fact made after a hearing, rather than the rulemaking process that is at issue in this case." *Select Specialty Hosp.-Akron, LLC v. Sebelius*, 820 F. Supp. 2d 13, 27 (D.D.C. 2011). Because the 2015 Final Rule was promulgated pursuant to notice and comment rulemaking, the substantial evidence test is inapplicable, and Plaintiffs' claim fails as a matter of law.

### d.   Contrary to a Constitutional Right

Finally, Plaintiffs argue that the State Department's 2015 Final Rule violated the APA because it is "contrary to . . . [a] constitutional right," 5 U.S.C. §706(2)(B), guaranteed by the Fifth, First, and Eighth Amendments. Compl. ¶¶ 200, 204; Pls.' Cross-Mot. and Opp'n Mem. at 3–29. The court will assess this claim as part of its review of Plaintiffs' constitutional claims.

*See Rydeen v. Quigg*, 748 F.Supp. 900, 905 (D.D.C. 1990), *aff'd mem.*, 937 F.2d 623 (Fed. Cir. 1991) (holding that a court "has the authority to examine and rule on any actions of a federal agency that allegedly violate the Constitution," apart from the power of review granted by the APA).

## B. Constitutional Claims

In contrast to the deference a court must give agency actions under APA review, courts review de novo constitutional challenges to agency actions. *Lead Indus. Ass'n, Inc. v. E.P.A.*, 647 F.2d 1130, 1173–74 (D.C. Cir. 1980) (holding that "a reviewing court owes no deference to the agency's pronouncement on a constitutional question").

### a. Fifth Amendment

The Fifth Amendment Due Process Clause declares that "[n]o person shall be . . . deprived of . . . liberty . . . without due process of law," U.S. Const., amend. V, and "provides heightened protection against government interference with certain fundamental rights and liberty interests," *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997).  To be considered a fundamental right under the Due Process Clause (1) the asserted right must be "deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [it] were sacrificed[,]" and (2) there must be "a careful description of the asserted fundamental liberty interest." *Glucksberg*, 521 U.S. at 721. Government regulations restricting a "fundamental right" are "subjected to strict scrutiny[,]" and regulations restricting rights which are "not fundamental . . . [are] subject only to rational basis scrutiny." *Abigail All. for Better Access to Dev. Drugs v. von Eschenbach*, 495 F.3d 695, 701, 712 (D.C. Cir. 2007).  "[A]ny government impingement on a substantive fundamental right . . . [is] measured under a strict scrutiny standard and would be justified only if the infringement is

narrowly tailored to serve a compelling state interest." *Hutchins v. D.C.*, 188 F.3d 531, 536 (D.C. Cir. 1999).

Plaintiffs argue that "the right to voluntarily renounce American citizenship is a fundamental right" protected by the Due Process Clause. Pls.' Cross-Mot. and Opp'n Mem. at 14. Plaintiffs cite no authority supporting this position, and this Circuit has acknowledged that neither the Supreme Court nor this Circuit has found that renunciation is a fundamental right. *See Kwok Sze v. Johnson*, 172 F. Supp. 3d 112, 121 (D.D.C. 2016), *aff'd sub nom. Kwok Sze v. Kelly*, No. 16-5090, 2017 WL 2332592 (D.C. Cir. Feb. 21, 2017) (citing *Afroyim v. Rusk*, 387 U.S. 253, 268 (1967)) ("[T]he Supreme Court has not recognized that the right to abandon one's citizenship constitutes a constitutional right[,]" and "[t]he D.C. Circuit has not addressed the question" either.). At oral argument, Plaintiffs' counsel acknowledged that this court would be the first to recognize such a constitutional right but noted in their brief that there are cases in which the Supreme Court has referenced a statutory right to expatriate, without reference to the Due Process Clause. First, Plaintiffs direct the court to *Savorgnan v. United States,* 338 U.S. 491, 498 n.11 (1950), in which the Supreme Court stated in a footnote that the language of the Expatriation Act is "broad enough to cover, and does cover, the corresponding natural and inherent right of American citizens to expatriate themselves." Pls.' Cross-Mot. and Opp'n Mem. at 25. Second, Plaintiffs rely on *United States v. Wong Kim Ark*, 169 U.S. 649, 704 (1898), in which the Supreme Court noted that "the right of expatriation . . . must be considered . . . a part of the fundamental law of the United States." Pls.' Cross-Mot. and Opp'n Mem. at 25. But although the Supreme Court has recognized "a constitutional right to remain a citizen," *Afroyim*, 387 U.S. at 268, it has recognized no such right to voluntarily expatriate, and this court will not decide that question as a matter of first impression, *see Collins v. City of Harker Heights, Tex.*,

503 U.S. 115, 125, (1992) ("The Court has always been reluctant to expand the concept of substantive due process . . . The doctrine of judicial self-restraint requires [courts] to exercise the utmost care whenever . . . asked to break new ground in this field.").

Moreover, even assuming *arguendo* that the substantive Due Process Clause does protect the right to voluntary renunciation, the State Department's Renunciation Fee would not violate that right. Even under a strict scrutiny analysis, the court is mindful of decisions in this Circuit holding that certain regulatory or statutory restrictions on the right to expatriate are permissible. In *Lozada Colon v. U.S. Dep't of State*, 2 F. Supp. 2d 43 (D.D.C. 1998), *aff'd*, 170 F.3d 191 (D.C. Cir. 1999), the district court held that "even if one were to concede Plaintiff's argument that an individual has a fundamental right to expatriate, the Secretary of State still would have the discretion to determine whether an individual has adequately renounced affiliation with the United States so as to trigger that right." *Id.* at 45. More recently in *Farrell v. Pompeo*, the district court "reject[ed] the plaintiff's claim that the [State Department's] denial of his application for a [CLN] was contrary to [an assumed] constitutional right to expatriate." 424 F. Supp. 3d 1, 24 (D.D.C. 2019), *rev'd and remanded sub nom. on other grounds*, *Farrell v. Blinken*, 4 F.4th 124 (D.C. Cir. 2021). And in other constitutional contexts, the Supreme Court has ruled that administrative fees—recouping the cost for facilitating the exercise of a right—do not violate a constitutional right. *See Cox v. New Hampshire*, 312 U.S. 569, 571, 577 (1941) (holding that charging a reasonable fee to obtain a "special license" for "a parade or procession upon any public street" is not "contrary to the Constitution."). Given that the Renunciation Fee only recoups the resources expended by the government, the court finds that that the $2,350 fee for processing a CLN is narrowly tailored to achieve the government's compelling interest.

Having found that the right to voluntarily expatriate is not a fundamental right protected by the Fifth Amendment, the court applies the rational basis test, and finds the government's interest in recouping expenses for administering renunciation services is "unquestionably important and legitimate" and that the Renunciation Fee is "reasonably related to their promotion and protection." *Glucksberg*, 521 U.S. at 735.  The Renunciation Fee is analogous to the fee the U.S. Citizenship and Immigration Services ("USCIS") charges non-citizens to process their N-400 application for naturalization. *See* 8 C.F.R. § 106.2(b)(3).  An individual applying to become a naturalized U.S. citizen seeks the pantheon of rights granted to U.S. citizens by the Constitution, and the court is unaware of any case holding that the citizenship application fee fails the rational basis test.  Consequently, Plaintiffs' motion for summary judgment on this claim will be denied, and Defendant's motion for summary judgment will be granted.

### b.  First Amendment

Both parties have moved for summary judgment on Plaintiffs' First Amendment claim, which contends that renouncing one's citizenship is protected speech under the First Amendment and the Renunciation Fee is an unconstitutional content-based restriction on speech.  Compl. ¶¶ 172–88.

The Constitution provides that "Congress shall make no law . . . abridging the freedom of speech . . . ."  U.S. Const., amend. I.  A facially content-based restriction on speech is "presumptively unconstitutional and may be justified only if the government proves that [it is] narrowly tailored to serve [a] compelling state interest."  *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015).  A restriction is content-based when it "applies to particular speech because of the topic discussed or the idea or message expressed."  *Id*.  Moreover, a restriction that is not content-based on its face may nevertheless be subject to strict scrutiny if it "cannot be 'justified without reference to the content of the regulated speech,'" or was "adopted by the government

'because of disagreement with the message the speech conveys[.]'" *Id.* at 164 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)) (internal quotation marks and brackets omitted).  On the other hand, speech restrictions that are content neutral are subject to the test in *United States v, O'Brien*, 391 U.S. 367, 377 (1968), which held that a court must examine whether (1) the government regulation is "within the constitutional power of the Government" to enact; (2) the regulation "furthers an important or substantial governmental interest"; (3) "the government interest is unrelated to the suppression of free expression"; and (4) the restriction is "no greater than is essential to the furtherance" of the government interest.

Plaintiffs argue that the "context of expatriation, the highly expressive nature, historical pedigree, the legal consequence bestowed upon the renunciant, and the uniqueness of voluntary expatriation suggest that the imposition" of a fee "is necessarily content-based."  Pls.' Cross-Mot. and Opp'n Mem. at 38.  However, this argument ignores the fact that the Renunciation Fee is imposed regardless of the reason for seeking expatriation or the content of any message an individual seeking to renunciate may wish to convey.  *See Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 509 (D.C. Cir. 2016) (holding that a Federal Election Commission ("FEC") rule prohibiting use of candidates' names in titles of their websites and social media pages was a "content-based discrimination pure and simple" because the FEC could not determine whether its rule applied without "examin[ing] the content" of the website (internal quotation marks and citations omitted)).

While the act of renouncing one's citizenship may be "speech" within the meaning of the First Amendment, the court does not find that Renunciation Fee is a content-based restriction on free speech that is subject to strict scrutiny.

Nothing in the record indicates that the State Department adopted the $450 or $2,350 renunciation fees "because of the topic" of renouncing citizenship, or to impede upon the "message expressed." *Reed*, 576 U.S. at 163. Nor is it impossible to "justif[y]" the Renunciation Fees "without reference to" the act of renunciation. *Id.* at 164. Rather, the State Department justified the Renunciation Fees in 2010, 2012, 2014, and 2015 as a user payment to cover the administrative cost of processing and adjudicating renunciation-based requests for a CLN. *See* 2010 IFR, 75 Fed. Reg. at 36525; 2012 Final Rule, 77 Fed. Reg. at 5177; 2014 IFR, 79 Fed. Reg. at 51250–51; 2015 Final Rule, 80 Fed. Reg. at 51465. The fee does not prevent a citizen from expressing their desire to renounce their citizenship or their reasons for doing so. Regardless of their reasons for seeking to renounce their U.S. citizenship, all Plaintiffs—who have a variety of reasons, including political, for seeking renunciation—are charged the same fee. The challenged regulation does not "draw[] distinctions based on the message a speaker conveys." *Reed*, 576 U.S. at 163.

Because the court finds that the State Department's Renunciation Fee is a content-neutral restriction on speech, the *O'Brien* test applies. The first factor of that test asks whether the "government regulation is . . . within [its] constitutional power." *O'Brien*, 391 U.S. at 377. Plaintiffs do not assert, and the court is unaware of any authority holding that the State Department lacks authority, delegated by Congress to the Executive Branch, to impose fees for services provided. The second factor, whether the regulation "furthers an important or substantial government interest," 391 U.S. at 377, is similarly uncontested; the United States undoubtedly has a substantial government interest in imposing a fee to cover the administrative costs of a service, *Seafarers Int'l*, 81 F.3d at 183 (explaining that several Supreme Court decisions "broadly permit user fees in connection with the provision of specific services"). As

noted above, the Renunciation Fee also satisfies *O'Brien's* third factor, that the "governmental interest is unrelated to the suppression of free expression." 391 U.S. at 377. And fourth, "the restriction is no greater than is essential," 391 U.S. at 377, because the record supports the State Department's assertion that the $2,350 Renunciation Fee seeks to recoup only the cost of providing renunciation services. *See Cox*, 312 U.S. 569, 570–71, 576–77 (1941) (holding that a charging a "reasonable" licensing fee "to parade or procession upon any public street" was not "contrary to the Constitution" where the fee charged was limited to recouping costs for the "administration of the [speech] act"). Plaintiffs' argument that the Renunciation Fee fails the fourth factor of the *O'Brien* test because the State Department could have chosen to implement alternative cost recouping measures, Pls.' Cross-Mot. and Opp'n Mem. at 39, is unavailing in light of the Supreme Court's holding that a regulation is not "invalid simply because there is some imaginable alternative that might be less burdensome on speech," *United States v. Albertini*, 472 U.S. 675, 689 (1985).

### c. Eighth Amendment

Defendants have moved, under Federal Rule of Civil Procedure 12(b)(6) to dismiss Plaintiffs' Eighth Amendment Claim, or, in the alternative, under Rule 56 for summary judgment.

The Eighth Amendment to the Constitution provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. For Eighth Amendment purposes, a "fine" is "understood to mean a payment to a sovereign as punishment for some offense," *Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 265 (1989), and "thus limits the government's power to extract payments, whether in cash or in kind, as punishment . . . ." *Austin v. United States*, 509 U.S. 602, 609–10 (1993) (internal quotation marks and citation omitted). In *Austin*, the Supreme

Court explained "that civil proceedings may advance punitive as well as remedial goals," and so the operative question is whether the payment "is punishment." *Austin,* 509 U.S. at 610. Because "sanctions frequently serve more than one purpose," a court must "determine that [the sanctions] can only be explained as serving in part to punish." *Id.* Thus, a court's responsibility in assessing an Excessive Fines Clause claim is twofold: "(1) determin[e] whether the government extracted payments for the purpose of punishment; and (2) assess[] whether the extraction was excessive." *United States v. Bikundi*, 926 F.3d 761, 795 (D.C. Cir. 2019).  "The first step determines whether the Excessive Fines Clause applies, and the second determines if the Clause was violated." *Id.*

The administrative record is devoid of any evidence supporting Plaintiffs' contention that the State Department's Renunciation fees "can only be explained as serving in part to punish." *Austin*, 509 U.S. at 610.  The Supreme Court has never held that a fee, let alone an administrative fee such as the one at issue here, constitutes a punishment, falling within the ambit of the Excessive Fines Clause.  Instead, the Court has found that several types of civil penalties, including *in rem* civil forfeitures and criminal forfeiture of assets or currency, constitute fines under the Eighth Amendment.  *See id.* at 619–22 (holding that *in rem* civil forfeitures under 21 U.S.C. §§ 881(a)(4) and (a)(7) are subject to the Eight Amendment's Excessive Fines Clause ); *Alexander v. United States*, 509 U.S. 544, 558–59 (1993) (holding that forfeiture of assets and money, as a penalty for violating the Racketeer Influenced and Corrupt Organizations Act, constituted a fine for purposes of the Eighth Amendment's Excessive Fines Clause); *United States v. Bajakajian*, 524 U.S. 321, 328 (1998) (holding that forfeiture of currency for violating 31 U.S.C. § 5316(a)(1)(A)—a statute requiring persons to report when transporting more than $10,000 outside of the United States—constitutes a fine within the meaning of the Excessive

Fines Clause); *see also* 172 A.L.R. Fed. 389 (originally published in 2001, updated weekly) (collecting Supreme Court cases determining that certain civil penalties constitute a "fine" under the Eighth Amendment).  Here, the administrative record supports Defendants' contention that the State Department imposed a fee to recoup the cost of a service, and not—as Plaintiffs assert—to punish overseas Americans as "tax cheats and evaders deserving of punishment or deterrence."  Pls.' Cross-Mot. and Opp'n Mem. at 41.

Likewise, Plaintiffs' argument that the "timing and juxtaposition of FATCA raise a material issue as to the true motive behind the creation and increase of the Renunciation Fee," Pls.' Cross-Mot. and Opp'n Mem. 41–42, finds no support in the record.  Absent a "strong showing of bad faith or improper behavior," courts are limited to evaluating an agency's contemporaneous explanation for rulemaking and may not further inquire into "the mental processes of administrative decision makers."  *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2573–74 (2019) (omitting internal citations and quotation marks).  While Plaintiffs clearly disagree with the State Department's stated reasons for the Renunciation Fee, the administrative record does not provide any basis for this court to find that the State Department acted in bad faith or engaged in improper behavior.  Consequently, the court finds, on the record before it, that the Renunciation Fees, as finalized in 2012 and 2015, are not fines under the Eighth Amendment and will therefore grant Defendants' motion for summary judgment as to Plaintiffs' Eighth Amendment claim.

## C.  Customary International Law Claim

Defendants have moved to dismiss Plaintiffs' customary international law claim pursuant to Federal Rule of Civil Procedure 12(b)(6), and, in the alternative, for summary judgment. Plaintiffs oppose Defendants' motion to dismiss and have cross-moved for summary judgment.

The Supreme Court long ago held that "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains." *Murray v. Schooner Charming Betsy, The*, 6 U.S. 64, 118 (1804); *see also Sampson v. Fed. Republic of Germany*, 250 F.3d 1145, 1152 (7th Cir. 2001) ("[T]he *Charming Betsy* canon directs courts to construe ambiguous statutes to avoid conflicts with international law"). Customary international law is the "general and consistent practice of states followed by them from a sense of legal obligation." *Usoyan v. Republic of Turkey*, 6 F.4th 31, 40 (D.C. Cir. 2021) (quoting Restatement (Third) of the Foreign Relations Law of the United States § 102(2) (Am. L. Inst. 1987)). To determine the existence of customary international law, a court looks to "obvious sources like treaties and legislative acts," "the general usage and practice of nations and judicial decisions recognizing and enforcing that law." *Usoyan*, 6 F.4th at 41 (internal quotations omitted).

Before the court can engage in the *Charming Betsy* statutory construction analysis, it must first find that Plaintiffs have established the existence of a customary international law with which the renunciation provision must comport. In their Complaint, Plaintiffs allege that "[v]oluntary expatriation is recognized as a right under customary international law," and a $2,350 Renunciation Fee that "preconditions Plaintiffs' right to expatriate on the payment of an exorbitant fee . . . fails to comport with customary international law." Compl. ¶ 209, 217 (citing Note, *The Right of Nonrepatriation of Prisoners of War*, 83 YALE L.J. 358, 373 (1973)). They further argue that only the imposition of a "nominal modest [renunciation] fee" would comport with customary international law. *Id.* ¶ 15. In other words, Plaintiffs seek to have the court recognize a "consistent practice of states," *Republic of Turkey*, 6 F.4th at 40, to permit citizens to voluntarily expatriate at no or very little charge.

Plaintiffs have not identified any international treaties, statutes, or court decisions declaring that the right to voluntarily expatriate must be unencumbered by no more than a nominal fee. To the contrary, Plaintiffs have identified at least nine countries other than the U.S. that charge a renunciation fee. *See* Pls.' Selective List of Renunciation Fees, ECF No. 14-3. Even if it is true that the U.S. has not historically charged a fee for voluntary expatriation and that it now charges the highest such fee of any country, those facts are still not sufficient to establish that the U.S.'s former practice of not charging a fee flows "from a sense of legal obligation." *Republic of Turkey*, 6 F.4th at 40. Indeed, Plaintiffs conceded at oral argument that the demand for CLNs has increased, and the State Department has explained that it had not previously set a renunciation fee because it was difficult to "accurately" assess the cost of renunciation. Compl. ¶ 116 (citing 80 Fed. Reg. 51465 (Aug. 25, 2015)). Thus, there is no basis upon which to find that the Executive Branch believed it was legally obligated to offer renunciation services for free. Having failed to show the existence of customary international law establishing that citizenship renunciation must be nearly free of charge, Plaintiffs cannot sustain their customary international law claim. *See United States v. Corey*, 232 F.3d 1166, 1179 (9th Cir. 2000) ("[T]he *Charming Betsy* rule does not apply because there is no conflict with international law to avoid"). Consequently, the court need not address Plaintiffs' cross motion for summary judgment on this claim, and Defendants' motion for summary judgement will be granted.

## IV.    CONCLUSION

The court will therefore GRANT Defendants' Partial Motion to Dismiss and Partial Motion for Summary Judgment: ECF No. 11.

Date: February 10, 2023

_Tanya S. Chutkan_
TANYA S. CHUTKAN
United States District Judge